## IN THE UNITED STATES DISTRICT COURT OF THE
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| **ESTATE OF KYLAN TAYLOR LEEPER; JAMESHA MURPHY, b/n/f of K.L., a minor;** | ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action |
| vs. | ) ) | Case No. _____ |
| **CORECIVIC, INC.; CORECIVIC OF TENNESSEE, LLC, as owner and Operator of TROUSDALE TURNER CORRECTIONAL CENTER, et al.;** | ) ) ) ) ) | **JURY DEMAND** |
| Defendants. | ) ) | |

---

## ORIGINAL COMPLAINT

NOW COMES the Estate of Kylan Taylor Leeper and Jamesha Murphy, b/n/f of K.L., a minor, the Plaintiffs herein, by and through counsel, and allege as follows:

## STATEMENT OF THE CASE

1. This tragic case involves the death of Kylan Taylor Leeper ("Kylan" or the "Decedent") who, while briefly incarcerated at the Trousdale Turner Correctional Facility located at 140 Macon way, Hartsville, Tennessee, 37074 ("TTCC"), overdosed and died after exposure to fentanyl as a direct result of chronic understaffing and the operation of a for-profit drug ring inside TTCC.

2. Society considers the risk of unfettered access and exposure to opioids inherently grave and in violation of contemporary standards of decency, given the potential for overdose and acute toxity.[1]  Even in prisons like TTCC, this

---

[1] There is also no question that "[t]he inherent danger of drugs is magnified when introduced to a controlled environment like a prison." <u>United States v. Colon</u>, 246 F. Appx 153, 156 (3d Cir. 2007). Given these unique vulnerabilities, the risk of injury from

is a risk that today's society chooses not to tolerate. Fentanyl unquestionably poses a severe danger to anyone who is exposed to it. There comes a point when a correctional facility becomes so awash in deadly narcotics that its inmates may be said to be incarcerated under unconstitutional conditions, posing a substantial risk of serious harm.

3.    Defendant, CoreCivic of Tennessee, LLC, f/k/a Corrections Corporation of America (hereinafter, "CoreCivic") owns, operates, and maintains a system of private prisons throughout the country with several private prisons in the State of Tennessee, including TTCC, which is Tennessee's largest privately run prison. Defendant CoreCivic is a corporation with a well-known history of putting profits ahead of the health and safety of inmates.  In the years preceding Kylan's death, Defendant CoreCivic paid millions in settlements around the United States because it routinely understaffed its correctional facilities, inevitably resulting in violence, assault, murder, overdoses, and suicide. In 2016, CoreCivic and its directors were sued by company shareholders who alleged that the company misrepresented its pattern of understaffing, which ultimately led the Federal Bureau of Prisons to cancel its business relationship with CoreCivic. In April of 2021, the company settled the shareholder case for $56 million. Notwithstanding the shareholder lawsuit and numerous other warnings, CoreCivic continues to provide inadequate staffing, supervision, and safety at its facilities, including TTCC.

4.    Federal and state laws require the Defendants to ensure that inmates receive adequate food, clothing, shelter, and medical care. Despite their incarceration, inmates, like Kylan, retain the essence of human dignity inherent in all persons, and so the Tennessee Constitution and the United States Constitution impose a duty on prison officials to take reasonable measures to guarantee the safety of inmates.  These Defendants breached their duties, resulting in Kylan's death.

---

unfettered access to deadly drugs inside a prison "is not one that today's society chooses to tolerate." See Helling, 509 U.S. 25, 36 (1983).

Consequently, this lawsuit seeks an award of damages for violation of Kylan's constitutionally protected rights at the hands of the Defendants.

## PARTIES

5. Jamesha Murphy is the mother of Kylan's minor child, K.L., and brings this lawsuit on behalf of the minor child individually and as survivor and next-of-kin to Decedent.

6. Defendant CoreCivic, Inc. is a limited liability company organized under the laws of the State of Tennessee, with its principal place of business located at 5501 Virginia Way, Ste 110, Brentwood, Tennessee 37027. CoreCivic, Inc.'s registered agent for process in the State of Tennessee is CT Corporation System, 800 S. Gay Street, Ste 2021, Knoxville, TN 37929-9710. Defendant owns and operates TTCC, housing prisoners sentenced to confinement in the Tennessee Department of Correction. As such, CoreCivic, Inc. performs a public function traditionally reserved to the state government and is therefore subject to suit under 42 U.S.C. § 1983.

7. CoreCivic of Tennessee, LLC is a wholly-owned subsidiary of CoreCivic, Inc., and it operates all of the CoreCivic facilities in Tennessee. CoreCivic, Inc. and CoreCivic of Tennessee, LLC are hereinafter referred to jointly as "CoreCivic" or "Defendant CoreCivic."

8. Defendant Vince Vantell is a resident of Tennessee and was employed by CoreCivic as the Warden of TTCC at all times relevant to this Complaint. As the day-to-day overseer of TTCC, he was responsible for supervising staff members, including those tasked with responding to imminent threats posed by unfettered access to lethal drugs. Kylan's death is attributable to Mr. Vantell's deliberate indifference to TTCC's chronically unconstitutional acts and omissions, as detailed below. Defendant Vantell remains employed by CoreCivic and is being sued in both his individual and supervisory capacities.

9. Defendant Jermaris Montiz Porter is a resident of Tennessee. At all times relevant to this Complaint, Defendant Porter was employed by CoreCivic as a correctional officer in a supervisorial role. Defendant Porter is currently

3

employed by CoreCivic as an Assistant Warden at TTCC. Defendant Porter remains employed by CoreCivic and is being sued in both his individual and supervisory capacities.

10. Plaintiffs hereby name Defendants John Does 1-50, along with any currently unknown correctional officers and/or CoreCivic staff in a supervisory or managerial role who worked at TTCC on or before October 6, 2023, as defendants in this lawsuit. These unnamed individuals are believed to have been involved in actions that contributed to Kylan's injuries and death, as well as the harm suffered by the Plaintiffs. Despite diligent efforts to ascertain their identities, these correctional officers and/or CoreCivic staff remain unknown at this time. Plaintiffs reserve the right to amend their Complaint to include the specific names of these defendants as they become known through the course of discovery.

11. Plaintiffs hereby name Defendants John Does 51-100, along with any currently unknown correctional officers and/or CoreCivic staff in a subordinate role who worked at TTCC on or before October 6, 2023, as defendants in this lawsuit. These unnamed individuals are believed to have been involved in actions that contributed to Kylan's injuries and death, as well as the harm suffered by the Plaintiffs. Despite diligent efforts to ascertain their identities, these correctional officers and/or CoreCivic staff remain unknown at this time. Plaintiffs reserve the right to amend their Complaint to include the specific names of these defendants as they become known through the course of discovery.

12. Defendant Vantell, Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 may be referred to as the "TTCC Defendants."

13. Defendant Trousdale County[2] is a county government in Tennessee. At all times relevant to this Complaint, Trousdale County subcontracted with Defendant CoreCivic to operate TTCC pursuant to the County Correctional Incentives Act of 1981. Trousdale County may be served with process through its counsel and upon its mayor, Jack McCall.

---

[2] Trousdale County is also referred to as "Hartsville/Trousdale County" or the "Hartsville/Trousdale County Government."

4

14. Defendant Stephen Chambers was the Mayor of Trousdale County and served in that elected position from 2018 to 2022. At all times relevant to this Complaint, Defendant Chambers is being sued in his individual capacity and official capacity acting under the color of state law.

15. Defendant Jack McCall is the Mayor of Trousdale County and has served in that elected position since August 2022. At all times relevant to this Complaint, Defendant McCall is being sued in his individual capacity and official capacity acting under the color of state law.

16. Defendant Jerry Ford is County Commissioner for Trousdale County, and in January 2022 was the Chairman of the Trousdale County Prison Oversight Committee.[3] At all times relevant to this Complaint, Defendant Ford is being sued in his individual capacity and official capacity acting under the color of state law.

17. Defendant Gary Walsh is County Commissioner for Trousdale County, and in January 2022 was the Vice Chairman of the Trousdale County Prison Oversight Committee. At all times relevant to this Complaint, Defendant Walsh is being sued in his individual capacity and official capacity acting under the color of state law.

18. Defendant Dwight Jewell is Building Official/Codes Enforcement Officer for Trousdale County, and in January 2022 was the Secretary of the Trousdale County Prison Oversight Committee. At all times relevant to this Complaint, Defendant Jewell is being sued in his individual capacity and official capacity acting under the color of state law.

19. Plaintiffs hereby name Defendants John Does 101-120, who are unkown Trousdale County officials a) who formed, oversaw, and ultimately disbanded the Prison Oversight Committee, and/or b) who have not taken any formal steps or actions to oversee, supervise, or ensure compliance with Defendant CoreCivic and TTCC to date. These John Doe Trousdale County officials are defendants whose identities remain unknown and could not be reasonably

---

[3] The Prison Relations Committee was previously referred to as The Prison Oversight Committee until 2020 when it was renamed.

ascertained despite diligent efforts due to the lack of transparency within the Trousdale County government. These unnamed officials are believed to have been involved in actions that contributed to Kylan's injuries and death, as well as the harm suffered by the Plaintiffs. Plaintiffs seek to hold these officials accountable while reserving the right to amend their Complaint to include the specific names of these individuals as they become known through the course of discovery.

20. Defendant Trousdale County, Defendant Chambers, Defendant McCall, Defendant Ford, Defendant Walsh, Defendant Jewell, and Defendants John Does 101-120 may be referred to as the "Municipal Defendants."

21. Collectively, Defendant CoreCivic, the TTCC Defendants and the Municipal Defendants may be referred to as the "Defendants."

## JURISDICTION AND VENUE

22. This Complaint is brought pursuant to 42 U.S.C. § 1983 seeking to redress deprivation of Decedent's rights by the Defendants under color of law, whose rights are secured by the Eighth and Fourteenth Amendments to the United States Constitution.

23. This Complaint concerns the violation of civil rights, and this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 1343.

24. This Court has supplemental jurisdiction over Plaintiffs' state law claims against the Defendants pursuant to 28 U.S.C. § 1367(a).

25. All of the claims alleged herein arose in the Middle District of Tennessee. Therefore, venue in this Court is appropriate pursuant to 28 U.S.C. § 1391.

## FACTS SUPPORTING RELIEF

**Understanding the Dangers of Fentanyl in the Prison Environment**

26. Fentanyl is an extremely potent synthetic opioid, estimated to be 50 to 200 times stronger than morphine, and its dangers extend beyond intentional misuse to mere exposure. Even minimal contact with fentanyl can lead to serious health consequences, including respiratory distress and death. This

6

risk is particularly acute in environments where fentanyl is handled, as inhalation or skin contact can result in rapid onset of symptoms. The lethality of fentanyl is compounded by its potential presence in counterfeit drugs, exposing unsuspecting individuals to life-threatening conditions without their knowledge. Given these grave risks, the perilous nature of fentanyl necessitates stringent precautions and accountability for those who manage the health and safety of incarcerated persons and fail to properly manage potential exposure to this hazardous substance.

27. Fentanyl poses an extraordinary threat within the confined environment of a prison, where individuals have limited ability to escape hazardous situations. In such a setting, even a small amount of fentanyl can be lethal, as inmates and staff alike may inadvertently come into contact with or inhale the substance. The risk is exacerbated by the close quarters, shared facilities, and potential for contaminated surfaces, making exposure more likely. Additionally, the lack of immediate access to medical care in emergencies can transform what might be a manageable situation into a fatal one. With no means to remove oneself from the danger, the presence of fentanyl in prisons creates an alarming scenario where mere exposure can lead to irreversible consequences, underscoring the urgent need for rigorous control and monitoring of this deadly substance.

28. Fentanyl exposure can lead to rapid onset of severe symptoms due to its potency as an opioid. Symptoms can develop within minutes to hours, depending on the method of exposure (whether inhaled, ingested, or absorbed through the skin) and volume. Initial signs may include confusion, drowsiness, and shallow breathing, quickly escalating to more severe manifestations such as respiratory depression, loss of consciousness, and, in critical cases, death. Vigilance is crucial, as individuals exposed to fentanyl may not exhibit immediate symptoms, making it essential for staff and peers to monitor for changes in behavior or physical condition. Without timely intervention, such as administration of naloxone (Narcan), a person can succumb to fentanyl toxicity

7

within minutes to hours, highlighting the urgent need for awareness and rapid response in environments where fentanyl is present.

29.    Narcan, a brand of naloxone, is highly effective at reversing opioid overdoses, including those caused by fentanyl. It works by quickly binding to opioid receptors in the brain, blocking the effects of the opioid and restoring normal breathing within minutes.  However, due to the potency of fentanyl, multiple doses of Narcan are often necessary to fully counteract an overdose. A common misconception is that Narcan can harm individuals who are not experiencing an opioid overdose, but this is not true; Narcan has no effect on someone without opioids in their system. Additionally, some believe that Narcan encourages drug use, but its primary purpose is to save lives in emergency situations.

30.    To effectively prevent and respond to fentanyl overdoses in a prison setting, best practices require a multi-faceted approach focused on vigilance and preparedness. Staff should receive comprehensive, frequent, and ongoing training on recognizing the signs of opioid overdose, including respiratory distress, altered mental status, and pinpoint pupils. Implementing regular surveillance and monitoring of inmates, particularly those with known substance use histories, is essential for early detection. Facilities must ensure immediate access to naloxone (Narcan) and establish clear protocols for its administration in case of suspected overdoses. Additionally, conducting routine inspections of the facility for contraband and potential sources of fentanyl is critical. Promoting a culture of safety and encouraging open communication among staff about concerns related to drug use can further enhance vigilance and preparedness, ultimately safeguarding inmate health and safety.

**The Relationship Between CoreCivic and Trousdale County**

31.    Defendant CoreCivic owns, operates, and maintains a system of private prisons throughout the United States, with several private prisons in the State of Tennessee, including TTCC.  CoreCivic has statutory authority to operate private prisons in the State of Tennessee under the Private Prison Contracting

8

Act of 1986, Tenn. Code Ann. §§ 41-24-101 through 41-24-119. At all times relevant to this Complaint, CoreCivic acted under the color of state law.

32. TTCC opened in 2016. It holds a maximum of 2,672 male inmates. There are seven (7) housing units within the facility (A, B, C, D, E, F, and W), each housing different number of inmates. For example, Housing unit W contains four pods, each holding a maximum of 128 inmates, for a total of 512 inmates. The inmates in this housing unit live in an open bay setting, which means that inmates are not in cells but sleep side by side in bunks. The segregation unit, Housing Unit A, contains five pods with a maximum capacity of 360. Inmates in Housing Unit A are kept in lockdown 24 hours a day.

33. The Prison Relations Oversight Committee (the "Oversight Committee") was created in 2016 by Defendant Trousdale County with the arrival of TTCC. The Oversight Committee was created to provide insight and review of reports, incidents, and operations related to TTCC. The Oversight Committee was to meet quarterly with the Warden of TTCC. In short, the Oversight Committee was created to oversee CoreCivic's operation of TTCC. Information regarding the agendas, minutes, and, when available, videos of the meetings are located here:

https://www.trousdalecountytn.gov/government/county_commission/commission_subcommittees/prisoncomm.php.

34. A history and review of the Oversight Committee presents a troubling picture that follows the known issues at TTCC between 2016 and 2022. First, despite the requirement to meet quarterly, the Oversight Committee appears to have only met twice in the first three (3) years of TTCC's operation. In total, the Oversight Committee met only thirteen (13) times in a little over eight (8) years (approximately 63 months). Second, Oversight Committee meetings frequently included a different warden of TTCC due to warden attrition, demonstrating the lack of leadership at TTCC throughout the years. Third, understaffing issues are discussed in nearly every meeting; however, no strategies, steps, or other means of resolving this issue are discussed to accomplish any goal of being fully staffed at TTCC. Fourth, each of these meetings appears to be less than

an hour in total time, rules of order are not closely followed, critical personnel (like the warden) are frequently absent, and minutes describing the meetings are cursory at best. Fifth, the Oversight Committee produced few documents outlining their charter, fiduciary responsibilities, and other decision-making responsibilities. Their record-keeping is so sparse, it is unclear whether individuals were appointed or elected, what roles each Oversight Committee member played, how they were set to operate, and other critical details important to understanding the responsibilities of a group ostensibly formed to oversee TTCC.

35. On February 3, 2021, inmate Ricky Flamingo Brown Jr. overdosed on fentanyl and died at TTCC.[4] This death was never discussed with or reported to the Oversight Committee.

36. On May 24, 2021, the Harstville/Trousdale County Commission approved a five (5) year agreement with CoreCivic, the State of Tennessee, and Trousdale County to operate TTCC, for which CoreCivic agreed to pay a $300,000 administrative fee to Trousdale County. In the agreement, Defendant CoreCivic contractually agreed to indemnify Defendant Trousdale County from damages assessments and legal liability. This has created a conflict of interest for Defendant Trousdale County, as further explained below.

37. As the Mayors of Trousdale County, Defendant Chambers and Defendant McCall bore responsibility for the day-to-day operations of the Trousdale County government, including its contractual relationship with CoreCivic for the ongoing operation of TTCC. Similarly, the Municipal Defendants bore responsibility for ensuring compliance with the terms of the agreement from 2022 to present. Upon information and belief, compliance with this agreement includes ensuring CoreCivic and TTCC's own compliance with all state and

---

[4] <u>Brown v. Corecivic</u>, 3:22-cv-00547 (M.D. Tenn. May 25, 2023)

federal laws and regulations, resolution of staffing issues, and ensuring the health, wellbeing, and safety of inmates.[5]

38.     The Oversight Committee consistently failed to fulfill its governmental and fiduciary duties.  A review of materials quickly reveals that the Oversight Committee would only "check-in" with random TTCC officials by posing "softball questions" without any meaningful follow-up or action.  Many of the meetings focused solely on "meet-and-greets" with the new wardens.  Unusually, the most pressing questions asked by the Oversight Committee revolved around funds, money, and reimbursement for Defendant Trousdale County. This superficial approach resulted in an absolute lack of accountability between Defendant Trousdale County and Defendant CoreCivic regarding critical issues at TTCC including chronic overstaffing, high turnover rates among wardens, and significant attrition among correctional officers, which severely compromised the safety and effectiveness of TTCC.

39.     Alarmingly, from 2016 to 2022 the Oversight Committee not once addressed the pressing issue of drug activities and overdoses at TTCC, despite mounting concerns within the prison, the surrounding community, and nationwide regarding the rise in fentanyl-related incidents. By neglecting to investigate these critical matters, the Oversight Committee ignored the urgent needs of TTCC but also endangered the lives of both inmates and staff, highlighting a glaring failure in their duty to ensure a safe and secure prison environment.

40.     Without reason or explanation, in early 2022 the Oversight Committee disbanded.  The last recorded meeting with an agenda and minutes was held January 20, 2022. Meeting minutes confirm that Defendant Chambers, Defendant Ford, Defendant Walsh, and Defendant Jewell were in attendance. Then TTCC Warden Frink was not in attendance.   Defendant Ford was confirmed as Chairman for the Oversight Committee, Defendant Walsh was confirmed as Vice Chairman for the Oversight Committee, and Defendant

---

[5] Despite repeated Freedom of Information Requests made to Defendant Trousdale County, the current agreement between Defendant Trousdale County and Defendant CoreCivic has not been made available to the Plaintiffs.

Jewell was confirmed as Secretary for the Oversight Committee. Due to Warden Frink's absence, the meeting was only twenty (20) minutes.

41. Upon information and belief, the last actual meeting over the Oversight Committee was March 11, 2022.[6] The current warden of TTCC at that time was not present, and the assistant warden was sent. Consequently, the majority of this meeting was another 'meet-and-greet' with yet another new face from Defendant CoreCivic. Understaffing issues were admitted by Defendant CoreCivic, and no follow up or other steps to remedy the understaffing issues were discussed or considered by CoreCivic and these Municipal Defendants. The meeting lasted approximately fifteen (15) minutes.

42. Since March 2022, there have been no formal committees or oversight groups within the Trousdale County government dedicated to supervising Defendant CoreCivic, their employees, and the TTCC facility. The Municipal Defendants have continued to run the government of Trousdale County without taking any meaningful actions to investigate, supervise, and oversee Defendant CoreCivic and TTCC. The County continues to receive its administrative fee from Defendant CoreCivic without interference or influence from the Municipal Defendants. Due to the contractual terms of the agreement with CoreCivic, these Defendants abandoned their duties to the inmates of TTCC knowing that CoreCivic will always pay for defense and indemnification of Defendant Trousdale County no matter what happens inside of TTCC.

43. On July 20, 2022, inmate Joshua Mince-Dies overdosed on fentanyl and died at TTCC.[7] This death was never discussed or disclosed to the Oversight Committee, which had disbanded only three (3) months prior.

---

[6] Plaintiffs were only able to locate a video of this meeting on YouTube, with poor audio, no agenda, and no minutes included.
[7] https://nashvillebanner.com/2024/09/18/inmate-died-trousdale-turner-prison-corecivic-tennessee/#:~:text=One%20woman%20in%20Middle%20Tennessee,of%20drugs%20that%20killed%20him.

**How CoreCivic and the TTCC Defendants Operate the Prison**

44. Recent audits have confirmed that TTCC has never, in its entire history, been fully compliant with minimum contractual staffing requirements. When minimum contractual staffing requirements are not met, CoreCivic facilities—including TTCC —experience heightened rates of drug-related overdoses, of which only a fraction are ever officially documented. Additionally, TTCC inmates have suffered from opioid overdoses since the facility opened in 2016.  During the pandemic in 2020, opioid overdoses actually increased at TTCC despite the prohibition of visitors into the facility.  Despite more prisons and prisoners, the facilities run by the Tennessee Department of Corrections ("TDOC") have consistently experienced far fewer overdose fatalities than facilities operated by CoreCivic.

45. At all times relevant to this Complaint, Defendant CoreCivic Correctional Officers ("COs") at TTCC were paid between fourteen and twenty-five dollars an hour ($14-$25/hr) to provide the security, care, and direct supervision of inmates.  These officers were responsible for maintaining the order and security of inmates, including the implementation of weapons or force to maintain discipline.  TTCC was notoriously understaffed, resulting in long hours and low pay for COs.

46. COs are not properly trained or supervised with respect to combatting or dealing with drugs at TTCC.  During COs initial six (6) week training at TTCC, very little training is dedicated to the drug detection.  In one training session in 2019, Defendant CoreCivic's Training Manager, Harris, announced to the trainees matter-of-factly that drugs are just everywhere TTCC and not much can be done about it.  No solutions are presented to trainee COs with respect to drugs in TTCC.  Upon information and belief, Training Manager Harris still works at TTCC and trains incoming COs.

47. COs are not properly trained or supervised with respect to dealing with overdoses.  During COs initial six (6) week training, virtually no instruction is dedicated to assisting inmates in the event of overdose.  During initial training, only ten (10) minutes of training, education, and instruction is provided

13

regarding the use of Narcan. As a result, upon information and belief it is commonly misunderstood how much Narcan could be required to revive an inmate who has overdosed, and it is a common misconception amongst COs that giving multiple doses of Narcan can result in an 'overdose' on the lifesaving drug.

48. Tennessee law requires prisons to deliver necessary medical care, including treatment for substance abuse disorders. At TTCC, Housing Unit F was intended to comply with this requirement. Housing Unit F was divided into four (4) pods of 75-125 inmates: Foxtrot Alpha; Foxtrot Bravo; Foxtrot Charlie; and Foxtrot Delta. During the day, inmates in Housing Unit F freely move between each individual pod with approval and access from the lone CO who is centrally supervising the Housing Unit F.

49. In addition to COs, Treatment Counselors ("TC") are employed by Defendant CoreCivic to work in Housing Unit F to provide substance abuse education. TCs are hired to facilitate TTCC's Substance Abuse program, including intake, data gathering, assessment, inmate screening, group treatment, interventions, therapy, documenting, and tracking treatment. TCs have more education and training than COs, and they receive higher wages from Defendant CoreCivic. Importantly, TCs are an extra set of trained eyes and ears in each pod to assist when, as explained further, COs are unable to enter a pod during an overdose requiring medical attention.

50. Despite their additional training, access to inmates, and the opportunity to assist the very short staffed facility, at all times relevant to this Complaint COs maintained supervisor-like authority over TCs when at work. For example, when TCs wanted to make recommendations to prevent drugs from entering Housing Unit F or implementing the use of more Narcan availability, COs at TTCC can and did veto their suggestions. While TCs worked to educate and save inmate lives, they were often undermined by the actions of other TTCC Defendants.

51. To avoid the potential for lethal drugs entering Housing Unit F, inmates from the other housing units (i.e. A, B, C, D, E, and W) were not permitted to enter

14

Housing Unit F. Upon information and belief, this was a policy implemented by Defendant CoreCivic to avoid the potential for unfettered access to dangerous drugs by the inmates who were most likely to utilize them due to drug abuse/misuse disorders. Despite this policy, Defendant Porter and other COs violated this policy at all times relevant to this Complaint, in an open and obvious way, permitting inmates from other housing units to enter Housing Unit F regularly. Defendant Porter would also take other actions to interfere with drug abuse education and to generally antagonize inmates in Housing Unit F, including locking down the entire Housing Unit and denying recreation and free time. These actions prevented TCs from the opportunity to work with inmates, assess potential threats of drug overdose, and otherwise assist COs in rooting out dangerous drugs. These actions by Porter were also understood to be a means of demonstrating Porter's authority in TTCC, generally, and intended to be retaliatory in nature to encourage inmates not to interfere with drug distribution, use, and abuse by inmates in Housing Unit F. Finally, Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 would additionally charge inmates known to have drug addiction/use/misuse disorders for access to Housing Unit F to receive treatment. These Defendants would advise inmates to have the inmate's third-party contact send an electronic money transfer (e.g. Cash App, Venmo, Zelle) to the COs' third-party contact for payment for access to medical treatment.

52. At all relevant times to this Complaint, the Defendant CoreCivic and the TTCC Defendants tolerated and, at times, contributed to woefully inadequate medical response to inmate drug overdoses at TTCC including, but not limited to, the following:

   a. Due to severe understaffing, one CO would be responsible for supervising up to four hundred (400) inmates at any given time.

   b. COs were not actively monitoring inmates for drug use, drug smuggling, and other drug activities in pods because of COs inability to walk through the pods as required by law and Defendant CoreCivic's policies.

c. COs were not required or encouraged to carry Narcan on their person each day. COs were additionally discouraged by Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 from carrying Narcan on their person or otherwise exhibiting best practices with respect to Narcan usage.

d. In such an open-air drug market, COs could not, and did not, monitor inmates under the influence of drugs for signs of overdose, including constricted pupils, losing consciousness, shallow or stopped breathing, limp body, choking and gurgling sounds, cold and clammy skin, and/or discolored skin.

e. The TTCC Defendants utilized other inmates as first responders. When an inmate would begin showing signs of overdose, these Defendants relied solely upon inmates to press buzzer buttons for assistance in each housing pod. Inmates were required to then communicate that another inmate was in distress. Once notified, the CO supervising the unit would have to wait until a supervisor CO was available before entering the pod. CoreCivic and the TTCC Defendants had a policy that a CO could not enter a pod by themselves which, due to staffing shortages, meant that COs would never timely assist inmates succumbing to overdoses. In lieu of help from these Defendants, inmates would attempt to assist the inmate in distress by such means as pouring water and ice on them, picking the inmate up, and other attempts to "wake up" the inmate. Inmates had no access to Narcan inside the pod or the prison. Inmates could not be relied upon to always determine when medical intervention was required for an inmate who had overdosed.

f. Once the CO and supervisor CO entered the pod, which would never be sooner than five (5) minutes and could be as long as ten to fifteen (10-15) minutes, then the CO and CO supervisor would determine whether further medical attention was warranted. If a call was made for medical support, then a nurse would take, at minimum, another five (5) minutes or more to arrive and administer the first dose of Narcan. As a result, the soonest an inmate could hope to get appropriate medical care in the event of an

16

overdose would be, at the earliest, ten (10) minutes after an inmate alerted a CO of the overdose.

g. COs were dissuaded by the Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 from administering Narcan and/or performing CPR on inmates who were in distress from an overdose. As a result, the company culture at TTCC surrounding overdoses was, at best, apathetic and, at worst, antagonistic.

h. Overdoses at TTCC are not recorded or reported by Defendant CoreCivic or the TTCC Defendants. Despite telling shareholders that they are taking a proactive approach to mitigate opioid use disorder,[8] Defendant CoreCivic and the TTCC Defendants have produced no publicly available data regarding incidents of opioid overdose at TTCC, including any learnings or best practices for curbing overdoses at the facility. Any internal metrics regarding overdoses at TTCC should be deemed inaccurate and unreliable due to the known activities of the TTCC Defendants as further explained below.

53. At all times relevant to this Complaint, TTCC was chronically understaffed. Due to the lack of personnel, COs are unable to conduct comprehensive checks for security. Defendant CoreCivic and the TTCC Defendants defaulted to one (1) CO to be routinely responsible for up to 400 inmates in a Housing Unit, resulting in inmate cell doors that are frequently compromised. As a result, inmates were free to move throughout their pods and the TTCC facility.

54. At all times relevant to this Complaint, the TTCC Defendants would only perform roster counts of inmates once or twice a week. This formal type of count would ensure a CO would confirm not only the correct number of inmates in the pod but also the identity, health, and wellbeing of each inmate in the pod. Due to understaffing, the TTCC Defendants were unable to conduct roster counts daily or at times of heightened threats in TTCC. More frequently, COs would only perform informal headcounts to make sure they had the correct

---

[8] https://www.corecivic.com/hubfs/_files/2023%20ESG%20Report.pdf

number of inmates in their pod; without regard to ensuring those inmates counted were actually the correct inmate for that cell, pod, and housing unit. In other words, the TTCC Defendants were focused solely on making sure they had the correct number of inmates in *total*, without regard to inmate location, proximity to other inmates, health, and wellbeing. This policy and practice was and is woefully inadequate because inmates may or may not be in their cell at the time of the count or when a door is locked. Moreover, not all of the lights confirming locked cells worked in the central security station. Further, inmates could switch cells and swap cells. Finally, this method did not involve actually monitoring and assessing inmates to determine if an inmate was in crises due to symptoms of overdose.

55.     Upon entry into TTCC, inmates are required to undergo a drug-screening to determine the potential for drug misuse/abuse. Despite the presence of qualified screeners, TCs are not utilized in this process. Instead, Defendant CoreCivic and the TTCC Defendants utilized lay staff or COs who are not appropriately trained to screen for the potential for drug misuse/abuse, compromising this critically important task. Consequently, even when inmates are determined to have either a medical diagnosis of drug abuse or demonstrate high risk factors for drug misuse/abuse, the TTCC Defendants would not take any proactive steps to monitor, assess, segregate, or otherwise mitigate the potential for access to drugs in the facility.

56.     COs were responsible for searching all personnel entering TTCC for narcotics upon their arrival to the facility. In theory, COs were expected to conduct regular and thorough searches of inmates, visitors, and staff for drugs, including body scans, pat-downs, and searches of personal items. In practice, COs at TTCC took shortcuts and were negligent, reckless, or, at worst, intentional in allowing drugs into TTCC.

**Defendant CoreCivic and the TTCC Defendants' Actual and Constructive Knowledge of Drug Smuggling and Distribution at TTCC**

57.     To make matters worse, understaffed and overworked, Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 seized on an

opportunity at TTCC to run an elaborate scheme to smuggle, distribute, and profit from inmate consumption of opioids and other drugs. Specifically, these Defendants took the following steps:

a. COs would solicit and entertain requests by inmates to obtain drugs for personal consumption at TTCC;

b. COs would instruct inmates to contact the inmate's third-party family and friends outside of the prison to pay for the drugs;

c. COs would advise inmates to have the inmate's third-party contact send an electronic money transfer (e.g. Cash App, Venmo, Western Union, Apple Cash, Green Dot Cards, etc.) to the COs' third-party contact for payment for the requested drugs;

d. COs would coordinate with people inside and outside of TTCC to permit drugs to enter the facility in a number of ways, including, but not limited to:

    i. Flying drones over the south security wall from the Cumberland River over Wilson Way Road inside the western part of TTCC near Housing Unit B where the COs or inmates would retrieve and recover the drugs;

    ii. Sending objects over security walls (e.g. football, baseketball, etc.) where the COs or inmates would retrieve and distribute the drugs;

    iii. Permitting COs or other guests or personal to bring drugs into the facility on their person, and coordinating with the TTCC security personnel to ignore or allow the CO with drugs to enter the facility;

    iv. Permitting drugs to enter the facility via mail services;

    v. Coordinating with kitchen staff employees to bring drugs in via kitchen staff workers.

e. Once drugs were in the facility and the COs' third-party contact had been paid, COs would coordinate distribution of the drugs to inmates;

f. COs would permit the distribution, exchange, and use of drugs within TTCC by allowing inmates and other COs to operate outside the view of cameras internal to the facility.

58.	Defendant Porter has worked on and off again for Defendant CoreCivic as a CO and in other supervisory and managerial roles. Plaintiffs have learned through news reports and direct knowledge from inmates, staff and COs who have worked with Porter that in 2023, the leader of this for-profit drug enterprise was Defendant Porter. Defendant Porter's influence and authority at TTCC is pervasive. Inmates, CoreCivic staff, and other COs report that Defendant Porter treats other employees, staff, and personnel at TTCC as though they are inmates themselves. Defendant Porter shows favor to certain COs, inmates and other operatives who further his illegal activities at TTCC.

59.	Upon information and belief, Porter was previously fired by CoreCivic for bringing contraband into TTCC. Upon information and belief, Defendant CoreCivic has never cooperated with legal authorities and arresting agencies to report Defendant Porter's criminal activities in the course and scope of his employment with CoreCivic.

60.	In 2023, Defendant Vantell became Warden of TTCC. Defendant Vantell was formerly the Assistant Warden at TTCC since 2019. Prior to that, Defendant Vantell was the Warden at Hardeman County Correctional Facility. Defendant Vantell is the sixth (6th) warden of TTCC in the eight (8) years the facility has been open.

61.	Upon his promotion to Warden, Defendant Vantell reinstated Defendant Porter at TTCC. Under Defendant Vantell, Defendant Porter has been routinely promoted. At all times relevant to this Complaint, Vantell made no efforts to investigate, report, train, or terminate Defendant Porter as a result of his known ties to drug smuggling, distribution, and profit in TTCC. In fact, Defendant Porter is now an Assistant Warden at TTCC—demonstrating Vantell's implicit trust, acquiescence, and willingness to look past Porter's unlawful conduct.

62.	Don Stewart, Senior Director of Security at CoreCivic, has a large personnel file on Defendant Porter. Mr. Stewart has admitted that CoreCivic was and is aware of Defendant Porter's activities at TTCC, and Mr. Stewart has said that Defendant Porter needs to be "locked up." As the Senior Director of Security

at CoreCivic, Mr. Stewart's knowledge of Defendant Porter's unlawful and/or criminal activities is imputed to Defendant CoreCivic.

63. Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 are alleged to have criminal ties with the organized crime organization known as the "Vice Lords." These COs would sometimes wear belt buckles with the initials "VL" to signify their gang relationship. These COs assisted in running the scheme to smuggle, distribute, and profit from inmate consumption of opioids and other drugs at TTCC. Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 are known to drive new vehicles, wear expensive clothing and jewelry, and otherwise flash their wealth and earnings at TTCC. Upon information and belief, the majority of drugs the enter TTCC must be coordinated, approved, and signed off by Defendant Porter, for which he and these other Defendants receive compensation. When Defendant Porter encounters other inmates who are smuggling, distributing, and profiting from the sale of drugs, Defendant Porter retaliates by bringing charges against the inmates resulting in solitary confinement.

64. Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 conspired to smuggle, distribute, and profit from inmate consumption of opioids and other drugs, associating together for the common purpose of carrying out an ongoing criminal enterprise. At TTCC, drugs were coming in through employees and staff, often through the kitchen area. Another means for entry is a gate that leads down towards the Cumberland River next to the TTCC facility with storage areas and boat docks, where COs can obtain and unload drugs from third-parties delivering via use of their restricted keys to the gate and area. Third-parties also lob objects (footballs and soccer balls and other packages) over the walls of the facility that contain illegal drugs.

65. Defendant Porter and Defendants John Does 51-100 had the authority to place certain employees at key security check points, providing the opportunity for employees to smuggle drugs into the facility. Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 coordinated to allow COs and other CoreCivic staff entry into TTCC with contraband. These same

21

Defendants could also coordinate for the arrest of people smuggling drugs into TTCC, giving the false appearance that the Defendants were actually attempting to curb drug ingress into TCC

66.    Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 received actual remuneration from the sale of drugs at TTCC, which was paid indirectly to them from the inmate's third-party who sent money to these Defendants' designated third-party in exchange for the distribution, sale, and delivery of drugs to the inmate.

67.    Since January 1, 2023, over twenty-one (21) employees at TTCC have been charged with offenses in the Trousdale County Court System related to their criminal activities at TTCC. At least eleven (11) of the employees were charged with Contraband in a Penal Facility.[9]  Information concerning these charges is publicly available, and all Defendants have active or constructive notice of these criminal activities at TTCC.

68.    In 2023, the Tennessee Department of Corrections ("TDOC") only reported three (3) arrests for manufacturing, smuggling, and/or distributing drugs in TTCC.[10]  All 3 three arrests involved visitors to TTCC in January and March 2023. TDOC did not report any of the arrests of Defendant CoreCivic's employees or COs who brought drugs into TTCC.

69.    In late Winter or early Spring 2023, a CO was arrested for bringing in a large quantity of uncut fentanyl and uncut methamphetamines to TTCC for distribution within the network of inmates at TCCC.  Upon information and belief, this CO was being utilized as a mule for Defendant Porter and/or Defendants John Does 51-100.  This CO was unwittingly caught by another CO, which led to his arrest and subsequent charges in the Trousdale County Court System.

---

[9] This is a separate charge from the other charges levied against TTCC employees, including Unlawful Telecommunications Device, Official Misconduct, Sex with Inmate, and Facilitation of Unlawful Telecommunications Device.
[10] https://www.tn.gov/correction/state-prisons/contraband-arrests.htmlQ

70. Since 2022, Defendant CoreCivic had actual and constructive notice that its employees and prison workers are willing to bring lethal drugs into CoreCivic's prison for money, including the following examples:

   a. In Arizona, a prison worker was arrested in 2024 after attempting to bring methamphetamine into a CoreCivic prison. Despite a prior inmate death from methamphetamine, CoreCivic did not terminate, arrest, or charge any of its employees in 2023 for smuggling drugs;[11]

   b. From January 2022 to January 2024, people were recruited to become correctional officers at CoreCivic's prison in Youngstown, Ohio to smuggle and distribute drugs to inmates. The scheme worked for nearly two (2) years until the Department of Justice intervened to investigate and indict the criminal conspirators, including CoreCivic employees.[12]

   c. In Hernando County, Florida, two CoreCivic correctional officers were arrested in March 2024 for attempting to deal drugs to undercover officers, including fentanyl.[13]

   d. At the McRae Correctional Facility in Telfair County, Georgia, a CoreCivic correctional officer was arrested in February 2023 for taking bribes to allow inmates to receive contraband.[14]

   e. At the Leavenworth Detention Center in Kansas, a trafficking operation operating from April through November 2020 was discovered at the CoreCivic prison wherein bribes were offered by prisoners to corrections officers to smuggle drugs and other contraband inside the prison.[15]

---

[11] https://www.civilbeat.org/2024/07/police-say-prison-worker-tried-to-bring-meth-into-arizona-facility-that-houses-hawaii-inmates/

[12] https://www.cleveland.com/court-justice/2024/04/cleveland-heartless-felons-crew-ran-drug-ring-in-youngstown-private-prison-feds-say.html

[13] https://www.abcactionnews.com/news/local-news/i-team-investigates/citrus-county-jail-employees-arrested-on-drug-charges

[14] https://www.justice.gov/usao-sdga/pr/ex-prison-guard-sentenced-after-admitting-she-took-bribes-allow-inmate-receive

[15] https://www.kansascity.com/news/local/crime/article257889693.html

71.     Additionally, Defendant CoreCivic has been alerted to allegations of drug smuggling at its prisons by CoreCivic employees in Tennessee via multiple lawsuits filed in the past few years.[16]

72.     At all times relevant to this Complaint, Defendant CoreCivic had actual and constructive knowledge of inmate overdose deaths at its facilities in Tennessee in the weeks and months prior to Kylan's death.  In 2022, at least five (5) inmates died of overdose inside Whiteville Correctional Facility.[17]

73.     Despite notice of the growing trend that their employees could and would smuggle, distribute, and sell drugs for profit in its prisons, Defendant CoreCivic failed to take the necessary steps to stop similar schemes at its Tennessee prisons, including TTCC.

74.     Since 2023, Defendant Vantell met frequently with Defendant Porter and other supervisors and COs in the cafeteria, along with CoreCivic's Senior Director of Security Operations and Intelligence, Don Stewart.  Inmates and other staff observed these meetings frequently and consistently at all times relevant to the Complaint.

**Defendant CoreCivic and the TTCC Defendants' Actual and Constructive Knowledge of Drug Overdoses at TTCC**

75.     During the period of May to October 2023, inmates had unfettered access to drugs at TTCC.  Inmates were able to ingest drugs in their cells and in open areas out of view of the prison cameras.  Inmates, staff and COs at TTCC reported witnessing inmates using drugs on a daily basis.

76.     During the period of May to October 2023, TTCC experienced non-fatal inmate overdoses daily and weekly.  Upon information and belief, during this time frame TTCC had days with up to twenty (20) non-fatal inmate overdoses in a single day.  Inmates, staff and COs at TTCC reported observing inmates falling over, falling out, requiring medical attention, and requiring resuscitation during

---

[16] Caraway v. Corecivic of Tenn., LLC, 98 F.4th 679 (6th Cir. 2024); Brown v. Corecivic, 3:22-cv-00547 (M.D. Tenn. May 25, 2023); Williams v. CoreCivic, 3:24-cv-00096 (M.D. Tenn. Aug. 1, 2022).

[17] https://wpln.org/post/28-people-have-died-of-overdoses-in-tennessees-prisons-this-year-lawsuits-blame-understaffing-and-easily-available-drugs/

24

this period of time. Radio calls of an overdose and inmates being wheeled out on carts due to overdose were a frequent occurrence.

77. During the period of May to October 2023, Trousdale County Emergency Medical Services would routinely be called to TTCC for inmate overdose. In fact, From January 1, 2022 to September 10, 2024, Trousdale County Emergency Medical Services made 418 runs to TTCC—an average of one (1) run every 2.35 days.

78. During the period of May to October 2023, CoreCivic and the TTCC Defendants maintained a policy of not permitting COs or other TTCC personnel (other than medical personnel) to carry the overdose drug Naloxone (which is also referred to as "Narcan"), an antagonist medicine proven to rapidly reverse opioid overdose. Confusingly, and in stark contrast to common-sense public health guidelines, the TTCC Defendants reportedly claimed that allowing COs or other TTCC personnel to carry Narcan would result in the inmate theft of Narcan to be traded by inmates and/or utilized recreationally in conjunction with opioid use.

79. During the period of May to October 2023, two (2) drug-sniffing dogs were utilized at TTCC. Inmates, staff and COs at TTCC reported that one of these dogs was either untrained or unable to locate drugs, noting that it would only recover cell phones or weapons, if alerting to anything at all. The other dog was trained to locate drugs; however, Defendant Porter, Defendants John Does 1-50, and/or Defendants John Does 51-100 would make it clear that known inmate drug users and/or known inmate drug distributors' cells were not to be searched. Consequently, drugs at TTCC were rarely found.

80. Despite the volume of overdoses at TTCC during the period of May to October 2023, CoreCivic and the TTCC Defendants failed to investigate or take any actions to determine the cause and origin of the overdoses, including the following acts and omissions:

a. Failure to bring in a sufficient number of drug-detecting dogs;

b. Utilizing dogs for searches that were not trained on detecting opioids; and

c. Failure to alter or increase security monitoring at the prison to eliminate blind spots where drugs can be bought, sold, and exchanged.

81. Despite the volume of overdoses at TTCC during the period of May to October 2023, Defendants failed to exercise even minimum medical precautions to assist inmates during an overdose, including the following acts and omissions:

a. Failure to regularly train correctional officers and medical staff in recognizing and responding to drug overdoses, including administering naloxone (Narcan) and performing CPR;

b. Failure to provide education to inmates about the dangers of drug use and overdose prevention, recognizing the signs of overdose, and/or responding to signs of overdose (e.g. alerting guards or medical staff);

c. Failure to ensure that naloxone is readily available in all areas of the prison, including common areas and medical facilities;

d. Failure to equip staff and trained inmates (where appropriate) with naloxone kits at the ready;

e. Failure to conduct regular health screenings and drug tests to monitor and manage inmate risk and usage of opioids;

f. Failure to implement more rigorous monitoring of inmates with known substance abuse issues;

g. Failure to establish, implement, and mandate clear protocols for emergency medical response in the event of overdose; and

h. Failure to create and maintain a robust system for reporting, analyzing, and predicting overdose incidents to improve response strategies.

**Kylan Taylor Leeper's Tragic Incarceration and Death at TTCC**

82. The Decedent, Kylan Taylor Leeper, was born on September 24, 1998. The minor child, K.L., is the Decedent's only known child and is next of kin under Tennessee law.

83. Kylan was incarcerated at TTCC from May 5, 2023 to his date of death on October 6, 2023. On May 13, 2023, Kylan was stabbed by his cellmate. However, neither correctional officers nor medical staff at TTCC provided

appropriate care for his wounds or conducted reasonable investigation to resolve the assault. Kylan also reported fentanyl overdoses to at TTCC to Defendants John Does 51-100 and wondered where inmates were obtaining the illegal drugs. Kylan wrote to his family that inmates at TTCC had to guard their food and beverages to avoid the potential for opioids like fentanyl being deposited to cause an intentional overdose.

84. When Kylan arrived at TTCC, CoreCivic and the TTCC Defendants had knowledge that Kylan had a prior history of drug possession, use, and abuse, given his prior criminal charges. During his intake process, these charges were available to these Defendants. However, from May 2023 until approximately July or August 2023, Kylan was kept segregated in Housing Unit A and denied appropriate medical care he should have received in Housing Unit F. In August or September of 2023, Kylan was finally able to move to Housing Unit F to receive what he hoped would be appropriate medical care. Little did he know, however, that moving into this unit would ultimately result in his untimely death.

85. In early September 2023, Kylan was housed in the Fox Bravo pod of Housing Unit F. His cellmate was an inmate with the last name Duncan. Inmate Duncan was a known drug distributor at TTCC. Upon information and belief, Inmate Duncan had dealings with Defendant Porter, Defendants John Does 1-50, and Defendants John Does 51-100 to obtain illegal drugs.

86. Inmate Duncan's cell was located on the lower level of the Fox Bravo pod. Kylan knew about Inmate Duncan's drug distribution and expressed his concern of exposure to fentanyl to at least one (1) CoreCivic employee in September 2023. To avoid the potential exposure to drugs, Kylan requested to be transferred to another cell.

87. With the assistance of a TC, a written request for cell transfer was made so that Kylan could move out of Inmate Duncan's cell to avoid and get away from ongoing drug activity. Importantly, these types of inmate cell relocation requests had to be approved by Defendant Vantell who, in this case, approved the request with the knowledge that a drug distributor was operating in Housing Unit F, Foxtrot Bravo Pod. Thereafter, Kylan was moved to a cell on the

27

opposite end of Fox Bravo pod, located on the second floor, to be as far removed from inmate Duncan's drug distribution cell.

88. During the second half of the month of September 2023, a lethal cache of drugs began infiltrating housing units at TTCC. Inmates in other housing units (W, A, B) began to overdose on the hour. COs and other staff at TTCC would call out over the radio whenever there was an overdose requiring medical staff, and these calls became so frequent that they would sometimes be multiple inmates overdosing in different housing units of TTCC at the same time. The volume of overdoses was so unsettling that inmates began to ask COs and staff what was happening. The consensus amongst COs, staff, and inmates was that the lethal cache of drugs now in TTCC included significant volumes of fentanyl.

89. During this escalated time in late September 2023, CoreCivic began to ask COs and other staff to come in for work so roster counts could be conducted. The benefit of a roster count (versus a headcount only) is that Defendants could confirm that each inmate was in their own cell at the time of count. Furthermore, a roster count would permit the CO or staff to visibly observe the inmate to potentially assess current health and any symptoms of overdose. Roster counts would also ensure that inmates were in their own cell, which is critically important to confirm before extended periods of time at night when inmates are sleeping and cannot be observed by other inmates or, if in F Housing Unit, observed by TCs during their day shifts. In periods of escalated overdoses, it is essential to maintain vigilance with frequent roster counts. Unfortunately, due to chronic understaffing Defendant CoreCivic and the TTCC Defendants could not conduct complete, consistent, and comprehensive roster counts to mitigate the potential for fatal drug overdoses.

90. Eventually, the lethal drugs found their way into Housing Unit F. During the week of September 25, 2023, inmates in Housing Unit F began to fall over and collapse from overdoses. Fortunately, Housing Unit F had more than a single CO monitoring all the inmates, and TCs were able to operate as additional eyes and ears. During this week, inmates were nodding off, leaning over, collapsing and suffering relentlessly from drug overdoses. TCs asked if they could carry

28

Narcan or have access to Narcan. In response, COs and nursing staff advised the TCs that they were not permitted to carry Narcan because they did not receive the "proper training."

91. Undeterred, on either September 26 or September 27, 2023, a group of TCs went to see Defendant Vantell to request access to Narcan. Following a five to ten (5-10) minute conversation with Defendant Vantell, the TCs were only granted permission to keep Narcan in a locked desk/office area away from inmates. Defendant Vantell did not allow TCs to carry Narcan, including multiple doses, on their person at this time or at any time relevant to this Complaint.

92. On Friday, September 29, 2023 an inmate overdosed and stopped breathing in the Foxtrot Alpha pod. CPR was performed by one of the TCs in Housing Unit F. A nurse eventually arrived and began administering doses of Narcan to the inmate. Fortunately, the inmate survived. It was determined that the inmate had consumed a "Deuce" in the cell of another inmate. A "Deuce" is a piece of paper that has been sprayed by a combination of drugs or opioids (often fentanyl) whereby inmates can inhale the fumes or otherwise come into contact with the drugs.

93. In response to the near-fatal overdose on Friday, September 29, 2023, CoreCivic and the TTCC Defendants took only the following actions to mitigate, prevent, and remediate incoming drugs and additional overdoses:

   a. A drug dog entered the Foxtrot Alpha pod on Friday, September 29, 2023 and located the "Deuce" that had already been used by the inmate who overdosed; and

   b. A drug dog entered the Foxtrot Alpha pod on Friday, September 29, 2023 and checked the remaining cells and made only one (1) alert for drugs in a different cell located on the second-floor.

94. In response to the near-fatal overdose on Friday, September 29, 2023, CoreCivic and the TTCC Defendants failed to take the following actions to mitigate, prevent, and remediate incoming drugs and additional overdoses prior to Kylan's death:

29

a. Utilize trained drug sniffing dogs to conduct random checks throughout the day and night on multiple days to locate all drugs in Housing Unit F;

b. Lock down the entire Housing Unit F to prevent inmates and non-authorized personnel from entering to limit drug ingress;

c. Send the "Green Unit" of COs at TTCC to toss cells and conduct a comprehensive search to located and remove all drugs and contraband used for the purpose of smuggling and distributing drugs;

d. Work with TCs and informant inmates to determine the source of the drugs entering Housing Unit F and/or TTCC to make arrests;

e. Conduct a thorough investigation of the inmates and/or COs who supplied drugs to the inmate who overdosed on September 29, 2023 to make appropriate arrests or take other actions to stall or stop infiltration of drugs.

f. Remove Inmate Duncan and other known drug distributors from Housing Unit F to stall or stop infiltration of drugs;

g. Increase surveillance within F Housing unit via cameras, COs, or other staff to detect drug use and monitor the potential for overdoses in key areas.

h. Implement roster costs immediately to observe inmates in their own cells and prevent known issue from lock door cell counts;

i. Distribute Narcan widely with multiple doses, providing further instruction and training to personnel monitoring F Housing Unit on dosages and use.

j. Implement additional monitoring measures during the evening hours when inmates are alone, vulnerable, and not being watched;

k. Increase opportunities for TC education surrounding the lethal drugs currently in F Housing Unit causing overdoses;

l. Increase medical staff availability for timely responses to likely overdoses; and

m. Enhance current security measures for TTCC to prevent further ingress of drugs, including random assignments for security detail, more time spent searching all personnel who enter the prison, more sweeps in visitor and common areas, partnership with local law enforcement on sweeps outside the prison facility, and increase drug dog searches throughout the prison.

30

95. From September 29, 2023 to October 6, 2023, overdoses continued to occur each day in Housing Unit F. CoreCivic and the TTCC Defendants continued to allow inmates from other houses units enter Housing Unit F against the recommendations of the TCs and in violation of CoreCivic and TTCC policy. These Defendants did not undertake a roster count in any pod of Housing Unit F. TCs were not allowed to carry Narcan on their person. In short, despite the clear and present threat of lethal overdoses in Housing Unit F at TTCC, these Defendants continued to operate as usual, hoping for the best and unprepared for the worst.

96. In the days and weeks leading up to October 6, 2023, Kylan was in imminent risk of injury or death due to:

   a. Understaffing at TTCC;

   b. Lack of security and other prevention to reduce or eliminate potentially fatal drugs at TTCC;

   c. Existence of a for-profit drug ring operating at TTCC;

   d. Unfettered access to potentially fatal drugs at TTCC;

   e. Threat of exposure to potentially fatal drugs at TTCC;

   f. Lack of education and training on minimum medical precautions to assist inmates during an overdose; and

   g. Failure to investigate or take any actions to determine the cause and origin of the high volume of overdoses.

97. On the evening of Friday October 6, 2023, Kylan was found unresponsive and pulseless inside inmate Duncan's cell during an emergency count that was being called by TTCC officials due to the high volume of overdoses. Unfortunately, resuscitation efforts were unsuccessful, and Kylan was pronounced dead at 11:55 p.m. that evening. The cause of death was later determined to be accidental fentanyl toxicity. The autopsy report lists the manner of Kylan's death as accidental.

98. To date, there is no information regarding how Kylan got to inmate Duncan's cell, whether his presence in inmate Duncan's cell was voluntary or coerced,

and what happened on the evening of October 6, 2023, that lead to the overdose.

99.    To date, there has been no information provided regarding the manner in which Kylan was exposed to fentanyl, and there has been no evidence presented which indicates that Kylan's exposure was due to the recreational use of fentanyl. There is no evidence that Kylan voluntarily ingested drugs leading to his death.

100.   In November 2023, Defendant Porter went to Housing Unit F to retrieve all the Narcan that was previously held by the TCs. By way of explanation, Defendant Porter advised that the TCs no longer needed to keep the Narcan, and that if they wanted to obtain it, they would have to take the extra step and request it directly from COs, who had previously denied them access to Narcan.

101.   In February 2024, Defendant CoreCivic reported its Full Year 2023 Financial Results.[18] Highlights include Total Revenue of $1.90 billion, and a net income of $67.8 million. Damon T. Hininger, CoreCivic's President and Chief Executive Officer, commented "We have managed our business prudently…"

102.   TTCC continues to have overdoses at an endemic level. On March 11, 2024, Joseph Lovelle Ware died at TTCC due to drug overdose and fentanyl toxicity. On March 14, 2024, Tramond Davenport died at TTCC due to drug overdose and fentanyl toxicity. During the week of July 7, 2024, there were at least six (6) overdoses in the E Pod at TTCC. On Saturday, July 13, 2024, an inmate overdosed on or about 2:15 p.m.

103.   In August 2024, the U.S. Department of Justice launched a civil rights investigation into TTCC amid mounting allegations of violent assaults, sexual abuse, and even murder.[19] According to several audits conducted by the Tennessee State Comptroller's office, TTCC has been severely understaffed for years, causing unsafe conditions for inmates. Staffing shortages have played a role in the serious problems that have plagued TTCC since it first

---

[18] See https://ir.corecivic.com/node/23431/pdf.
[19] https://www.justice.gov/opa/pr/justice-department-announces-civil-rights-investigation-conditions-tennessees-trousdale

32

opened its doors in 2016. Publicly available information suggests that Trousdale Turner has been plagued by serious problems since it first opened its doors. This includes reports of staffing shortages, physical and sexual assaults, murders, and a 188% turnover rate among prison guards in 2023 alone. The prison staffing problems persist despite years of efforts to attract and retain officers, including through pay increases, bonuses and relocation assistance.

104. In September 2024, Protestors gathered at TTCC to call for its immediate closure.

## CLAIMS FOR RELIEF

**COUNT I -** **Failure To Protect, Pursuant To 42 U.S.C. § 1983, in Violation of the Eighth Amendment (Defendant CoreCivic, Defendant Vantell, Defendant Porter, Defendants John Does 1-50, Defendants John Does 51-100)**

105. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein

106. Defendant CoreCivic and the TTCC Defendants violated Kylan's Eighth Amendment and Fourteenth Amendment rights under the United States Constitution and Tennessee Constitution by failing to protect Kylan from unfettered access to dangerous drugs, resulting in exposure to a lethal dose of fentanyl while incarcerated at TTCC.

107. Defendant Porter operated a for-profit drug operation in the prison that was widely known to Defendant CoreCivic and the TTCC Defendants. Defendant Porter's activities were known at the highest levels of CoreCivic, and CoreCivic has a personnel file on Defendant Porter and believes that he should be locked up due to his acts and omissions at TTCC. Proof of widespread drugs at TTCC was reported by inmates, CoreCivic employees, and COs. The open-air drug market was manifestly evident, given the volume of overdoses at the facility announced over radios by the hour in the days, weeks, months, and years preceding Kylan's death. Dozens of COs have been arrested for contraband, including at least one CO arrested for bringing in a large volume of fentanyl and

33

methamphetamine in the months prior Kylan's death. Training Manager Harris acknowledged that the facility would always have drugs and that nothing could be done about it.   In September and October 2023, the problem of fentanyl and overdoses was known at the highest levels of TTCC, as Defendant Vantell was told by staff in the K Housing unit that Narcan was desperately needed to prepare for the wave of overdoses inevitably coming.

108.   These Defendants ignored both the prevalence of drugs and the possibility of fatal outcomes from fentanyl exposure.   These Defendants failed to stop Defendant Porter's continued drug operations, lock down the K Housing Unit to prevent drug ingress by inmates and other personnel, effectively sweep each pod to eradicate an overly potent batch of drugs containing high doses of fentanyl, root out known drug distributers (like Inmate Duncan) who would package and distribute drugs to inmates with drug abuse disorders, require and distribute Narcan to all COs and CoreCivic Staff, and initiate roster counts to better monitor and assess inmate health.   Defendants utilized drug-sniffing dogs who were untrained or ineffective, and in early October 2023 these dogs were not utilized in anything more than a cursory way following the inmate overdose in September 29, 2023.   Defendants also relied on inmates to function as first-responders for overdoses due to understaffing and a policy that prohibited entering pods without two COs.   These Defendants did virtually nothing in the days and hours leading up to Kylan's death, hampered by unconstitutional understaffing and a high tolerance for drug access and overdoses.

109.   In the days leading up to his death, Kylan was at a substantial risk of fatal overdose from exposure to fentanyl because, quite simply, it was everywhere at TTCC.   Kylan did not have the freedom to extricate himself from TTCC's drug-saturated environment, and reasonably relied on these Defendants to assume the responsibility to provide for his safety by not allowing unfettered access and exposure to deadly narcotics.   As a last resort, Kylan attempted to do the only thing he could do to avoid further exposure: request a cell change. Sadly, this was not enough to overcome these Defendants wrongful conduct.

34

110.    Defendants were subjectively aware of the risk that Kylan and other inmates in the F Housing Unit (and even the Foxtrot Bravo pod) would be exposed to lethal drugs.  A near fatal overdose had occurred only one week prior to Kylan's death. Inmates in Kylan's pod--Foxtrot Bravo--were walking around the pod under the influence of drugs, and overdoses continued to happen throughout the prison in the days preceding Kylan's death.  A known drug dealer—Inmate Duncan— continued to operate in the Foxtrot Bravo pod and distribute drugs.  Kylan had reported drug activity to Defendants in the days preceding his death as the reason he needed to move from his cell.  Unable to obtain Narcan from COs and medical personnel at TTCC, TCs from the F Housing Unit had to go directly to Defendant Vantell to request permission to obtain Narcan because of the waves of overdoses the unit during the last week of September 2023. Tragically, it was not a matter of if someone would fatally overdose in the F Housing Unit, but when. Defendants subjectively knew this and accepted the risk.

111.    These Defendants had knowledge of the substantial risk of harm to inmates in the F Housing Unit, including Foxtrot Bravo Pod, but failed to take any meaningful actions to curb the introduction, spread, and usage of drugs at TTCC.  Defendants also failed to initiate any preventative or prophylactic measures to deal with the inevitable overdose after hours—when only a single CO was supervising over 400 F Housing Unit Inmates—and only inmates could assist in identifying overdose symptoms and the need for more acute medical care.

112.    These Defendants' unconstitutional and wrongful patterns, practices and policies all came together on the evening of Friday October 6, 2023, when Kylan was exposed to a lethal dose of fentanyl after hours, when no CoreCivic staff were present to assist, no roster count was in place, no measures were taken to prevent drugs entering the Foxtrot Bravo pod earlier that day, no attempts were made to stop drug distribution, and all resuscitation efforts came far too late.

35

113. These Defendants' acts and omissions in this regard deprived Kylan of the right under the laws of the United States and the United States Constitution to be free from unfettered access and exposure to lethal fentanyl, a right that encompasses the protection of his health and safety within TTCC.

114. These Defendants' conduct outlined in the Complaint caused the catastrophic conduct inside TTCC in September and October 2023, resulting in injury and death to the Decedent.

115. Plaintiffs are entitled to recover damages for the unconstitutional and wrongful conduct of this Defendant, in an amount to be proven at trial.

**COUNT II – Failure To Train and Supervise, Pursuant To 42 U.S.C. § 1983, Pursuant To 42 U.S.C. § 1983, in Violation of the Fourteenth Amendment Defendant Vantell, Defendant Porter, Defendants John Does 1-50)**

116. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein

117. Defendant Vantell, Defendant Porter, Defendants John Does 1-50 violated Kylan's Eighth Amendment and Fourteenth Amendment rights under the United States Constitution and Tennessee Constitution in their role as supervisors by failing to supervise and train subordinate employees to prevent the entry of dangerous drugs into TTCC, to eliminate unfettered access to dangerous drugs, and to monitor, assess, and timely respond to medical emergencies involving inmate overdose.

118. Defendant Porter had direct responsibility and actively engaged in unconstitutional and wrongful conduct resulting in Kylan's death, including facilitating the smuggling and distribution of drugs into TTCC, coordinating the entry of persons carrying drugs into the F Housing Unit, foregoing roster counts during the days and weeks of daily overdoses at TTCC in September and October 2023, and other actions as described in this Complaint. Porter abdicated his responsibilities as a supervisor, failing to take any steps to stop the risks of incoming lethal drugs and ongoing overdoses.

119. Defendant Vantell had direct responsibility and actively engaged in unconstitutional and wrongful conduct resulting in Kylan's death. As the leader

36

of TTCC, Vantell accepted that illegal drugs would be a part of TTCC, permitting training managers to advise incoming COs in training that drugs were simply here to stay in the facility. Vantell understaffed the prison so recklessly that they could not conduct roster counts during the days and weeks of daily overdoses at TTCC in September and October 2023. Vantell was aware of the ongoing drug-smuggling operation at TTCC via frequent meetings with Porter in the cafeteria and in the administrative section of TTCC in the days and weeks leading up to October 2023. Vantell also had knowledge of ongoing drug smuggling given the volume of CO arrests for contraband in the months preceding Kylan's death. Vantell met with, acquiesced to, and ultimately promoted the leader of the drug operation, Defendant Porter, even amidst the increase in overdoses. Vantell either ignored the overwhelming evidence that Defendant Porter was utilizing TTCC as a for-profit drug operation, or else Vantell permitted Porter and other COs to forego the investigation and eradicate the drugs. When confronted with alarming and overwhelming cases of overdose in the F Housing Unit by the TCs on or about September 25 or 26, 2023, Vantell abandoned his duties as Warden in the face of actual knowledge of a tidal wave of overdoses. No additional drug sweeps were conducted. The F Housing Unit was not locked down. Porter was permitted to operate as usual. Drug dealing inmates were permitted to sell more drugs. No investigation was launched following the near-fatal September 29, 2023 overdose in the Foxtrot Bravo pod other than a cursory dog sweep. The "Green Squad" was not sent to toss cells and locate all drugs. Roster checks were not implemented. All the while, inmates continued to use drugs, fall out, and overdose in Foxtrot Bravo pod.

120. Defendants John Does 1-50 were unknown supervisors who engaged in acts and omissions in furtherance of Defendant Porter and Defendant Vantell's unconstitutional and wrongful conduct as alleged in this Complaint and in Count II.

121. These Defendants knowingly acquiesced to the constitutional violations and wrongful conduct occurring in TTCC in the days immediately preceding Kylan's

death, knowingly exposing inmates in the F Housing Unit and Foxtrot Bravo to a substantial risk of serious harm. As a result of Defendant Porter and Defendant Vantell's acts and omissions as described, Kylan was exposed to a lethal amount of fentanyl, causing his slow decline and, ultimately, his untimely death.

122. These Defendants' acts and omissions in this regard deprived Kylan of the right under the laws of the United States and the United States Constitution to be free from unfettered access and exposure to lethal fentanyl, a right that encompasses the protection of his health and safety within TTCC.

123. These Defendants' conduct outlined in the Complaint caused the catastrophic conduct inside TTCC in September and October 2023, resulting in injury and death to the Decedent.

124. Plaintiffs are entitled to recover damages for the unconstitutional and wrongful conduct of these Defendants, in an amount to be proven at trial.

**COUNT III – Individual Liability, Pursuant To 42 U.S.C. § 1983 (Defendant Porter)**

125. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

126. Defendant Porter acted under the color of state law in his role as a supervisor at TTCC at all times relevant to this Complaint, including, but not limited to, Defendant Porter's involvement and coordination with drug smuggling, distribution, and sale at TTCC; decisions concerning the roles and responsibilities of subordinate COs at TTCC in furtherance of drug smuggling, distribution, and sale; acts and omissions with respect to F Housing Unit; decisions regarding staffing and cell counts in F Housing Unit; antagonism towards F Housing Unit inmates and staff; acts and omissions regarding availability of Narcan and response to inmate overdoses; and facilitating drug distribution by Inmate Duncan and others within the F Housing Unit and Foxtrot Bravo pod.

127. Defendant Porter's acts and omissions in this regard deprived Kylan of the right under the laws of the United States and the United States Constitution to be

free from unfettered access and exposure to lethal fentanyl, a right that encompasses the protection of his health and safety within TTCC.

128. Defendant Porter's conduct caused the catastrophic conduct inside TTCC in September and October 2023, resulting in injury and death to the Decedent.

129. Plaintiffs are entitled to recover damages for the unconstitutional and wrongful conduct of this Defendant, in an amount to be proven at trial.

**COUNT IV – Individual Liability, Pursuant To 42 U.S.C. § 1983 (Defendant Vantell)**

130. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

131. Defendant Vantell acted under color of state law in his role as Warden at TTCC at all times relevant to this Complaint, including, but not limited to, accepting a culture of illegal drugs ingrained in TTCC; understaffing the prison so recklessly that they could not conduct roster counts during the days and weeks of daily overdoses at TTCC in September and October 2023; failure to act on information of the ongoing drug-smuggling operation at TTCC in the days and weeks leading up to October 2023; failure to follow through on CO arrests for contraband, including fentanyl distribution; supporting and conspiring with Defendant Porter, ignoring evidence that Defendant Porter was utilizing TTCC as a for-profit drug operation; failure to properly investigate and eradicate drugs infiltrating the F Housing Unit in the face of actual knowledge of a tidal wave of overdoses in September and October 2023; failure to investigate, lock down, and remove drugs from the F Housing Unit in September and October 2023; failure to stop Porter and other drug distributors in the F Housing Unit in September and October 2023; failure to take actionable investigation following the near-fatal September 29, 2023 overdose in the Foxtrot Bravo pod, including roster checks, multiple random drug screenings, utilization of the "Green Squad," and other measures.

132. Defendant Vantell's acts and omissions in this regard deprived Kylan of the right under the laws of the United States and the United States Constitution to

be free from unfettered access and exposure to lethal fentanyl, a right that encompasses the protection of his health and safety within TTCC.

133. Defendant Vantell's conduct caused the catastrophic conduct inside TTCC in September and October 2023, resulting in injury and death to the Decedent.

134. Plaintiffs are entitled to recover damages for the unconstitutional and wrongful conduct of this Defendant, in an amount to be proven at trial.

**COUNT V – Failure To Investigate, Pursuant To 42 U.S.C. § 1983 (Defendant Trousdale County)**

135. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein

136. The Municipal Defendants recognized the need for oversight of Defendant CoreCivic, the TTCC Defendants, and the TTCC facility. Consequently, they established a Trousdale County policy and custom with the Oversight Committee to investigate, oversee, and supervise.

137. From 2016 to 2022, the Municipal Defendants failed to investigate, oversee, and supervise the unconstitutional conduct Defendant CoreCivic and the TTCC Defendants including, but not limited to, severe understaffing; frequent leadership changes at TTCC; failure to attend meetings by the TTCC warden; drug smuggling, distribution, and sale; CO arrests for smuggling drugs into TTCC; volume of overdoses; inmate hospitalizations due to overdose; and deaths due to overdose.

138. In 2022, the Municipal Defendants disbanded the Oversight Committee without explanation or reason. The Municipal Defendants took no other formal or informal, official or unofficial steps to investigate, oversee, and supervise Defendant CoreCivic and the TTCC Defendants. From approximately March 2022 to October 2023, the Municipal Defendants asked no questions and received no information regarding the hire of Defendant Vantell, the termination, rehiring, and promotions of Defendant Porter, the wave of drugs entering TTCC in late September and early October 2023, the increase in overdoses in September and October 2023, the ongoing CO arrests for smuggling drugs into TTCC, including fentanyl, the inmate hospitalizations and

40

deaths due to overdose, operations surrounding the F Housing Pod, response to and investigation of inmate overdoses and deaths, and other information pertinent to their obligations as Trousdale County officials.

139. The Municipal Defendants continued to take their administrative fee, conduct meet-and-greet with warden after warden, and attempt to get CoreCivic to cover Trousdale County costs. Further, these Defendants enjoyed and were lulled into administrative and fiduciary apathy knowing that CoreCivic would always defend and indemnify them for what occurred inside TTCC. These Defendants failed to ensure compliance with the terms of the agreement between Trousdale County and Defendant CoreCivic

140. The Municipal Defendants' failure to investigate, oversee, and supervise Defendant CoreCivic and the TTCC Defendants officials from 2016 to 2022 amounted to a ratification of their unconstitutional and wrongful conduct. When the Municipal Defendants disbanded the Oversight Committee with explanation or reason in 2022, Defendant CoreCivic and the TTCC Defendants knew they were no longer being watched or held accountable, and with that freedom they continued to strive for profits over people and operate TTCC in the unconstitutional and unlawful manner previously described.

141. These Defendants' acts and omissions in this regard deprived Kylan of the right under the laws of the United States and the United States Constitution to be free from unfettered access and exposure to lethal fentanyl, a right that encompasses the protection of his health and safety within TTCC.

142. These Defendants' conduct caused the catastrophic conduct inside TTCC in September and October 2023, resulting in injury and death to the Decedent.

143. Plaintiffs are entitled to recover damages for the unconstitutional and wrongful conduct of this Defendant, in an amount to be proven at trial.

## COUNT VI – Individual Liability, Pursuant To 42 U.S.C. § 1983 (Defendants John Does 101-120)

144. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

145. Defendants John Does 101-120 acted under color of state law when they formed the Oversight Committee; breached their fiduciary duties while on the Oversight Committee in their lack of oversight, investigation, or accountability; subsequently disbanded the Oversight Committee, and took no further steps to curtail the unconstitutional and wrongful conduct of Defendant CoreCivic and the TTCC Defendants.

146. Defendants John Does' 101-120 acts and omissions in this regard deprived Kylan of the right under the laws of the United States and the United States Constitution to be free from unfettered access and exposure to lethal fentanyl, a right that encompasses the protection of his health and safety within TTCC.

147. Defendants John Does' 101-120 conduct caused the catastrophic conduct inside TTCC in September and October 2023, resulting in injury and death to the Decedent.

148. Plaintiffs are entitled to recover damages for the unconstitutional and wrongful conduct of this Defendant, in an amount to be proven at trial.

**COUNT VII – Individual Liability, Pursuant To 42 U.S.C. § 1983 (Defendant Chambers, Defendant Ford, Defendant Walsh, Defendant Jewell, Defendant McCall)**

149. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

150. Defendant Chambers acted under color of state law when served as Mayor from 2018 to 2022 and failed to supervise the Oversight Committee; failed to ensure compliance with the terms of the agreement between Trousdale County and Defendant CoreCivic; took no further steps to investigate and curtail the unconstitutional and wrongful conduct of Defendant CoreCivic and the TTCC Defendants; and allowed or coordinated the disbandment of the Oversight Committee.

151. Defendant Ford, Defendant Walsh, and Defendant Jewell acted under color of state law in their roles on the Oversight Committee and in their respective roles as government officials when they failed to supervise the Oversight Committee; failed to ensure compliance with the terms of the agreement between Trousdale

42

County and Defendant CoreCivic; took no further steps to investigate and curtail the unconstitutional and wrongful conduct of Defendant CoreCivic and the TTCC Defendants; and allowed or coordinated the disbandment of the Oversight Committee.

152. Defendant McCall acted under color of state law when he took office in August 2022 and failed to reinstate the Oversight Committee; failed to ensure compliance with the terms of the agreement between Trousdale County and Defendant CoreCivic; and took no further steps to investigate and curtail the unconstitutional and wrongful conduct of Defendant CoreCivic and the TTCC Defendants.

153. These Defendants' acts and omissions in this regard deprived Kylan of the right under the laws of the United States and the United States Constitution to be free from unfettered access and exposure to lethal fentanyl, a right that encompasses the protection of his health and safety within TTCC.

154. These Defendants' conduct caused the catastrophic conduct inside TTCC in September and October 2023, resulting in injury and death to the Decedent.

155. Plaintiffs are entitled to recover damages for the unconstitutional and wrongful conduct of this Defendant, in an amount to be proven at trial.

**COUNT VIII - Civil Conspiracy, Pursuant To 42 U.S.C. § 1983 (Defendant Porter, Defendant Vantell, Defendants John Does 1-50, Defendants John Does 51-100)**

156. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

157. The aforementioned facts reflect a mountain of evidence of a civil conspiracy between Defendant Porter, Defendants John Does 1-50, Defendants John Does 51-100, who agreed to engage in the unlawful acts of smuggling drugs into TTCC for sale and distribution. These Defendants profited from the sale of drugs and retained power and influence at TTCC as a result of their enterprise. The injuries to inmates from the distribution and sale of drugs were open and obvious, and these Defendants were unmoved by the harm they caused via injuries, hospitalization and fatal overdose. Despite an

overwhelming wave of overdoses in late September and early October 2023, including at least one near fatal overdose, these Defendants continued their ongoing for-profit operation inside of TTCC, F Housing Unit, and Foxtrot Bravo pod.

158. Defendant Vantell knew of the conspiracy to sell drugs at TTCC by his employees through his close relationship and frequent meetings with Porter. Further, Defendant Vantell would have information about the numerous COs arrested in 2023 for contraband and drug charges. Additionally, Defendant CoreCivic had a large personnel file on Defendant Porter documenting activities that were known to be unlawful, and Defendant CoreCivic would have shared this information with Defendant Vantell. Defendant Vantell either tolerated or condoned the distribution and sale of drugs by TTCC employees for the benefit of maintaining some semblance of order and control in the facility. Further, the additional income earned by Defendant Porter, Defendants John Does 1-50, Defendants John Does 51-100 meant that TTCC would not become even further understaffed. Finally, Defendant Vantell would be pressured not to incriminate Defendant Porter, Defendants John Does 1-50, Defendants John Does 51-100 to avoid the potential for personal culpability. Thus, Defendant Vantell permitted, accepted, and tolerated unfettered access to drugs in the days leading up to October 6, 2023.

159. Defendant Porter, Defendant Vantell, Defendants John Does 1-50, Defendants John Does' 51-100 acts and omissions in this regard deprived Kylan of the right under the laws of the United States and the United States Constitution to be free from unfettered access and exposure to lethal fentanyl, a right that encompasses the protection of his health and safety within TTCC.

160. Defendant Porter, Defendant Vantell, Defendants John Does 1-50, Defendants John Does' 51-100 conduct caused the catastrophic conduct inside TTCC in September and October 2023, resulting in injury and death to the Decedent.

161. Plaintiffs are entitled to recover damages for the unconstitutional and wrongful conduct of these Defendants, in an amount to be proven at trial.

**COUNT VIII – Wrongful Death (All Defendants)**

44

162. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

163. Despite his incarceration, Defendants owed a duty of care to the Decedent.

164. Defendants breached their duty of care negligently (Defendant CoreCivic, Defendant Trousdale County, Defendant Chambers, Defendant Ford, Defendant Walsh, Defendant Jewell, Defendant McCall) and recklessly, willfully, and/or intentionally (Defendant Vantell, Defendant Porter, Defendants John Does 1-50, Defendants John Does' 51-100) as described in the actions and omissions in this Complaint.

165. Defendants' breach of their duties directly and proximately caused the violation of Kylan's constitutional rights, resulting in his injury and death due to overdose.

166. Plaintiffs are entitled to expenses, pain and suffering, costs, and other damages as a result of the pecuniary losses suffered as a result of Kylan's death.

167. Plaintiff Jamesha Murphy b/n/f of K.L., a minor, has suffered actual damages as a direct and proximate result of Defendants' negligence, including past and future pain and suffering, past and future mental anguish, past and future loss of enjoyment of life, loss of consortium, and other damages to be proven at trial.

**COUNT IX – Liability Under <u>Monell v. Dept. Of Social Services</u>, 436 U.S. 658 (1978) (Defendant CoreCivic)**

168. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

169. CoreCivic has an unconstitutional policy and practice of maintaining staffing levels at TTCC that are wholly inadequate to protect inmates, like Kylan, from unfettered access to lethal drugs like fentanyl.

170. Defendant CoreCivic has adopted a policy and practice of severely understaffing its facilities, including TTCC, without regard to inmate safety because understaffing is more profitable.

171. CoreCivic's understaffing routinely results in hundreds of job openings at TTCC being unfilled or understaffed every month.

45

172. In the months leading up to Kylan's death, CoreCivic received notices from the TDOC detailing its consistent and severe noncompliance with minimum contractual staffing requirements.

173. Due to multiple audits and regular liquidated damages assessments identifying TTCC's severe understaffing issues, and due to thousands of overdoses—both reported and unreported—at the facility over a period of years, CoreCivic had actual knowledge of TTCC's chronic understaffing problems and chose not to staff TTCC adequately.

174. At the time of Kylan's death, CoreCivic's employees—including Defendant Vantell, its on-site policymaker—had actual knowledge that TTCC's chronic understaffing problems resulted in an extraordinary and overwhelming access to dangerous drugs causing inmate overdoses. Defendant CoreCivic and Defendant Vantell, its on-site policymaker, knew of the heightened and chronic safety risks to inmates resulting from understaffing at TTCC, but they tolerated, maintained, and promoted understaffing to generate greater profits for CoreCivic at the expense of the safety of inmates like Kylan.

175. CoreCivic's policy and practice of understaffing is widespread, rampant, and endemic to CoreCivic's Tennessee prison facilities, including and especially TTCC.

176. Kylan's overdose, injury, and death are attributable to Defendant CoreCivic's policy and practice of failing to ensure adequate staffing at its prison facilities, including TTCC, which was explicitly or impliedly authorized by Defendant Vantell and in which he knowingly acquiesced in accordance with CoreCivic's policy, custom, and practice of understaffing CoreCivic's Tennessee facilities.

177. Plaintiff Jamesha Murphy b/n/f of K.L., a minor, has suffered actual damages as a direct and proximate result of Defendants' negligence, including past and future pain and suffering, past and future mental anguish, past and future loss of enjoyment of life, loss of consortium, and other damages to be proven at trial.

**COUNT X – Tennessee Common Law Negligence (Defendant CoreCivic, Defendant Porter, Defendant Vantell, Defendants John Does 1-50, Defendants John Does 50-100)**

178. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

179. Defendant CoreCivic, Defendant Porter, Defendant Vantell, Defendants John Does 1-50, and Defendants John Does 51-100 owed a legal duty of care to Kylan to protect him from reasonably foreseeable harm.

180. These Defendants knew of the specific risks of unfettered access and exposure to lethal fentanyl in the F Housing Unit and/or Foxtrot Bravo Pod in the immediate days and hours before Kylan's death, including Kylan's request to be moved to a cell by himself away from Inmate Duncan and his drug distribution.

181. These Defendants had actual and constructive notice that if inmates, like Kylan, were exposed to fentanyl, there was an imminent threat of fatal overdose due to the wave of prior overdoses in the cache of drugs in TTCC in October 2023, the lack of first responders after hours, the ongoing ingress of drugs into Foxtrot Bravo, the issue of understaffing to observe inmates, the dearth of available Narcan to revive inmates in distress, the lack of training and supervision of at-risk inmates like Kylan, and other issues as described in this Complaint.

182. These Defendants breached their duty of care to Kylan, and their breaches directly and proximately caused Kylan's overdose, injury, and death.

183. Plaintiff Jamesha Murphy b/n/f of K.L., a minor, has suffered actual damages as a direct and proximate result of Defendants' negligence, including past and future pain and suffering, past and future mental anguish, past and future loss of enjoyment of life, loss of consortium, and other damages to be proven at trial.

**COUNT XI – Tennessee Common Law Negligence Supervision (Defendant Trousdale County, Defendant Chambers, Defendant Ford, Defendant Walsh, Defendant Jewell, Defendant McCall, and Defendants John Does 101-120)**

184. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

185. TTCC is operated by CoreCivic pursuant to a contract with Defendant Trousdale County, Tennessee, a Tennessee municipality. At all times relevant to the Complaint, the Municipal Defendants failed to investigate, oversee, or supervise CoreCivic and the TTCC Defendants' operation of Trousdale Turner Correctional Center in part because CoreCivic has contractually agreed to indemnify Trousdale County from damages assessments and legal liability.

186. From 2016 to 2022, the Municipal Defendants received updates that CoreCivic regularly understaffed TTCC. From 2016 to October 6, 2023, these Defendants knew that CoreCivic routinely violated minimum staffing and other minimum contract requirements, because the TDOC regularly transmitted Trousdale County notice of damages assessments for such violations. During this same time, these Defendants failed to exercise any diligence in obtaining information about drugs at TTCC, inmate overdoses, and fatal overdoses.

187. The Municipal Defendants unreasonably failed to exercise due care to ensure CoreCivic's compliance with minimum contract requirements at TTCC, including requirements that CoreCivic and the TTCC Defendants staff critical posts in F Housing, aimed at protecting both inmates and staff from dangerous fentanyl exposure and potential overdoses. These Defendants unreasonably failed to exercise due care to ensure staffing compliance and failed to ensure a reasonable degree of safety at the facility

188. Notwithstanding its actual knowledge that CoreCivic was chronically violating minimum TDOC contract requirements, including related to failure to staff critical security posts, these Defendants chose not to meaningfully investigate, oversee, or supervise CoreCivic and the TTCC Defendants or take action to remedy unfettered access to dangerous drugs causing endemic inmate overdoses.

189. The Municipal Defendants owed a duty to all inmates at TTCC, including Kylan, to oversee CoreCivic and the TTCC Defendants, supervise their activities, and ensure adequate staffing and safety of TTCC.

48

190. The Municipal Defendants breached their duty of care to Kylan by failing to exercise due care to oversee, supervise, and ensure adequate staffing and safety at TTCC, and these breaches directly and proximately caused Kylan's overdose, injury, and death. Kylan's overdose, injury, and death is attributable to these Defendants' failure to ensure adequate staffing at TTCC, as well as other acts and omissions outlined above.

191. Immunity from suit under the Governmental Tort Liability Act ("GTLA") is statutorily removed for injuries proximately caused by any negligent acts or omissions of governmental employees acting or failing to act within the scope of their employment.

192. Plaintiff Jamesha Murphy b/n/f of K.L., a minor, has suffered actual damages as a direct and proximate result of Defendants' negligence, including past and future pain and suffering, past and future mental anguish, past and future loss of enjoyment of life, loss of consortium, and other damages to be proven at trial.

**COUNT XII -** **Tennessee Common Law Civil Conspiracy (Defendant Porter, Defendant Vantell, Defendants John Does 1-50, Defendants John Does 51-100)**

193. Plaintiffs hereby adopt and incorporate the preceding paragraphs as if fully set forth herein.

194. The aforementioned facts reflect a mountain of evidence of a civil conspiracy between Defendant Porter, Defendants John Does 1-50, Defendants John Does 51-100, who agreed to engage in the unlawful acts of smuggling drugs into TTCC for sale and distribution. These Defendants profited from the sale of drugs and retained power and influence at TTCC as a result of their enterprise. The injuries to inmates from the distribution and sale of drugs was open and obvious, and these Defendants were unmoved by the harm they caused via injuries, hospitalization and fatal overdose. Despite an overwhelming wave of overdoses in late September and early October 2023, including at least one near-fatal overdose, these Defendants continued their

ongoing for-profit operation inside TTCC, F Housing Unit, and Foxtrot Bravo pod.

195. Defendant Vantell knew of the conspiracy to sell drugs at TTCC by his employees through his close relationship and frequent meetings with Porter. Further, Defendant Vantell would have information about the numerous COs arrested in 2023 for contraband and drug charges. Additionally, Defendant CoreCivic had a large personnel file on Defendant Porter documenting activities that were known to be unlawful, and Defendant CoreCivic would have shared this information with Defendant Vantell. Defendant Vantell either tolerated or condoned the distribution and sale of drugs by TTCC employees for the benefit of maintaining some semblance of order and control in the facility. Further, the additional income earned by Defendant Porter, Defendants John Does 1-50, Defendants John Does 51-100 meant that TTCC would not become even further understaffed. Finally, Defendant Vantell would be pressured not to incriminate Defendant Porter, Defendants John Does 1-50, Defendants John Does 51-100 to avoid the potential for personal culpability. Thus, Defendant Vantell, permitted, accepted, and tolerated unfettered access to drugs in the days leading up to October 6, 2023.

196. Defendant Porter, Defendant Vantell, Defendants John Does 1-50, Defendants John Does' 51-100 acts and omissions in this regard deprived Kylan of the right under the laws of Tennessee and the Tennessee Constitution to be free from unfettered access and exposure to lethal fentanyl, a right that encompasses the protection of his health and safety within TTCC.

197. Defendant Porter, Defendant Vantell, Defendants John Does 1-50, Defendants John Does' 51-100 conduct caused the catastrophic conduct inside TTCC in September and October 2023, resulting in injury and death to the Decedent.

198. Plaintiffs are entitled to recover damages for the unconstitutional and wrongful conduct of these Defendants, in an amount to be proven at trial.

## **REQUEST FOR RELIEF**

WHEREFORE, the Plaintiffs pray for the following relief:

1. That proper service issue and be served upon the Defendants, and that the Defendants be required to appear and answer this Complaint within the time required by law;

2. That the Plaintiffs be awarded all compensatory, consequential, and incidental damages to which the Plaintiffs are entitled in an amount in excess of $75,000.00;

3. That the Plaintiffs be awarded punitive damages to be determined at trial;

4. That the Plaintiff be awarded reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988(b) and other relevant federal and state law(s);

5. That a jury of 12 be empaneled to try this cause;

6. That Plaintiffs be awarded all pre-judgment and post-judgment interest, costs, and other expenses; and

7. That the Plaintiffs be awarded all further relief in law or equity to which the Plaintiffs are entitled.

**MARC WALWYN**
ATTORNEY AT LAW

Respectfully Submitted,

Marc A. Walwyn, BPR No. 022431
Law Office of Marc Walwyn
412Georgia Avenue, Ste. 102
Chattanooga, TN  37403
Tel:  423.954.7266
Fax: 423.565-0125
E-Mail:  marc@walwynlegal.com

51