UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| ESTATE OF KYLAN TAYLOR LEEPER; JAMESHA MURPHY, b/n/f of K.L., a minor, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Civil Action Number 3:24-CV-1197 District Judge Waverly D. Crenshaw, Jr. |
| CORECIVIC, INC., ET AL., | ) ) | Magistrate Judge Jeffery S. Frensley |
| Defendants. | ) ) | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Defendants CoreCivic, Inc., CoreCivic of Tennessee, LLC (collectively, "CoreCivic"), Trousdale County, Tennessee ("Trousdale County"), Stephen Chambers ("Chambers"), Jerry Ford ("Ford"), Dwight Jewell ("Jewell"), Jack McCall ("McCall"), Jermaris Porter ("Porter"), Vincent Vantell ("Vantell"), and Gary Walsh ("Walsh") respectfully move the Court to dismiss the claims asserted against them by Plaintiffs Estate of Kylan Taylor Leeper and Jamesha Murphy, b/n/f of K.L., a minor (collectively, "Plaintiffs").[1]

## I. INTRODUCTION

This case arises out of the death of Kylan Leeper ("Leeper") from a drug overdose. At the time of his death, Leeper was a prisoner of the State of Tennessee and was incarcerated at the Trousdale Turner Correctional Center ("Trousdale"). Leeper experienced a medical emergency on October 6, 2023, and, despite medical personnel promptly responding and appropriately administering Narcan, he later was pronounced dead as the result of a fentanyl overdose.

---

[1] Plaintiffs also have asserted claims against numerous additional named and John Doe defendants (Docket Entry 24 ¶¶ 10-18, 26), none of whom have been served with the Amended Complaint.

322145904.2

Plaintiffs filed a Complaint on October 4, 2024 (Docket Entry 1), which they then amended on December 19, 2024 (Docket Entry 24). Through their First Amended Complaint ("Amended Complaint"), Plaintiffs purport to assert (1) claims against all Defendants under 42 U.S.C. § 1983 ("Section 1983"), all of which allege a failure to protect Leeper from illegal drugs in violation of the Eighth Amendment; (2) a state law wrongful death claim against all Defendants; (3) a state law negligence claim against CoreCivic, Porter, and Vantell; (4) a state law negligent supervision claim against Trousdale County, Chambers, Ford, Jewell, McCall, and Walsh; and (5) a civil conspiracy claim against Porter and Vantell. (Docket Entry 24). In doing so, Plaintiffs seek to shift responsibility for Leeper's drug overdose death and to hold Defendants liable by contending that Trousdale is understaffed and suffers from a drug smuggling problem such that Leeper would not have died had Defendants protected him from the introduction of illegal drugs into Trousdale. The Amended Complaint, however, is riddled with contradictory assertions related to staffing and the presence of illegal drugs in Leeper's housing unit and largely consists of conclusory statements that parrot the elements of the causes of action that Plaintiffs purport to assert.

Indeed, while Plaintiffs' general allegations of wrongdoing at Trousdale and other CoreCivic facilities are verbose and convoluted, the reasons that the Amended Complaint fails to state a claim are simple. First, Plaintiffs' Section 1983 claims fail because they do not sufficiently allege a constitutional violation in connection with Leeper's overdose and subsequent death, particularly in light of the Sixth Circuit's recent decision in *Caraway v. CoreCivic of Tennessee, LLC,* 98 F.4th 679 (6th Cir. 2024). Second, Plaintiffs' Section 1983 claims against CoreCivic and Trousdale County fail because their general allegations of understaffing by CoreCivic and failure to supervise by Trousdale County do not sufficiently allege an official policy or a pervasive, widespread custom of failing to ensure inmate health and safety in connection with the alleged proliferation of drugs at Trousdale. Third, Plaintiffs fail to adequately allege a Section 1983 claim

2

against Chambers, Ford, Jewell, McCall, Porter, Vantell, and Walsh in their individual capacities because Plaintiffs' allegations amount to claims for supervisory liability, and Plaintiffs fail to plead that these Defendants personally were involved in the circumstances surrounding Leeper's death. Fourth, Plaintiffs cannot hold Chambers, Ford, Jewell, McCall, and Walsh liable because those Defendants are entitled to qualified immunity. Finally, while the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims because Plaintiffs fail to state a federal claim, such claims also fail because Plaintiffs do not adequately allege that any Defendant is liable for wrongful death, was negligent, or engaged in a civil conspiracy. As a result, Plaintiffs' claims should be dismissed for failure to state a claim on which relief can be granted.

## II. <u>SUMMARY OF ALLEGATIONS</u>

Leeper was a prisoner of the State of Tennessee and was incarcerated at Trousdale at the time of his death on October 6, 2023. (Docket Entry 24 ¶¶ 1, 100). Plaintiffs assert claims against CoreCivic, Inc., the entity that owns and operates Trousdale, CoreCivic of Tennessee, LLC, the entity that employs certain individuals who work at the facility, and Trousdale County, the county government with which CoreCivic contracts to operate Trousdale. (*Id.* at ¶¶ 6-7, 20). Plaintiffs also assert claims against seven individual defendants. Five of these individuals – Chambers, Ford, Jewell, McCall, and Walsh – currently or previously worked for Trousdale County, and the Amended Complaint contains no allegation that they ever worked at Trousdale. (*Id.* at ¶¶ 21-25). As to the individuals who work at Trousdale, Vantell serves as the Warden, and Porter serves as an Assistant Warden. (*Id.* at ¶¶ 8-9).

Plaintiffs admit that Leeper had a history of drug abuse (Docket Entry 24 ¶ 101), and while the Amended Complaint purports to describe the general presence of illegal drugs at Trousdale and his cellmate's alleged drug distribution activities, Plaintiffs tellingly provide no information about the exact manner in which Leeper obtained the fentanyl that caused his death. Rather, they

3

vaguely allege that on "October 6, 2023, [Leeper] was found unresponsive and pulseless inside [his] cell during an emergency count that was being called by [Trousdale] officials due to the high volume of overdoses." (*Id.* at ¶ 115). Plaintiffs generally contend that Leeper died because of his "exposure to fentanyl" that was facilitated by "chronic understaffing" and the operation of an alleged "for-profit drug ring" inside Trousdale. (*Id.* at ¶ 1).

The Amended Complaint otherwise is rife with conclusory allegations of understaffing and the presence of illegal drugs at Trousdale. Indeed, Plaintiffs generally allege that CoreCivic has adopted a policy or custom of understaffing at Trousdale; that Trousdale County has failed to adequately supervise Trousdale and prevent the proliferation of drugs; that the individual Defendants were aware of, carried out, or otherwise ignored the execution of CoreCivic's alleged policy or custom of understaffing; and that certain of the individual Defendants either participated in or were aware of an alleged "for-profit drug ring" inside Trousdale. (*See, e.g.*, Docket Entry 24 ¶¶ 128-29, 132, 160-61, 186 190-91). In contending that prison officials turned a blind eye to the existence of a drug ring at Trousdale, Plaintiffs appear to rely on allegations that, in 2021 and 2022, three inmates died of an overdose out of the thousands who were incarcerated at Trousdale during that period (*id.* at ¶¶ 39, 42, 51); that the Prison Relations Oversight Committee (the "Oversight Committee") created to supervise Trousdale failed to address certain issues, failed to follow its rules of order, and disbanded in 2022 (*id.* at ¶¶ 41, 48); that certain employees of Trousdale and CoreCivic facilities in other states have been charged with bringing drugs into correctional facilities (*id.* at ¶¶ 83, 86); and that other lawsuits against CoreCivic have alleged the existence of drug smuggling at Trousdale (*id.* at ¶ 85).

Plaintiffs, however, do not allege specific facts concerning how Leeper obtained the drugs that caused his death, how or when he consumed the drugs, or the quantity consumed. Plaintiffs also do not allege any facts demonstrating that Defendants knew Leeper was at risk of consuming

drugs. As for understaffing, Plaintiffs do not allege specific facts concerning how understaffing caused Leeper to consume drugs, what specific posts were understaffed in Leeper's housing unit at the time of his death, or how additional security checks would have prevented Leeper's death. And, as for Chambers, Ford, Jewell, McCall, and Walsh, Plaintiffs do not contend that any of these individuals knew Leeper or possessed any information about him indicating he would overdose on drugs. Plaintiffs similarly do not contend that Porter or Vantell took or failed to take any action on October 6, 2023, that caused or contributed to Leeper's death.

In fact, to the extent that Plaintiffs attempt to include specific allegations related to the circumstances at the time of Leeper's death, they serve to contradict the general allegations related to understaffing, the severity of the drug issue in Leeper's housing unit, and the refusal of prison officials to take action to combat the alleged proliferation of illegal drugs. At the time of his death, Leeper was housed in Housing Unit Foxtrot ("Unit F"). (Docket Entry 24 ¶¶ 101, 102). While Plaintiffs generally contend that Trousdale is understaffed because it has a single correctional officer monitoring all the inmates in a housing unit, that was not the case for Unit F at the time of Leeper's death, as Plaintiffs state that "[f]ortunately, Housing Unit F had more than a single CO monitoring all the inmates" and that treatment counselors "were able to operate as additional eyes and ears." (*Id.* at ¶ 107). As to the presence of illegal drugs in Leeper's housing unit prior to his death, while Plaintiffs generally contend that "inmates in Housing Unit F began to fall over and collapse from overdoses[,]" they do not identify any of those inmates and only describe one overdose that resulted in the administration of Narcan and occurred more than a week before Leeper's death at a facility that houses up to 2,672 inmates. (*Id.* ¶¶ 39, 107-109). And, while Plaintiffs generally complain about the response to that overdose that allegedly occurred on September 29, 2023, their allegations also show that the overdose was not ignored, as a drug detection dog located the drugs that resulted in the overdose and searched all cells in the housing

5

unit that same day. (*Id.* ¶ 110). Plaintiffs also allege that the facility was "constantly on lockdown due to high volumes of violence and overdoses" in August, September, and October 2023, which further negates any assertion that the presence of illegal drugs was ignored. (*See id.* ¶ 71).

### III.  STANDARD OF REVIEW

A complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2). This "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). To survive a motion to dismiss, a complaint must contain sufficient factual matter to state a claim for relief that is "plausible on its face." *Id.* (quoting *Twombly*, 550 U.S. at 570).

This standard requires that the factual allegations "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* Moreover, factual allegations that are merely *consistent* with the defendant's liability do not satisfy the plaintiff's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

### IV.  LAW AND ARGUMENT

#### A.  Plaintiffs Fail to Plead Sufficient Facts to Support a Section 1983 Claim.

Section 1983 creates a private cause of action for constitutional deprivations by any person acting under color of state law:

> Every person who, under the color of any statute, ordinance, regulation, custom, or usage of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the

6

> United States or other person within the jurisdiction thereof to the
> deprivation of any rights, privileges, or immunities security by the
> Constitution and laws, shall be liable to the party injured in an action
> at law, suit in equity . . . .

42 U.S.C. § 1983. To prevail on their Section 1983 claims, Plaintiffs must establish that Leeper was deprived of a right secured by the Constitution and that he was subjected to this deprivation by a person acting under color of state law. *Searcy v. Daytona*, 38 F.3d 282, 286 (6th Cir. 1994).

In this case, Plaintiffs allege that Defendants deprived Leeper of his Eighth Amendment rights by failing to protect him from overdosing. The Eighth Amendment protects inmates from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Estelle v. Gamble*, 429 U.S. 98, 104-05 (1976); *Rouster v. County of Saginaw*, 749 F.3d 437, 446 (6th Cir. 2014). Conditions that "deprive inmates of basic human needs" or the "minimal civilized measure of life's necessities" violate the Eighth Amendment. *Rhodes v. Chapman*, 452 U.S. 337, 345-46 (1981). In contrast, when prison conditions do not "lead to deprivations of essential food, medical care, or sanitation" and do not "create other conditions intolerable for prison confinement," no constitutional violation exists. *Id*. at 347-48.

In support of their Section 1983 claims, Plaintiffs generally allege that certain Defendants had knowledge and awareness of understaffing and of the proliferation of drugs at Trousdale, and therefore failed to protect Leeper from overdosing on fentanyl. However, Plaintiffs do not allege facts sufficient to allow the Court to draw the inference that any Defendant violated the Eighth Amendment with respect to Leeper and should be held liable for his death. Accordingly, Plaintiffs' Section 1983 claims should be dismissed in their entirety.

      1.      <u>**Plaintiffs Fail to Adequately Allege that Any Defendant Violated the Eighth Amendment in Connection with Leeper's Overdose Death.**</u>

To succeed on an Eighth Amendment failure to protect claim, Plaintiffs must prove that Defendants acted with "deliberate indifference to a sufficiently serious risk of harm." *Caraway*,

7

98 F.4th at 683. The deliberate indifference standard embodies both objective and subjective components. *Carter v. Vandercook*, 59 Fed. Appx. 52, 54 (6th Cir. 2003). The objective component requires Plaintiffs to demonstrate that Leeper was "subjected to specific deprivations that are so serious that they den[ied] [him] 'the minimal civilized measure of life's necessities.'" *Id*. The subjective component requires Plaintiffs to demonstrate that "prison officials acted wantonly, with deliberate indifference to [Leeper's] serious needs." *Grissom v. Davis*, 55 Fed. Appx. 756, 757 (6th Cir. 2003). Deliberate indifference entails more than negligence or even gross negligence. *Dajani v. Montgomery Cnty*, 59 Fed. Appx. 740, 745 (6th Cir. 2003). An official is deliberately indifferent only if he or she knows of and disregards an excessive risk to inmate health or safety. *Bishop v. Hackel,* 636 F.3d 757, 766-67 (6th Cir. 2011). The official must be aware of the facts from which such an inference could be drawn and must also draw the inference. *Id.*

As an initial matter, Plaintiffs cannot sustain an Eighth Amendment claim against Defendants because they do not adequately plead that Leeper faced an objectively serious risk of harm from access to illegal drugs. The Sixth Circuit's recent decision in *Caraway* is instructive, as it relates to an assessment of the objective component in connection with an inmate overdose death. There, the Sixth Circuit affirmed the district court's dismissal of a failure to protect claim involving circumstances very similar to those presented here in that an inmate died of a fentanyl overdose at a CoreCivic facility in Tennessee, and the plaintiff alleged that understaffing resulted in drug smuggling and allowed fentanyl to proliferate at the facility. *Caraway*, 98 F.4th at 681-82. After clarifying that "a failure-to-protect claimant can't state an objectively excessive risk of harm by simply pointing to physical harm that occurred after the violation" and noting that "[t]he relevant constitutional 'injury' is the exposure to an objectively excessive risk, *not* any physical harm that befalls the inmate because of that risk[,]" the Sixth Circuit determined that the plaintiff's

generalized allegations of understaffing and drug proliferation failed to satisfy the objective component of a failure to protect claim. *Id*. at 685 (emphasis in original).

In doing so, the Sixth Circuit took great care to distinguish *Zakora v. Chrisman*, 44 F. 4th 452 (6th Cir. 2022), specifically noting that the conclusion in that case "was a limited one" based on "the egregiousness of Zakora's circumstances." *Caraway*, 98 F.4th at 684. In *Zakora*, the court determined that the plaintiff plausibly stated an objectively serious risk of harm based on specific allegations of "unfettered access to deadly drugs inside a prison." 44 F. 4th at 470-71. As the Sixth Circuit noted in *Caraway*, three key facts presented in *Zakora* "made that case extraordinary" and drove the decision to allow a failure to protect claim to proceed: (1) the complaint plausibly alleged that drugs were "everywhere" in Zakora's facility and contained specific allegations about how the drugs got there; (2) two other inmates in Zakora's small twelve-to-sixteen person housing unit overdosed in the two days before his death; and (3) prison officials failed to investigate the two prior overdoses. *Caraway*, 98 F.4th at 684 (citing *Zakora*, 44 F. 4th at 461, 471-72). While the court questioned whether the complaint plausibly alleged the widespread presence of drugs based on generalized allegations about Caraway's alleged access to drugs, it concluded that it need not decide that issue because it could not "reasonably infer an overdose problem as acute as the one in *Zakora*" based on broad statements that inmates have overdosed at increased rates at CoreCivic facilities and because the plaintiff did not allege that there were any overdoses immediately prior that the facility failed to investigate. *Id*. at 685. The same is true here.

On the first key fact, Plaintiffs do not allege how the specific drugs that Leeper took got inside Trousdale. Rather, they simply conclude that certain individuals "were actively smuggling drugs in" (*see, e.g.*, Docket Entry 24 ¶¶ 61, 70-71, 102), which does not demonstrate the required level of specificity as to the manner in which the general presence of illegal drugs caused Leeper's

overdose. *See Iqbal*, 556 U.S. at 680; *Caraway*, 98 F.4th at 686 (stating that the complaint "never explains . . . how any violation caused Caraway's overdose").

On the second key fact, while Plaintiffs allege that there were three inmate overdose deaths at Trousdale in 2021 and 2022 (Docket Entry 24 ¶¶ 42, 51) and that another inmate in Leeper's housing unit overdosed and received Narcan on September 29, 2023 (*id.* ¶ 109), they still do not offer sufficient "detail about the magnitude of the overdose problem" at Trousdale. *Caraway*, 98 F.4th at 685. Indeed, Plaintiffs do not allege that a single inmate overdose death occurred in 2023 prior to Leeper's death. And, Plaintiffs' vague allegations about non-fatal overdoses at Trousdale do not "come close to showing the kind of excessive, one-for-every-eight risk Zakora faced." *Id.* Plaintiffs detail only one non-fatal overdose in Unit F more than a week before Leeper's death, which, in a housing unit of 75 to 125 inmates in a facility that houses up to 2,672 inmates (Docket Entry 24 ¶¶ 39, 57), does not compare to the circumstances in *Zakora* where two inmates in a twelve to sixteen-person housing unit overdosed in the two days prior to the decedent's overdose.

Finally, on the third key fact, while the Amended Complaint includes generalized allegations about the failure to prevent the alleged drug problem at Trousdale, such allegations are a far cry from *Zakora*'s "specific, close-in-time failure [to investigate prior overdoses]." *Caraway*, 98 F.4th at 685. For example, Plaintiffs do not plausibly allege that Defendants failed to investigate the September 29, 2023, overdose in Unit F, as their allegations demonstrate that prison officials immediately employed a drug detection dog in an attempt to locate any additional illegal drugs in the housing unit. Plaintiffs thus fail to allege that Leeper faced an excessive risk of harm from access to drugs at Trousdale, and their Section 1983 claims should be dismissed.

Even if Plaintiffs satisfied the objective component, however, the Amended Complaint still fails to satisfy the subjective component of a failure to protect claim. In *Caraway*, the court noted that to meet the subjective component the plaintiff needed to "allege facts permitting the reasonable

10

inference that the defendants (1) had notice of the risk that inmates would overdose based on their unfettered access to drugs and (2) failed to reasonably respond to that risk." *Caraway*, 98 F.4th at 686. Plaintiffs' Amended Complaint does neither.

First, Plaintiffs do not sufficiently allege that Defendants knew of a drug problem at Trousdale. While the Amended Complaint vaguely suggests that Defendants were aware of the "rampant" presence of illegal drugs and an illegal drug ring at Trousdale, Plaintiffs do not include any detail about how or when Defendants obtained that awareness and what that awareness entailed with respect to Leeper, which is fatal to their claim. *See Caraway*, 98 F.4th at 686; *see also Curran v. Venango County*, 2023 WL 8439274, at *8 (W.D. Pa. Nov. 2, 2023), *report and recommendation adopted*, 2023 WL 8061513 (W.D. Pa. Nov. 21, 2023) (allegations that prison officials knew of and disregarded a pervasive drug smuggling problem were "mere conclusions of law masquerading as allegations of fact"). Second, Plaintiffs do not sufficiently allege that prison officials failed to reasonably respond to the alleged staffing concerns or the alleged risk of access to illegal drugs. Conversely, Plaintiffs allege that CoreCivic actively sought to address staffing concerns in September 2023 (Docket Entry 24 ¶ 105); brought in a drug detection dog to search Unit F in the days preceding Leeper's death (*id.* at ¶ 110); and discussed understaffing issues with Trousdale County "in nearly every" Oversight Committee meeting (*id.* at ¶ 41). While Plaintiffs appear to contend that Defendants should have done more, the Amended Complaint does not plausibly demonstrate that they failed to respond to the risk of illegal drugs at Trousdale. Plaintiffs thus fail to satisfy the subjective component, and their failure to protect claim should be dismissed.

### 2. Plaintiffs Fail to Allege that Leeper's Death Was Caused by a Policy or Custom of CoreCivic or Trousdale County.

With respect to Plaintiffs' Section 1983 claims against CoreCivic and Trousdale County, the Supreme Court has held that a municipality is a "person" that may act under color of state law

and incur liability under Section 1983. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). Likewise, private entities that perform a traditional state function in operating a prison also act under the color of state law and may be liable under Section 1983. *Street v. CCA*, 102 F.3d 810, 814 (6th Cir. 1996). Section 1983 claims against private entities like CoreCivic thus are analyzed in accordance with *Monell* as if it were a municipal entity like Trousdale County. *See id.* at 818.

However, municipalities and prison contractors cannot be held liable under Section 1983 on a *respondeat-superior* theory. *Monell*, 436 U.S. at 691. Instead, they are responsible only for injuries caused by those acts that represent official policy or a custom that, although not "formally approved by an appropriate decisionmaker," is nonetheless "so widespread as to have the force of law." *Ford v. Cty. of Grand Traverse*, 535 F.3d 483, 495-96 (6th Cir. 2008). Accordingly, to establish a Section 1983 claim against CoreCivic or Trousdale County, Plaintiffs must: (1) identify the policy or custom; (2) connect the policy or custom to CoreCivic or Trousdale County; and (3) demonstrate that injury resulted from the execution of the policy or custom. *Garner v. Memphis Police Department*, 8 F.3d 358, 364 (6th Cir. 1993).

A policy consists of "formal rules or understandings . . . that are intended to, and do, establish fixed plans of action to be followed under similar circumstances consistently and over time." *Bowman v. CCA*, 188 F. Supp. 2d 870, 880 (M.D. Tenn. 2000). A policy "generally implies a course of action consciously chosen from among various alternatives." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Not every course of action or decision of an employee of a municipality or a corporation establishes a binding policy for liability purposes, however. *Liptak v. City of Niles*, 1999 WL 1045100, at *5-6 (6th Cir. Nov. 10, 1999). The individuals for whose conduct Plaintiffs seek to hold CoreCivic and/or Trousdale County liable "must possess final authority to establish . . . policy with respect to the action ordered." *Id.*

322145904.2

To establish an unconstitutional custom, Plaintiffs must prove: (1) the existence of a clear and persistent pattern of unconstitutional conduct; (2) notice or constructive notice; (3) tacit approval of the unconstitutional conduct, such that a failure to act amounts to an official policy of inaction; and (4) that the custom was the moving force or direct causal link in the constitutional deprivation. *D'Ambrosio v. Marino*, 747 F.3d 378, 387-88 (6th Cir. 2014). This custom "must be so permanent and well-settled as to constitute a custom or usage with the force of law" and "must include deeply embedded traditional ways of carrying out state policy." *Miller v. Calhoun County*, 408 F.3d 803, 815 (6th Cir. 2005). Random, unconnected, and scattershot accusations do not establish a pervasive, widespread custom. *See Rizzo v. Goode*, 423 U.S. 362, 375 (1976).

The Sixth Circuit thus has identified certain ways that a Section 1983 plaintiff may demonstrate an actionable policy or custom, including: (1) the existence of an illegal official policy or legislative enactment; (2) that an official with final decision-making authority ratified illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. *See Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013). Plaintiffs, however, have failed to assert any specific facts demonstrating that the alleged constitutional deprivations at issue in this lawsuit directly were caused by an official policy or a pervasive, widespread custom of CoreCivic or Trousdale County, and their Section 1983 claims against these Defendants should be dismissed as a result.

a. **Plaintiffs' General Allegations that Trousdale Is Understaffed Fail to State a Claim Under Section 1983.**

With respect to their Section 1983 claim against CoreCivic, Plaintiffs appear to allege that CoreCivic has adopted a company-wide policy of "understaffing" in order generate greater profits. (Docket Entry 24 ¶ 195). As it relates to Trousdale, Plaintiffs offer only vague generalizations about staffing and, in passing, reference past audits performed by the Tennessee Comptroller's

13

Office in support of the notion that CoreCivic has a policy or custom of understaffing at Trousdale. (*Id.* ¶ 122). Indeed, while Plaintiffs broadly contend that Trousdale is "chronically" understaffed, they do not connect the dots between their scattershot allegations of understaffing, an illegal drug ring, and Leeper's death. Instead, Plaintiffs summarily conclude that Leeper's death is "attributable to Defendant CoreCivic's policy and practice of failing to ensure adequate staffing in its prison facilities . . . ." (Docket Entry 24 ¶ 197). Similarly, Plaintiffs baldly allege that Trousdale County's failure to properly supervise CoreCivic and "ensure compliance with the terms of the agreement between Trousdale County and [CoreCivic]" was what "caused the catastrophic conduct inside [Trousdale] . . . resulting in injury and death to [Leeper]." (*Id.* at ¶¶ 160, 163).

Such vague and conclusory allegations of understaffing cannot support a Section 1983 claim because they are the exact types of allegations that fail to "raise a right to relief above the speculative level" and "nudge[] the[] claims across the line from conceivable to plausible." *Twombly*, 550 U.S. at 555, 570. Indeed, Plaintiffs include no factual allegations showing that any purported understaffing caused Leeper's death. Rather, Plaintiffs merely suggest that CoreCivic's alleged staffing shortages and Trousdale County's failure to address or otherwise supervise CoreCivic as to staffing constitute "unconstitutional" and "wrongful" conduct. (Docket Entry 24 ¶¶ 164, 190). This is not sufficient to sustain a Section 1983 claim against CoreCivic.

Indeed, allegations of understaffing do not magically create a Section 1983 claim. *See Atkins v. CoreCivic, Inc.*, 2021 WL 4773080, at *5 (M.D. Tenn. Oct. 12, 2021) ("The glaring problem with the plaintiffs' position is that the failure – even the knowing failure – to ensure adequate staffing at a prison does not, *per se*, amount to a constitutional violation."). What Plaintiffs fail to do is provide appropriate factual enhancement concerning understaffing beyond the "unadorned, the-defendant-unlawfully-harmed-me accusation[s]" that are insufficient under *Iqbal* and *Twombly*. Courts recently have determined that such broad allegations of understaffing

cannot sustain a Section 1983 claim. *See Caraway*, 98 F.4th at 685-86 (allegations of understaffing could not sustain a Section 1983 claim where the plaintiff asserted no "facts supporting the conclusion that the defendants' understaffing caused drugs to proliferate"); *Massey v. CoreCivic, Inc.*, 2023 WL 5917399, at *11 (M.D. Tenn. Sept. 29, 2023) (dismissing Section 1983 claim against CoreCivic where the plaintiff did not allege facts showing that understaffing in any way caused or contributed to an alleged assault and subsequent inmate death). Plaintiffs thus cannot hold CoreCivic liable for alleged understaffing because they have failed to sufficiently allege that CoreCivic had a policy or custom of understaffing at Trousdale and that such policy or custom actually caused the alleged constitutional deprivations at issue.

Plaintiffs' Section 1983 claims against Trousdale County fare no better. As to Trousdale County, Plaintiffs merely allege that it failed to "investigate, oversee, and supervise" CoreCivic with respect to staffing. (Docket Entry 24 ¶ 158). In essence, Plaintiffs seek to hold Trousdale County liable for the alleged policies, practices, and customs of CoreCivic at Trousdale. This is exactly the type of *respondeat-superior* theory on which courts consistently have determined municipalities cannot be held liable under Section 1983. *Monell*, 436 U.S. at 691. Because Plaintiffs have failed to sufficiently allege that Trousdale County has a policy or custom of failing to address understaffing at Trousdale and that such policy or custom actually caused the alleged constitutional deprivation at issue, their allegations about understaffing provide no basis for a Section 1983 claim against Trousdale County.

> **b. Plaintiffs' Allegations that CoreCivic Permits Illegal Drugs at Trousdale and that Trousdale County Failed to Address Such Conduct Fail to State a Claim under Section 1983.**

Plaintiffs also generally allege that CoreCivic "ignored both the prevalence of drugs and the possibility of fatal outcomes from fentanyl exposure" and that Trousdale County's "failure to investigate, oversee, and supervise" in essence ratified CoreCivic's alleged misconduct. (Docket

15

Entry 24 at ¶¶ 129, 158, 161). These conclusory allegations, however, fall well short of establishing the requisite policy or custom to assert a Section 1983 claim against either Defendant. Indeed, while Plaintiffs vaguely allege that inmates at Trousdale have "unfettered access to dangerous drugs," (*id.* at ¶ 209), they provide no basis for attributing Leeper's death to any CoreCivic or Trousdale County policy or custom concerning the presence of illegal drugs at Trousdale. Their conclusory allegations about the presence of illegal drugs at Trousdale simply do not give rise to a reasonable inference that CoreCivic has a policy or custom of allowing inmates at Trousdale to obtain illegal drugs. Indeed, setting aside Plaintiffs' conclusory allegations, the Amended Complaint does not allege any facts suggesting the existence of such a policy or custom.

Moreover, while Plaintiffs allege that three of the thousands of inmates incarcerated at Trousdale died of drug overdoses in 2021 and 2022, that one inmate in Leeper's housing unit was given Narcan following an overdose on September 29, 2023, and that certain Trousdale employees have been charged with bringing drugs into the facility, this still does not demonstrate an official policy or a pervasive, widespread custom of allowing illegal drugs to enter Trousdale. Courts faced with similarly isolated examples routinely have acknowledged that isolated instances of alleged misconduct cannot establish liability under Section 1983 based on the existence of an unconstitutional policy or custom. *See Peet v. City of Detroit*, 502 F.3d 557, 567 (6th Cir. 2007) ("[N]o reasonable juror could find on the basis of three discrete incidents that a city-wide policy or custom of unconstitutional treatment of witnesses was in place."); *Thomas v. City of Chattanooga*, 398 F.3d 426, 432-34 (6th Cir. 2005) (rejecting plaintiffs' attempt to "infer a municipal-wide policy based solely on one instance of potential misconduct" and holding that the plaintiffs must show "a pattern of deliberate indifference that goes beyond the facts of [their] own case" to prove a "custom").

322145904.2

Plaintiffs' vague references to Leeper's overdose and subsequent death and to other unidentified instances of inmate overdoses and employees purportedly bringing contraband into the facility simply fail to demonstrate (1) that CoreCivic and/or Trousdale County had an official policy of allowing illegal to drugs to proliferate at Trousdale so as to amount to a failure to ensure inmate health and safety, (2) that a clear and consistent pattern of such constitutional deprivations occurred at Trousdale so as to amount to an unconstitutional custom, or (3) that any such policy or custom concerning illegal drugs was the "moving force" behind the alleged constitutional deprivations in this case. Specifically, Plaintiffs do not connect the claimed policy or custom to CoreCivic and/or Trousdale County or plausibly demonstrate that Leeper's death resulted from execution of that policy or custom. Accordingly, Plaintiffs fail to state a Section 1983 claim against CoreCivic or Trousdale County based on a policy or custom of allowing illegal drugs to enter Trousdale, and any such claims should be dismissed.

> **c.** **Plaintiffs' Allegations that CoreCivic and Trousdale County Failed to Train or Supervise Employees at Trousdale Do Not State a Claim under Section 1983.**

Plaintiffs also vaguely allege that CoreCivic and Trousdale County failed to adequately train and/or supervise the employees who work at Trousdale. (Docket Entry 24 ¶¶ 137-145, 156-164). As with Plaintiffs allegations' concerning understaffing and the presence of illegal drugs at Trousdale, their allegations concerning an alleged failure to train and/or supervise cannot sustain a Section 1983 claim against CoreCivic or Trousdale County.

The culpability of a municipality or corporation for a deprivation of constitutional rights is at its most tenuous where a claim turns on a failure to train or supervise. *Connick v. Thompson*, 563 U.S. 51, 61 (2011). To state a claim based on inadequate training, the alleged failure to train must amount to "deliberate indifference to the rights of persons with whom the [untrained employees] come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989). Only then

322145904.2

"can such a shortcoming be properly thought of as a [] 'policy or custom' that is actionable under § 1983." *Connick*, 563 U.S. at 61. Thus, to state a Section 1983 claim based upon a failure to train or supervise theory, a plaintiff must plead: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of deliberate indifference; and (3) the inadequacy was closely related to or actually caused the alleged injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006).

Here, while Plaintiffs contend that the training of CoreCivic employees at Trousdale was insufficient, they do not plead facts sufficient to support a conclusion that such training amounted to deliberate indifference. To the contrary, Plaintiffs allege that trained treatment counselors worked in Unit F for purposes of working with inmates who had substance abuse issues and who were well-trained in identifying potential overdoses. (Docket Entry 24 ¶ 58). Plaintiffs' allegations that CoreCivic and Trousdale County failed to properly train and/or supervise employees at Trousdale as to drug overdoses amount to nothing more than conclusory assertions without "further factual enhancement," and do not allege the elements necessary to assert liability under Section 1983 on a failure to train theory. Thus, to the extent that Plaintiffs base their Section 1983 claims on an unspecified failure to train, such claims are not viable and should be dismissed.

### 3. Plaintiffs Fail to Allege that the Individual Defendants Had Personal Involvement in the Circumstances Associated with Leeper's Death.

Plaintiffs also purport to assert Section 1983 claims against Chambers, Ford, Jewell, McCall, Porter, Vantell, and Walsh based on allegations that these individuals failed to protect Leeper from overdosing. (Docket Entry 24 ¶¶ 148, 153 174). Section 1983 individual-capacity claims differ from Section 1983 official-capacity claims. *Peatross v. City of Memphis*, 818 F.3d 233, 240 (6th Cir. 2016). While an official-capacity claim against a person is "essentially a claim

18

against the municipality [or corporation]," "an individual-capacity claim seeks to hold an official personally liable for the wrong alleged." *Id*. at 241.

Regarding such individual-capacity claims, the law is clear that "[g]overnment officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*." *Iqbal*, 556 U.S. at 676; *see also Bellamy v. Bradley*, 729 F.2d 416, 421 (6th Cir. 1984). Officials only are liable for "their own unconstitutional behavior." *Colvin v. Caruso*, 605 F.3d 282, 292 (6th Cir. 2010). A plaintiff, therefore, must plead that each official, through the official's own actions, violated the Constitution. *Iqbal*, 556 U.S. at 676. This requires that an official be "personally involved in the unconstitutional action." *Pineda v. Hamilton Cty.*, 977 F.3d 483, 490 (6th Cir. 2020). Indeed, for a supervisor to be held liable, there must be a showing that the supervisor encouraged the specific instance of misconduct or in some other way directly participated in it. *Bellamy*, 729 F.2d at 421. "At a minimum, a [Section] 1983 plaintiff must show that a supervisory official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending subordinates." *Id*.

With respect to their Section 1983 claims against the individual Defendants, it is clear that Plaintiffs have conflated the concepts of individual-capacity liability and official-capacity liability. Because Plaintiffs do not allege that these Defendants had any personal involvement in, or knowledge of, the circumstances associated with Leeper's overdose death, the Amended Complaint does not allege facts that would make them personally liable. At most, Plaintiffs' allegations concerning the individual Defendants suggest official-capacity liability based on their alleged implementation and promulgation of prison or county policies, which are insufficient to sustain a Section 1983 claim against CoreCivic or Trousdale County. In this regard, courts previously have dismissed Section 1983 claims based on similarly insufficient allegations against individual defendants in similar contexts. *See Massey*, 2023 WL 5917399, at *6-7 (dismissing

Section 1983 claims against prison officials because they were not involved in the specific incidents of misconduct at issue); *Caraway v. CoreCivic of Tennessee, LLC*, 2023 WL 2799732, at \* 11 (W.D. Tenn. Apr. 5, 2023) (dismissing Section 1983 claims against prison officials, including Vantell, because the plaintiff failed make any specific factual allegations against them).

Indeed, Plaintiffs' allegations that relate to the individual Defendants are not accompanied by facts suggesting that these Defendants "either encouraged the specific incident of misconduct" that led to the alleged failure to protect Leeper from overdosing or that they contemporaneously were aware of or "implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Bellamy*, 729 F.2d at 421. Because the Amended Complaint is devoid of allegations that these Defendants had any personal involvement in or knowledge of Leeper's overdose, Plaintiffs have not alleged facts that would make them personally and individually liable for Leeper's death under Section 1983. *See Phillips v. Roane Cnty.*, 534 F.3d 531, 543 (6th Cir. 2008) (finding that the plaintiff's allegations regarding the supervisory defendants' "collective failure to train their employees as to the proper protocols" did not constitute sufficient evidence for individual liability and, instead, "improperly conflate[d] a § 1983 claim of individual supervisory liability with one of municipal liability"). The Court, therefore, should dismiss any individual-capacity Section 1983 claims against Chambers, Ford, Jewell, McCall, Porter, Vantell, and Walsh.

## 4. Chambers, Ford, Jewell, McCall, and Walsh Are Entitled to Qualified Immunity.

Plaintiffs also fail to state a Section 1983 claim against Chambers, Ford, Jewell, McCall, and Walsh because they are entitled to qualified immunity. "Under the doctrine of qualified immunity, 'government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or

constitutional rights of which a reasonable person would have known.'" *Goode v. Berlanga*, 646 F. App'x 427, 429 (6th Cir. 2016). "The question of whether a defendant enjoys qualified immunity is a question of law for the Court to resolve." *Wilson v. Berghuis*, 2009 WL 6442983, at *4 (W.D. Mich. May 26, 2009), *report and recommendation adopted*, 2010 WL 1875515 (W.D. Mich. May 10, 2010). Because the "'driving force' behind the qualified immunity doctrine is the 'desire to ensure that insubstantial claims against government officials will be resolved prior to discovery,' immunity questions should be resolved at the earliest possible stage of litigation." *Id.*

"To survive [a] motion to dismiss on qualified-immunity grounds, the plaintiff must allege facts that 'plausibly mak[e] out a claim that the defendant's conduct violated a constitutional right that was clearly established law at the time, such that a reasonable [official] would have known that his conduct violated that right.'" *Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016). Thus, to determine whether government officials are entitled to qualified immunity, "courts 'ask two questions: First, viewing the facts in the light most favorable to the plaintiff, has the plaintiff shown that a constitutional violation has occurred? Second, was the right clearly established at the time of the violation?'" *Goode*, 646 F. App'x at 429. "If the answer to the first question is in the negative, the Court need not consider the second question because if no constitutional right exists, no such right would have been clearly established." *Foster v. Birkett*, 2009 WL 799061, at *6 (E.D. Mich. Mar. 23, 2009). As for the second question, "'[a]n official's conduct flunks this 'clearly established' test only if the conduct's unconstitutionality was 'beyond debate' when the official acted, such that any reasonable person would have known that it exceeded constitutional bounds.'" *Jones v. Burt*, 2022 WL 4244298, at *4 (W.D. Mich. July 15, 2022), *report and recommendation adopted in part*, 2022 WL 3210073 (W.D. Mich. Aug. 9, 2022).

In support of their Section 1983 claims against Chambers, Ford, Jewell, McCall, and Walsh in their individual capacities, Plaintiffs generally contend that these Defendants violated Leeper's

Eighth Amendment rights by failing to ensure compliance with the terms of the agreement between Trousdale County and CoreCivic. Plaintiffs, however, do not allege that these Defendants were aware of or consciously disregarded any risk that Leeper would fatally overdose on drugs while at Trousdale. Indeed, the Amended Complaint contains contradictory assertions regarding the degree of oversight that Trousdale County exercised over Trousdale, averring that the Oversight Committee discussed understaffing issues "in nearly every meeting" (Docket Entry 24 ¶ 41) while simultaneously alleging that a purported "conflict of interest" between Trousdale County and CoreCivic prevented these Defendants from addressing "critical issues" at the facility (*id.* at ¶ 46). Similarly, while the Amended Complaint alleges that Chambers, Ford, Jewell, McCall, and Walsh "allowed or coordinated the disbandment of the Oversight Committee" (*id.* at ¶ 171) it offers no detail concerning how these Defendants engaged in such conduct or how it had any connection to Leeper's death. At most, Plaintiffs criticize the Oversight Committee's alleged lack of record keeping, relatively short meetings, and various other administrative practices. Such conduct does not amount to a constitutional violation, much less one that is "clearly established" or "beyond debate." Chambers, Ford, Jewell, McCall, and Walsh are entitled to qualified immunity, and Plaintiffs' Eighth Amendment individual capacity claims against them should be dismissed.

**B.** **The Court Should Dismiss Plaintiffs' State Law Claims Against Defendants.**

Plaintiffs also seek to invoke the Court's supplemental jurisdiction and purport to assert state law wrongful death claims against all Defendants, negligence claims against CoreCivic, Porter, and Vantell, negligent supervision claims against Trousdale County, Chambers, Ford, Jewell, McCall, and Walsh, and a civil conspiracy claim against Porter and Vantell. (Docket Entry 24 ¶¶ 183-188, 199-219). As an initial matter, the Court should decline to exercise supplemental jurisdiction over Plaintiffs' state law claims because there are no viable federal claims against Defendants, as outlined above. The grant of supplemental jurisdiction over state law claims that

arise out of the same facts that form a basis for a federal claim is within the Court's discretion. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726 (1966); *Vandiver v. Hardin County Board of Education*, 925 F.2d 927, 935 (6th Cir. 1991). If all federal claims are dismissed, the balance of factors typically will point toward dismissal of the state law claims. *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, 350 (1988). Therefore, if the Court determines that Plaintiffs fail to state a claim for relief under Section 1983, then it should decline to exercise supplemental jurisdiction over their state law claims against Defendants. Regardless, Plaintiffs do not allege sufficient facts to sustain their state law claims, and they should be dismissed.

### 1. Plaintiffs Fail to State a Claim for Wrongful Death.

Tennessee's wrongful death statute provides that when a person "dies from injuries received from another, or whose death is caused by the wrongful act, omission, or killing by another" the person's right of action "shall pass . . . to the person's children or next of kin . . . ." TENN. CODE ANN. § 20-5-106. Here, Plaintiffs summarily conclude that Defendants breached a duty of care owed to Leeper and that such breach resulted in Leeper's death. (Docket Entry 24 ¶ 185). These summary allegations do not lead to the conclusion that Defendants breached any duty of care that resulted in Leeper's death. As a result, the Court should dismiss Plaintiffs' wrongful death claim against Defendants.

### 2. Plaintiffs Fail to State a Claim for Negligence.

To properly allege a common law negligence claim, a plaintiff must set forth the following elements: (1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the applicable standard of care that amounts to a breach of that duty; (3) an injury or loss; (4) causation in fact; and (5) proximate, or legal, causation. *See e.g.*, *Staples v. CBL & Assocs.*, 15 S.W.3d 83, 89 (Tenn. 2000). For Plaintiffs to assert a negligence claim against CoreCivic, Porter, and Vantell, they must specifically allege how each of these Defendants took actions that

could constitute negligence or how each of these Defendants could be held vicariously liable for the negligent actions of another. Plaintiffs fall well short of doing either. Indeed, Plaintiffs' allegations do not include any facts plausibly showing how these Defendants breached any duty of care owed to Leeper or, much less, how any alleged breach caused Leeper's death. They merely parrot the elements of a negligence claim and broadly allege that these Defendants breached their duties "to protect [Leeper] from reasonably foreseeable harm." (Docket Entry 24 ¶ 200). However, simply alleging that Leeper was able to procure illegal drugs and died from a fentanyl overdose does not compel the conclusion that these Defendants breached a duty owed to Leeper and that such breach caused his death. Plaintiffs' negligence claim should be dismissed.

### 3. Plaintiffs Fail to State a Claim for Negligent Supervision.

Plaintiffs also fail to state a claim for negligent supervision against Trousdale County, Chambers, Ford, Jewell, McCall, and Walsh because such a claim "sounds squarely in civil rights" and therefore is barred by the civil rights exception to the Tennessee Governmental Tort Liability Act (the "GTLA"). *Betty H. v. Williamson Cnty.*, 2023 WL 5193537, at **4-5 (Tenn. Ct. App. Aug. 14, 2023) (noting that the phrase "civil rights" has been construed as "'claims arising under the federal civil rights law and the U.S. Constitution'"). Indeed, where the "substantial point" of a negligent supervision claim against a municipality and its employees "involves violations of civil rights," such a claim is barred notwithstanding a party's "insistence that the conduct was merely negligent." *Id.* at *5. Moreover, "any ambiguity as to whether immunity exists must be resolved in favor of retaining immunity." *Id.* Here, Plaintiffs' claim for negligent supervision sounds squarely in civil rights – namely, certain Defendants' alleged "failure to ensure a reasonably degree of safety" at Trousdale and "protect[] both inmates and staff from dangerous fentanyl exposure", (Docket Entry 24 ¶ 208), which is the same conduct forming the basis of Plaintiffs' Section 1983 claims. Plaintiffs' negligent supervision claim is barred by the GTLA and should be dismissed.

322145904.2

## 4.    Plaintiffs Fail to State a Claim for Civil Conspiracy.

Plaintiffs also fail to state a claim for civil conspiracy against Porter and Vantell. To establish a claim for civil conspiracy in Tennessee, a plaintiff must establish four elements: (1) a common design between two or more persons, (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means, (3) an overt act in furtherance of the conspiracy, and (4) resulting injury. *Kincaid v. Southtrust Bank,* 221 S.W.3d 32, 37 (Tenn. Ct. App. 2007). The law is clear that allegations of civil conspiracy "must be pled with some degree of specificity and that vague and conclusory allegations unsupported by material facts will not be sufficient . . . ." *Haynes v. Harris,* 1999 WL 317946, at *2 (Tenn. Ct. App. 1999). A civil conspiracy claim also "requires an underlying predicate tort allegedly committed pursuant to the conspiracy." *Watson's v. McCormick*, 247 S.W.3d 169, 180 (Tenn. Ct. App. 2007). Where the underlying tort is not actionable, conspiracy, by itself, is not actionable. *Id.* at 179-80.

Here, Plaintiffs fail to connect any alleged civil conspiracy to the drugs Leeper consumed and plead their allegations of conspiracy with little specificity. For example, Plaintiffs assert, without providing any factual basis, that Vantell "knew of the conspiracy to sell drugs at [Trousdale]," "tolerated or condoned the distribution and sale of drugs," and "would be pressured not to incriminate Porter," among others. (Docket Entry 24 ¶ 216). Plaintiffs, however, fail to connect any alleged civil conspiracy to Leeper's death and assert in conclusory fashion that these Defendants "caused the catastrophic conduct" that resulted in Leeper's death. (*Id.* at ¶ 218). Thus, to the extent Plaintiffs seek to assert a claim for civil conspiracy, they fail to allege facts sufficient to sustain such a claim under Tennessee law.

## V.  CONCLUSION

For these reasons, the Court should grant Defendants' Motion and dismiss Plaintiffs' claims against them for failure to state a claim on which relief may be granted.

322145904.2

Respectfully submitted,

/s/ Erin Palmer Polly
Joseph F. Welborn, III (#15076)
joe.welborn@klgates.com
Erin Palmer Polly (#22221)
erin.polly@klgates.com
Terrence M. McKelvey (#36531)
terrence.mckelvey@klgates.com
K&L Gates LLP
501 Commerce Street, Suite 1500
Nashville, Tennessee 37203
(615) 780-6700
(615) 780-6799

*Counsel for Defendants CoreCivic, Inc.,
CoreCivic of Tennessee, LLC, Trousdale
County, Tennessee, Stephen Chambers,
Jerry Ford, Dwight Jewell, Jack McCall,
Jermaris Porter, Vincent Vantell, and Gary
Walsh*

## CERTIFICATE OF SERVICE

I certify that a true and exact copy of the foregoing has been served upon Filing Users via the electronic filing system and on other counsel via U.S. Mail, first-class postage prepaid, this January 31, 2025, on the following:

Marc A. Walwyn
Law Office of Marc Walwyn
412 Georgia Avenue, Suite 102
Chattanooga, Tennessee 37403

/s/ Erin Palmer Polly

26