UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

**ESTATE OF KYLAN TAYLOR LEEPER,**                )
**et al.,**                                                             )
                                                                             )
         **Plaintiffs,**                                             )
                                                                             )          **NO. 3:24-cv-01197**
**v.**                                                                  )
                                                                             )
**CORECIVIC, INC., et al.,**                             )
                                                                             )
         **Defendants.**                                          )

## MEMORANDUM OPINION

Kylan Taylor Leeper was a prisoner at Trousdale Turner Correctional Center ("TTCC"), who died of a Fentanyl overdose on October 6, 2023. (Doc. No. 24 ¶¶ 1, 100, 115). His Estate and his minor son are suing CoreCivic, Inc., the owner of TTCC; CoreCivic of Tennessee, LLC, a subsidiary of CoreCivic, Inc. that operates TTCC; Vincent Vantell, the former Warden of TTCC; Jermaris Porter, the Assistant Warden of TTCC; a host of identified and unidentified correctional officers employed by CoreCivic; Trousdale County, the municipality where TTCC is located; and several Trousdale County officials and employees.[1] (Id. ¶¶ 6-26).

The Estate's primary claim is that Defendants violated Mr. Leeper's Eighth Amendment right by allowing inmates unfettered access to drugs. (Id. ¶¶ 126-136, 146-155, 165-176). In addition, the Estate claims that: (1) prison officials failed to train and supervise their employees, in violation of 42 U.S.C. § 1983, (id. ¶¶ 137-145; (2) the County failed to investigate the operations at TTCC, in violation of § 1983, (id. ¶¶ 156-164); (3) prison officials and employees conspired to smuggle drugs into the prison and thereby deprived Mr. Leeper of his constitutional rights, in violation of § 1983 and Tennessee common law, (id. ¶¶ 177-182, 214-219); (4) all Defendants

---
[1] The Court will refer to Plaintiffs collectively as the "Estate."

wrongfully caused Mr. Leeper's death, in violation of Tennessee law, (id. ¶¶ 183-188); (5) CoreCivic and prison officials and employees were negligent, in violation of Tennessee law, (id. ¶¶ 199-204); and (6) the County and County officials negligently failed to supervise CoreCivic, in violation of Tennessee law, (id. ¶¶ 205-213).

CoreCivic, Inc., CoreCivic of Tennessee, Trousdale County, Stephen Chambers (the former Mayor of Trousdale County), Jerry Ford (a Trousdale County Commissioner), Dwight Jewell (Trousdale County's Building Code Enforcement Officer), Jack McCall (the current Mayor of Trousdale County), Jermaris Porter (the Assistant Warden of TTCC), Vincent Vantell (the former Warden of TTCC), and Gary Walsh (a Trousdale County Commissioner) have moved to dismiss every claim against them.[2] (Doc. Nos. 27, 28). Plaintiffs responded in opposition (Doc. No. 32), and Defendants have filed a reply (Doc. No. 33).

Now that the matter has been fully briefed, the Court will grant the motion to dismiss in part and deny it in part.

## I.      FACTUAL BACKGROUND[3]

Mr. Leeper entered TTCC on May 5, 2023. (Doc. No. 24 ¶ 100). During his short incarceration before his untimely death, Mr. Leeper reported fentanyl overdoses to correction officers working at TTCC. (Id.). He also wrote to his family that he had to "guard [his] food and beverages to avoid the potential for opioids like fentanyl being deposited to cause an intentional overdose." (Id.). Mr. Leeper also reported to his family that between May and October 2023,

---

[2] The other named and unnamed Defendants have not filed a motion to dismiss or answer. There is no record these Defendants have ever been served with a copy of the Amended Complaint. Therefore, the Court will only discuss the claims as they apply to the moving Defendants.

[3] These facts are derived from the Amended Complaint, and are accepted as true, as they must be at this stage.

2

Trousdale County Emergency Medical Services were routinely called to TTCC for inmate overdoses. (Id. ¶ 94). Mr. Leeper relayed that TTCC had up to twenty (20) non-fatal inmate overdoses in a single day. (Id. ¶ 93).

Mr. Leeper also reported that his cellmate, Willie Duncan, was a known drug distributor at TTCC. (Id. ¶ 102). Mr. Leeper expressed concern about exposure to fentanyl based on his cellmate's drug distribution activities and his own history of drug use and requested to be transferred to another cell. (Id. ¶ 103). CoreCivic granted his request to transfer cells; however, when Mr. Leeper learned his new cellmate was a known gang member, he ultimately decided to stay put. (Id. ¶ 114).

Beginning in September 2023, a "lethal cache of drugs began infiltrating housing units at TTCC." (Id. ¶ 105). "Inmates in other housing units (W, A, B) began to overdose on the hour." (Id.). CoreCivic staff members would "call out over the radio whenever there was an overdose requiring medical staff, and these calls became so frequent that they would sometimes be multiple inmates overdosing in different housing units of TTCC at the same time." (Id.). During the week of September 25, 2023, inmates in Housing Unit F began to "fall over and collapse from overdoses." (Id. ¶ 107). "[I]nmates were nodding off, leaning over, collapsing and suffering relentlessly from drug overdoses." (Id.). On September 29, 2023, there was a nearly fatal overdose in the Foxtrot Alpha pod; however, prison officials were able to revive the inmate. (Id. ¶ 107). In response to this near fatal drug overdose, CoreCivic inspected the common areas and cells in the Foxtrot Alpha pod with a drug dog. (Id. ¶ 110). However, CoreCivic took no other steps to search for drugs or stem the flow of drugs into other areas of the prison. (Id. ¶ 111). From September 29, 2023 to October 6, 2023, overdoses continued to occur each day in Housing Unit F. (Id. ¶ 112).

On October 6, 2023, Mr. Leeper was found unresponsive and pulseless inside his cell during an emergency count that was being called by TTCC officials due to the high volume of overdoses. (Id. ¶¶ 100, 115). Efforts to resuscitate him were unsuccessful. (Id.). An autopsy showed that Mr. Leeper died of a fentanyl overdose. (Id.).

## II.    LEGAL STANDARDS

When assessing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), like the one filed by Defendants, the Court must accept the Complaint's factual allegations as true, draw all reasonable inferences in Plaintiff's favor, and "take all of those facts and inferences and determine whether they plausibly give rise to an entitlement to relief." Doe v. Baum, 903 F.3d 575, 581 (6th Cir. 2018) (citing Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). To survive a motion to dismiss, the complaint must contain "either direct or inferential allegations respecting all material elements to sustain a recovery under some viable legal theory." Eidson v. State of Tenn. Dept. of Children's Servs., 510 F.3d 631, 634 (6th Cir. 2007). "Conclusory allegations or legal conclusions masquerading as factual allegations will not suffice." Id.

## III.    ANALYSIS

### A.  Section 1983 Claims

"Section 1983 creates a federal cause of action against state or local officials who deprive a person of a federal right while acting under the color of state law." Thomas v. City of Chattanooga, 398 F.3d 426, 429 (6th Cir. 2005). A plaintiff may sue state or municipal officials in their individual or official capacities, or they may sue a municipality or an organization that serves as a government agent. To state an individual-capacity claim under § 1983, "the plaintiff must allege two elements: 1) the defendant acted under color of state law; and 2) the defendant's conduct deprived the plaintiff of rights secured under federal law." Fritz v. Charter Twp. of Comstock, 592

4

F.3d 718, 722 (6th Cir. 2010).  To state a municipal, organizational, or official-capacity claim, a plaintiff must allege "(1) that a violation of a federal right took place, (2) that the defendants acted under color of state law, and (3) that a municipality's policy or custom caused that violation to happen."  Bright v. Gallia Cnty., 753 F.3d 639, 660 (6th Cir. 2014) (citing Monell v. Department of Social Services, 436 U.S. 658 (1978)).  Official capacity claims are treated as municipal liability claims against the entity for which the defendant is an officer or agent.  Kentucky v. Graham, 473 U.S. 159, 165 (1985); see also Peatross v. City of Memphis, 818 F.3d 233, 241 (6th Cir. 2016) ("An official-capacity claim against a person is essentially a claim against the municipality.").  Both municipal liability and official capacity claims are often referred to as Monell claims.

Here, Plaintiff appears to have brought individual and official capacity claims against Warden Vantell and Assistant Warden Porter and an organizational liability claim against CoreCivic.  The Court will discuss each theory of § 1983 liability, in turn.

### 1. Failure to protect claim against Vantell and Porter.

Prisoners are protected by the Eighth Amendment from cruel and unusual punishments.  Caraway v. CoreCivic of Tenn., LLC., 98 F4th 679, 683 (6th Cir. 2024) (citing U.S. Const. amend. VIII).  Prison officials must provide inmates with "food, clothing, shelter, medical care and reasonable measures of safety."  Zakora v. Chrisman, 44 F.4th 452, 467 (6th Cir. 2022).  One way they violate the Eighth Amendment is by "display[ing] 'deliberate indifference' to a sufficiently serious risk of harm from which they owe an inmate protection."  Caraway, 98 F.4th at 683.  The Sixth Circuit refers to "this type of claim [as] a 'failure to protect.'"  Id. (citation omitted).

To prevail on a failure-to-protect theory, a plaintiff must show: (1) there was a serious risk of harm; (2) the state actor had notice of the harm; and (3) the state actor did nothing to prevent the harm.  The first element is known as the "objective component" and the second and third

5

elements combine to form the "subjective" component. Caraway, 98 F.4th at 683. Defendants have argued that the Estate has failed to satisfy the objective and subjective components of a failure-to-protect claim. (Doc. No. 28 at 7-11; Doc. No. 33 at 2-3). The Court will address these arguments.

### i. Objective Component

To establish the objective component, a prisoner (or his legal successors) must show he was subjected to "conditions posing a substantial risk of serious harm." Reedy v. West, 988 F.3d 907, 912 (6th Cir. 2021). The "risk" must be so excessive and "grave that society refuses to tolerate it." Helling v. McKinney, 509 U.S. 25, 36 (1993); see also Farmer, 511 U.S. at 837. The "risk" is the threat of injury posed by the prison officials' indifference, not the realized injury. Caraway, 98 F.4th at 685 ("The relevant constitutional 'injury' [of a failure-to-protect claim] is the exposure to an objectively excessive risk, not any physical harm that befalls the inmate because of that risk.").

Here, Mr. Leeper's Estate claims he suffered a significant risk of harm from the unfettered flow of drugs into TTCC. The Sixth Circuit recently addressed Eighth Amendment claims based on access to drugs in Zakora, 44 F.4th at 467 and Caraway, 98 F.4th at 685. Defendants argue that this case is closer to Caraway than Zakora, and that Caraway forecloses relief here. The Court will consider these decisions, and how they interact with the allegations in this case.

Zakora appears to be the first circuit-court decision in the country to recognize a duty for prison officials to protect inmates from "unfettered access to drugs." 44 F.4th at 472. In that case, the Sixth Circuit held that "simple exposure to drugs, without more, does not violate contemporary standards of decency and thus does not satisfy the objective prong"; however, "unfettered access to drugs in prison" is serious enough to "satisfy the objective prong of an Eighth Amendment

6

claim."[4]  Id.  In that case Mr. Zakora's estate sufficiently alleged the objective component because: (1) of the "widespread presence of drugs" in the prison; (2) two other inmates in the twelve-to-sixteen-inmate unit had overdosed two days before Zakora's death; and (3) prison official perpetuated the risk for Mr. Zakora by not investigating the two earlier overdoses.  Caraway, 98 F.4th at 684 (citing Zakora, 44 F.4th at 461-62, 470-472).

In Caraway, the Sixth Circuit distinguished the Zakora decision, noting that Zakora's holding "was a limited one" and was based on the "egregiousness of Zakora's circumstances."[5] 98 F.4th at 684.  The Caraway court emphasized that the objective factor was only satisfied in Zakora because: (1) Zakora's estate alleged that "drugs were everywhere in Zakora's facility"; (2) it "included specific allegations about how the drugs got there"; (3) it alleged two overdoses in a small housing unit immediately prior to Zakora's overdose; and (4) it alleged that prison officials did nothing to investigate the two prior overdoses.  Id. at 684-685.

The Caraway court affirmed the dismissal of Mr. Caraway's § 1983 claim because the type of "egregious" facts outlined in Zakora were not present in that case.  Id. at 684.  First, Mr. Caraway's estate simply alleged that "the prison was plagued by rampant drugs" but did not allege how the drugs entered the facility.  Id.  Second, Mr. Caraway's estate generally alleged that

---

[4] The Zakora Court said that prisons do not have to protect prisoners from "simple exposure to drugs" and that "run-of-the-mill drug-overdose case[s]" will not lead to § 1983 liability.  However, the Zakora Court provided no means to differentiate between "simple exposure to drugs" and "unfettered access to drugs."  It also did not define what a "run-of-the-mill" drug case is.  Instead, it held that the facts of Mr. Zakora's case constituted "unfettered access to drugs."  Until the Sixth Circuit elaborates on Zakora's holding or reverses it, district courts are left to undertake a factually intensive "you'll know it when you see it" inquiry.  See Jacobellis v. State of Ohio, 378 U.S. 184, 197 (1964) (Stewart, J.) (concurring).

[5] The Caraway panel could not overrule the Zakora panel, it could only qualify and clarify.  See In re Omnicare, Inc. Sec. Litig., 769 F.3d 455, 476 (6th Cir. 2014) (noting that a subsequent case's "qualifi[cation]" of "overly broad language" and "clarification of the standard" from a previous case does not violate the prior-panel rule).

7

overdoses increased in the prison, but this was insufficient because "the mere allegation that inmates have overdosed—even at an increased rate—doesn't come close to showing the kind of excessive, one-for-every-eight risk Zakora faced." Id. Third, Mr. Caraway's estate did not show a failure to investigate because it had not alleged specific facts about overdoses in the past that would have required investigation. Id. Therefore, the Sixth Circuit concluded that Mr. Caraway's estate had not alleged sufficient facts to establish the objective component.

In this case, the Estate has made factual allegations, including based on the personal observations of Mr. Leeper (as reported back to his family), that drugs were omnipresent at TTCC. For example, Mr. Leeper reported that his own cellmate was a drug dealer and that he had to watch his food and drink to avoid drugs being surreptitiously placed inside. (Doc. No. 24 ¶¶ 100, 102). The Estate further alleges that between May and September 2023, prison officials would routinely radio one another or come over the speaker system to announce a drug overdose, often multiple times per day. (Id. ¶ 128). In fact, some days there were up to twenty non-fatal overdoses at TTCC. (Id.). Beginning in September 2023, a more potent batch of drugs enter "Housing Unit F," which is where Mr. Leeper was living. During that time, inmates in Unit F were "nodding off, leaning over, collapsing, and suffering relentlessly from drug overdoses." (Id. ¶ 107). Overdoses became such a problem that correctional officers asked if they could carry Narcan during their rounds. (Id. ¶¶ 107, 108). On September 29, 2023—seven days before Mr. Leeper's death—an inmate in Unit F overdosed and stopped breathing. (Id. ¶ 109). The Estate also pled how the drugs made it into the prison, including detailed and specific allegations about the structure and operations of a well-organized drug smuggling operation within TTCC headed by Assistant Warden Porter. (Id. ¶¶ 67, 71).

8

These allegations, taken in their entirety, are more like those in <u>Zakora</u> than those in <u>Caraway</u>. The Estate has alleged that TTCC inmates had nearly unfettered access to drugs, and it has also alleged how the drugs made it into the prison. Therefore, the Court concludes that Plaintiffs have satisfied the objective component by showing prisoners at TTCC had "unfettered access to deadly drugs" between May and October 2023.

Defendants claim the Estate's allegations should be discounted because they are "conclusory." (Doc. No. 28 at 2) ("The Amended Complaint is riddled with contradictory assertions related to … the presence of illegal drugs in Leeper's housing unit and largely consists of conclusory statements that parrot the elements of the causes of action that Plaintiffs purport to assert."). Not so. While Plaintiffs may not ultimately prove some of their allegations, that does not make them conclusory. A conclusory allegation, for example, is that a prison is "plagued by rampant drugs." <u>Caraway</u>, 98 F.4th at 684. That type of allegation merely restates what is necessary to plead the objective component—<i>i.e.</i>, "unfettered access to drugs." Here, Plaintiffs have alleged much more than that. They have alleged facts that can be proven either true or false, including that prisoners were overdosing at a rate of up to twenty prisoners per day and that correctional officers were smuggling the drugs into the prison and were thwarting official attempts to root out the proliferation of drugs. These allegations are sufficient to establish the objective component at this stage.

### ii.    Subjective Component

For the subjective component, the plaintiff must allege facts showing that prison officials were "aware of the risk and fail[ed] to take reasonable measures to abate it," such that the official can be said to have "acted with deliberate indifference to inmate safety." <u>Reedy</u>, 988 F.3d at 912; <u>see also</u> <u>Caraway</u>, 98 F.4th at 686-687 and <u>Carrier v. Patterson</u>, 2024 WL 4524677, at *2 (6th Cir.

9

Oct. 18, 2024). "In determining whether an official was deliberately indifferent," the Court "focus[es] on individual official's personal involvement, knowledge, and actions." <u>Reedy</u>, 988 F.3d at 914.

In <u>Zakora</u>, the Sixth Circuit found that the subjective component was satisfied because anyone working in the prison would have known about the "two drug overdoses in the relatively small C-Unit of Lakeland that occurred in the two days prior to Zakora's fatal overdose" and would have concluded there was substantial risk of harm to the inmates in that unit. <u>Id.</u> The "subjective prong" was further bolstered by the Zakora estate's allegations that prisoners had informed prison officials about a "drug smuggling operation" in the prison "on more than one occasion." <u>Id.</u>

The <u>Caraway</u> Court affirmed that the subjective factor was only satisfied in <u>Zakora</u> because: (1) Zakora's estate pled that prison officials were on "notice of the risk" because prisoners had alerted officials to the drug smuggling operation, and (2) prison officials failed to reasonably respond to their knowledge about the drug smuggling operation and their knowledge of two prior overdoses. <u>Id.</u> at 686-687. By contrast, Mr. Caraway's estate alleged in a conclusory fashion that "the defendants 'had knowledge' of a drug-smuggling problem," but did not allege "how the defendants obtained that knowledge, when they obtained it, or what that knowledge entailed. <u>Caraway</u>, 98 F.4th at 686. In that case, merely "recit[ing] the subjective element of the estate's failure-to-protect claim" was "not enough." <u>Id.</u>

Here, the Amended Complaint contains sufficient allegations to satisfy the "notice" prong of the subjective component. For example, everyday prison officials would radio that an inmate had overdosed. (Doc. No. 24 ¶ 128). Some days there would be as many as twenty overdoses. (<u>Id.</u>). Additionally, overdoses were so prevalent that correctional officers asked prison officials, including Warden Vantell, if they could carry Narcan throughout the day. (<u>Id.</u> ¶¶ 107, 108). Given

the sheer volume of overdoses alleged by the Estate, the Court can infer that prison officials like Warden Vantrell and Assistant Warden Porter were on notice of the pervasive drug problem at TTCC.

But even if knowledge of daily drug overdoses was insufficient to put prison officials on notice, the Estate pleaded even more information suggesting notice of the risk. For example, several correctional officers were arrested in 2023 for bringing contraband into the prison. (Id. ¶¶ 83, 140) ("Vantell also had knowledge of ongoing drug smuggling given the volume of CO arrests for contraband in the months preceding [Mr. Leeper's] death."). One of those correctional officers was arrested for smuggling a "large quantity of uncut fentanyl and uncut methamphetamines" into TTCC. (Id. ¶ 85). Moreover, the Estate has alleged that CoreCivic, and by extension Warden Vantell, knew that Assistant Warden Porter had a history of smuggling drugs into prisons yet continued to employ (and promote) him. (Id. ¶¶ 69, 77-78). These allegations create a reasonable inference that CoreCivic and senior prison officials knew about the drug smuggling operation and tolerated it. Again, these allegations about notice of risk are closer to the allegations in Zakora than they are to those in Caraway. They are sufficient to survive a motion to dismiss.

Where the Estate's claim hits a slight speedbump is on the "failure to reasonably respond" portion of the subjective component. (See Doc. No. 33 at 2) ("Plaintiffs admit that CoreCivic actively sought to address staffing concerns and brought in a drug detection dog to search Unit F in the days preceding [Mr.] Leeper's death."). The Amended Complaint candidly admits that between May and October 2023, two drug sniffing dogs were utilized at TTCC, and that after a near fatal overdose on September 29, 2023, TTCC employed drug sniffing dogs to search public areas and cells in the Foxtrot Alpha pod. (Id. ¶¶ 96, 110). The Amended Complaint also alleges that in September 2023, CoreCivic asked staff to do "roster counts" instead of "head counts," to

reduce overdoses or at least deaths or serious injuries from overdoses. (Id. ¶ 106). This is a far cry from how the prison officials responded in Zakora by doing nothing to address two overdoses in a 16-person housing unit over the course of two days. 44 F.4th at 472. Absent additional facts, prison officials' response to the overdose problem would probably be fatal to Plaintiffs' claims.

Here, though, there is a factual twist not in Zakora or Caraway. The Amended Complaint contains detailed allegations that Warden Vantell knew about Assistant Warden Porter's drug smuggling operation and did nothing about it. (Doc. No. 24 ¶¶ 71(g), 76-78). In the face of daily overdoses—sometimes twenty per day—the question is whether employing two drug sniffing dogs is a "reasonable" response, especially when Warden Vantrell knew how the drugs were coming into TTCC and who was doing the smuggling. A jury could conclude that the only reasonable measure to abate the drug problem was cut off the head of the snake. In other words, Warden Vantell needed to fire Assistant Warden Porter and any other correction officers who were known drug smugglers, or at the very least undertake an investigation into the source of the drugs. Therefore, granting the Estate all reasonable inferences, the Court concludes it has pleaded sufficient facts to call into question whether Warden Vantell's response to the risk of unfettered access to drugs was reasonable.[6]

If Plaintiffs allegations against Warden Vantell are sufficient, they are more than sufficient as to Assistant Warden Porter. Plaintiffs allege that Porter was the head of the drug smuggling operation and that he used his senior position at the prison to frustrate the prison's official response to the drug crisis. (Id. ¶ 96). Specifically, Porter would ensure that the drug dogs did not search the cells of "known inmate drug users and/or known inmate drug distributors." (Id.). In other

---

[6] To be clear, the Court draws this conclusion based on Warden Vantell's own actions and omissions. As to Plaintiffs' § 1983 failure-to-protect claim, Warden Vantell cannot be held liable based on the actions or omissions of his employees.

words, Porter made sure there was no response, let alone a reasonable one, to the risk of unfettered access to drugs in the prison.

With these factual allegations, the Estate has established the objective and subjective components of a failure-to-protect claims against Warden Vantell and Assistant Warden Porter. Therefore, the Estate's individual capacity claims against these two prison officials survive Defendants' 12(b)(6) motion.

### 2. <u>Monell</u> claim against CoreCivic.[7]

The Estate also brings a municipal liability claim (often referred to as a <u>Monell</u> claim) against CoreCivic under § 1983. CoreCivic—as a private entity performing a government function—can be liable under § 1983 only if its policies, practices, or customs were the driving or moving force behind a violation of Leeper's federal rights. See <u>City of Canton v. Harris</u>, 489 U.S. 378, 385 (1989) (citing <u>Monell</u>, 436 U.S. at 694). CoreCivic "may not be sued under § 1983 for an injury inflicted solely by its employes or agents." <u>Id.</u>; see also <u>Burgess v. Fischer</u>, 735 F.3d 462, 479 (6th Cir. 2013) (holding that <u>Monell</u> prohibits respondeat superior liability). When considering a municipal liability claim, the Court must engage in a two-pronged inquiry: (1) first, the Court must determine whether the plaintiff asserted the deprivation of a constitutional right, and (2) if so, the Court must then decide whether the entity's official policy or custom is responsible for that deprivation. <u>Cash v. Hamilton Cnty. Dep't. of Adult Probation</u>, 388 F.3d 539, 542 (6th Cir. 2004).

As discussed above, the Estate has sufficiently alleged the deprivation of a constitutional right—*i.e.*, the right to be protected from unfettered access to drugs. See <u>supra</u> (III)(A)(1).

---

[7] To the extent Plaintiffs are bringing official capacity claims against Warden Vantell and Assistant Warden Porter, those claims are analyzed alongside the <u>Monell</u> claim against CoreCivic.

Therefore, the first prong a municipal liability claim against CoreCivic (and Vantrell and Porter in their official capacities) has been satisfied. The question then is whether CoreCivic had an official policy or custom that is responsible for that deprivation.

To allege the existence of an illegal policy or custom, a plaintiff must assert sufficient facts to establish: (1) an illegal official policy or legislative enactment; (2) an official with final decision-making authority ratified an employee's illegal actions; (3) the existence of a policy of inadequate training or supervision; or (4) the existence of a custom of tolerance or acquiescence of federal rights violations. Burgess, 735 F.3d at 478. While a municipal or organizational defendant will rarely commit to writing that they are deliberately indifferent to harm faced by prisoners, prisoners can still prevail if they show the municipality had "a clear and persistent pattern of" deliberate indifference. See Smith v. Cnty. of Lenawee, 505 F. App'x 526, 537 (6th Cir. 2012) (quoting Jones v. City of Cincinnati, 521 F.3d 555, 560 (6th Cir. 2008)). However, the custom "must be the moving force of the constitutional violation to establish the liability of the government body." Id.

At this stage, benefiting from all reasonable inferences, the Estate has alleged that CoreCivic had a custom of tolerating or acquiescing to the unfettered flow of drugs into TTCC. CoreCivic would have certainly been aware of the staggering number of overdoses at TTCC—sometimes as many as twenty per day. (Doc. No. 24 ¶ 128). It also would have been aware of the 2023 arrests of correctional officers for smuggling contraband into the prison.[8] (Id. ¶¶ 83, 85,

_____

[8] CoreCivic conducted no investigation into what causing the surge of drugs into TTCC, including failing to conduct an internal investigation after these arrests. (Doc. No. 24 ¶ 97). For example, CoreCivic could have questioned the arrested correctional officers about who, if anyone, they were working with. CoreCivic could have also questioned other employees about any associations the arrested correctional officers may have had with other prison officials or prisoners. The lack of an internal investigation creates a reasonable inference that CoreCivic was willfully blind to a large, sophisticated drug smuggling operation within the prison. See Zakora, 44 F.4th at 476–77.

140).  Finally, the Estate has alleged that CoreCivic knew that Assistant Warden Porter was a drug dealer but continued to employ and promote him.  (Id. ¶¶ 69, 77-78).  In other words, CoreCivic tolerated Porter's drug dealing in exchange for him and his accomplices—who were otherwise overworked and underpaid—maintaining order at the prison.  This is sufficient to establish a custom of tolerance or acquiescence of federal rights violations, and that the custom was the moving force behind the constitutional harm, *i.e.* unfettered access to drugs.  After all, CoreCivic could have fired known drug dealers at anytime or, at the very least, launched a meaningful internal investigation.

For these reasons, the Estate's <u>Monell</u> claim against CoreCivic (and Vantell and Porter in their official capacities) survives Defendants' 12(b)(6) motion.

### 3.  Failure to Supervise Claim (against Vantell and Porter).

The Estate also brings failure-to-supervise claims against Vantell and Porter.  (Doc. No. 24 ¶¶ 137-145).  The Court will treat these claims as both individual and official capacity claims.

A failure-to-supervise theory "must be based on more than *respondeat superior*, or the right to control employees."  <u>Shehee v. Luttrell</u>, 199 F.3d 295, 300 (6th Cir. 1999).  A simple failure to act, without "a showing of 'direct responsibility' for the actions of the individual officers," will not suffice to establish supervisory liability.  <u>Hays v. Jefferson County</u>, 668 F.2d 869, 873-74 (6th Cir. 1982) (quoting <u>Rizzo v. Goode</u>, 423 U.S. 362, 376 (1976)).  Instead, "supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor."  <u>Peatross v. City of Memphis</u>, 818 F.3d 233, 241 (6th Cir. 2016).

Supervisors may be liable for failure to supervise if they "abandon[] the specific duties of his [or her] position in the face of actual knowledge of a breakdown in the proper workings of the department."  <u>Winkler v. Madison County</u>, 893 F.3d 877, 898 (6th Cir. 2018).  Supervisors must

15

abdicate their duties, and said abdication must directly result in the constitutional injury. See Gregory v. City of Louisville, 444 F.3d 725, 752 (6th Cir. 2006). This means that, "at a minimum, the plaintiff must show that the defendant at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." Peatross, 818 F.3d at 242 (citation and internal quotation marks omitted). The subjective prong is the same as it is for the subordinate officers: "The supervisor need not have known of the substantial risk to the injured party but rather must have possessed knowledge of potential danger to a particular class of persons." Troutman v. Louisville Metro Dep't of Corr., 979 F.3d 472, 488 (6th Cir. 2020).

The failure to supervise claim survives against Vantell and Porter in their individual capacities for many of the same reasons the failure-to-protect claim did. See supra (III)(A)(1). Among other things, Vantell and Porter never ordered an investigation into the source of the drugs despite having knowledge about a pervasive drug problem at TTCC.[9] See Zakora, 44 F.4th at 476–77 ("Failing to order an investigation into the drug smuggling, particularly after the two overdoses inside the C-Unit on consecutive days, could be found to constitute "knowing acquiescence" to the constitutional violation of exposing the inmates in the C-Unit to a substantial risk of serious harm."). That makes perfect sense because the Estate claims that Porter was the head of the drug smuggling operation and that Vantell knew about the operation and tacitly supported it. Under those circumstances, it would not make any sense for Vantell or Porter to order an investigation into themselves. But their failure to order an investigation into the source of drugs at TTCC was an abdication of a key supervisory responsibility, and therefore, the failure-to-supervise claim can proceed against Vantell and Porter in their individual capacities.

---

[9] Although Vantell may have taken limited steps to detect drugs once they were inside the prison, he was being reactive instead of proactive. He took no steps to discover how the drugs were coming into the prison and who was the source.

The official capacity claim can also proceed for the same reasons discussed above, namely that CoreCivic had a custom of turning a blind-eye to the significant drug problem at TTCC. See supra (III)(A)(2). CoreCivic's custom of ambivalence about how drugs were pouring into the facility combined with the Warden and Assistant Warden's abdication of one of the most important supervisory roles—ensuring the security of the prison—arguably led to the constitutional deprivation—*i.e.*, Mr. Leeper having unfettered access to drugs.

### 4. Failure-to-Train Claim (against Vantell and Porter)

The Estate also brings a failure-to-train theory. To state a claim under this theory, the Amended Complaint must allege that a "need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that [officials] can reasonably be said to have been deliberately indifferent to the need." J.H. v. Williamson County, 951 F.3d 709, 720–21 (6th Cir. 2020) (quoting City of Canton v. Harris, 489 U.S. 378, 390 (1989)). Liability can be established "based on a single violation of federal rights" when the plaintiff also shows that the officials' failure to train "present[ed] an obvious potential for a constitutional violation." Id. However, a plaintiff has the burden of showing two layers of obviousness: "It must be obvious that the failure to train will lead to certain conduct, and it must be obvious (i.e., clearly established) that the conduct will violate constitutional rights." Id.

A failure-to-train theory does not fit the facts of this case. Plaintiffs have only alleged in a conclusory manner that drugs entered the facility because correctional officers were untrained or improperly trained.[10] (Doc. No. 24 ¶ 66). By contrast, they allege in detail that drugs entered

---

[10] At various places throughout the Amended Complaint, the Estate claims that correctional officers were improperly trained to administer Narcan or otherwise treat prisoners who had overdosed. (E.g., Doc. 24 ¶¶ 89, 107, 113(f)). These allegations are superfluous, though, because the Estate does not claim that anyone deprived Mr. Leeper of constitutionally adequate medical treatment.

TTCC because of an elaborate drug smuggling operation led by Assistant Warden Porter and carried out by his accomplices. (Id. ¶¶ 67-71). In fact, the Amended Complaint alleges that Assistant Warden Porter manipulated the schedule so that co-conspirators would be positioned at points of entry to allow the drugs to pass freely into the prison. (Id. ¶ 71(c)). Based on the allegations, as currently pleaded, it is difficult to see how failing to train correctional officers caused the proliferation of drugs at TTCC. If a correctional officer is willing to commit a crime, no amount of training on how to detect drugs will affect the outcome.

Accordingly, the Estate's failure-to-train claim will be dismissed.

### 5. § 1983 Conspiracy Claim

The Estate has separately pleaded a § 1983 conspiracy claim. However, "a §1983 civil conspiracy by itself does not constitute a separate cause of action." Quezergue v. Gunn, 2022 WL 1217237, at *4 (M.D. Tenn. Apr. 25, 2022). Rather, it is a mean of asserting that "each of the Defendants should be held liable based on the alleged tortious conduct of the alleged co-conspirators." DeLanis v. Metro. Gov't of Nashville & Davidson Cnty., 697 F. Supp. 3d 748, 782 (M.D. Tenn. 2023) (citing JRS Partners, GP v. Leech Tishman Fuscaldo & Lampl, LLC, 615 F. Supp. 3d 750, 781 (M.D. Tenn. 2022)).

To hold co-conspirators liable for the unconstitutional conduct of another co-conspirator, a plaintiff must allege: "(1) a single plan existed, (2) [defendants] shared in the general conspiratorial objective to deprive [plaintiffs] of [their] constitutional ... rights, and (3) an overt act was committed in furtherance of the conspiracy that caused injury to [plaintiffs]." Siefert v. Hamilton Cnty., 951 F.3d 753, 767–68 (6th Cir. 2020). The injury must arise from an actionable constitutional violation. See Wiley v. Oberlin Police Dep't, 330 F. App'x 524, 530 (6th Cir. 2009).

As already discussed, the Amended Complaint adequately pleads a constitutional violation that injured Mr. Leeper. The Estate has also pleaded a far-reaching drug smuggling conspiracy that deprived prisoners at TTCC of their right to be free from the unfettered flow of drugs into the prison. Therefore, even though a § 1983 civil conspiracy is not a separate cause of action, the Estate can proceed with discovery and to summary judgment on this theory of liability that may prove its § 1983 claims against some of the Defendants.

### 6. Failure to Protect Claim (against Chambers, Ford, Walsh, Jewell, and McCall) and Failure to Investigate Claim (against Trousdale County)

The Court will not linger on the Estate's claims against the County and County officials. The Amended Complaint alleges that "Trousdale County and CoreCivic entered a contract to cooperate and work with the Tennessee Department of Corrections to build and operate TTCC," and that "the contract promises that in exchange for allowing CoreCivic to build a prison, Trousdale County would benefit in numerous ways, including increased tax dollars, construction contracts, and employment opportunities." (Id. ¶ 43). However, ancillary financial benefits the County may receive from the presence of TTCC does not make it responsible for protecting the constitutional rights of TTCC's prisoners.

The Amended Complaint also alleges that "Trousdale County subcontracted with Defendant CoreCivic to operate TTCC." (Id. ¶ 20). However, this allegation conflicts with publicly available information from both the Tennessee Department of Corrections and the United States Department of Justice. Both government sources are clear that CoreCivic owns and operates TTCC and that the Tennessee Department of Corrections contracts with CoreCivic to house state

prisoners there.[11]  A court "need not feel constrained to accept as true conflicting pleadings … that are contradicted … by facts of which the court may take judicial notice." Patel v. AR Grp. Tennessee, LLC, 2022 WL 2678733, at *7 (M.D. Tenn. July 11, 2022) (quoting In re Livent, Inc. Noteholders Secs. Litig., 151 F. Supp. 2d 371, 405–06 (S.D.N.Y. 2001)).  Regardless, the Amended Complaint does not allege that Mr. Leeper was being housed at TTCC while in the County's custody.  Absent an allegation to the contrary, the Court will presume Mr. Leeper was in the custody of the State of Tennessee, not Trousdale County, because only state prisoners are housed at TTCC. Therefore, Trousdale County had no obligation to protect the constitutional rights of a state prisoner unless that state prisoner was being held in a County-owned-or-operated facility.

Even assuming the County and its officials did owe Mr. Leeper some obligation to protect his constitutional rights—even though it does not own or operate TTCC and was not responsible for Mr. Leeper's incarceration—the Amended Complaint still fails to connect the constitutional deprivation to a custom or policy of Trousdale County.  For example, the Amended Complaint fails to allege that Trousdale County or County officials knew about the overdoses at TTCC and turned a blind eye to them.  There are also no allegations that Trousdale County or its officials knew about the drug smuggling ring at TTCC or that Assistant Warden Porter was undermining the prison's official response to TTCC's drug problem.  At most, the Amended Complaint alleges that County officials were supposed to be members of a "prison oversight committee."  (Doc. No. 24 ¶ 40). That Trousdale County voluntarily created a committee to review issues at the prison, as a matter of good local government, does not obligate the County or its officials to protect the constitutional rights of state prisoners.

_____

[11]    See    https://www.justice.gov/archives/opa/pr/justice-department-announces-civil-rights-investigation-conditions-tennessees-trousdale;   https://www.tn.gov/correction/state-prisons/state-prison-list/trousdale-turner-correctional-center.html.

In sum, because the Estate has not alleged that the County or its officials owed Mr. Leeper any duty to protect his constitutional rights or that it deprived him of his constitutional rights, the § 1983 claims against the County and its officials must be dismissed.[12]  The Court will also dismiss all of the state common law claims against the County and its officials for similar reasons—chief among them that the County and its officials had no relationship with Mr. Leeper and owed him no duty of care.

### B.  Tennessee Common Law Claims

#### 1.  Wrongful Death and Negligence Claims (against CoreCivic and TTCC Defendants).

The Amended Complaint contains Tennessee common law claims for negligence and wrongful death.  To prove wrongful death, a plaintiff must establish: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct falling below the applicable standard of care amounting to a breach of that duty; (3) an injury or loss; (4) causation in fact; [and] (5) approximate or legal cause."  Merrell v. Roane Cnty. Gov't, 2023 WL 3010171, at *7 (E.D. Tenn. Apr. 19, 2023) (citing McCall v. Wilder, 913 S.W.2d 150, 153 (Tenn. 1995)).  Likewise, to prove negligence, a plaintiff must establish: "(1) the defendant owed a duty of care to the plaintiff; (2) the defendant breached the applicable standard of care; (3) the plaintiff suffered an injury; (4) defendant's conduct was a cause in fact of the injury; and (5) defendant's conduct was a proximate cause of the injury."  Turnage v. Oldham, 346 F. Supp. 3d 1141, 1151 (W.D. Tenn. 2018) (Giggers v. Memphis Hous. Auth., 277 S.W.3d 359, 364 (Tenn. 2009)).  As relevant here, the causes of action share a common

---

[12] Plaintiffs and their counsel should be mindful of their obligation to only make allegations that "have [or] will likely have evidentiary support."  Fed. R. Civ. P. 11(b)(3).  They should also heed the requirement to only state claims that are warranted by "existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P. 11(b)(2).

element—*i.e.*, that the defendant owed a duty of care to the injured party. The parties did not identify any Tennessee cases establishing a duty on the part of prisons or prison officials to protect inmates from taking drugs. The Court also searched and did not find any pertinent authority. Therefore, whether prisons and prison officials owe inmates a common law duty to protect them from "unfettered access to drugs" appears to be an issue of first impression in Tennessee.

The Court doubts that the Supreme Court of Tennessee would recognize a common law duty like the Eighth Amendment right articulated in Zakora, 44 F.4th at 467 (6th Cir. 2022). However, the Court would not have predicted the outcome in Zakora either. Regardless, "[s]tate courts, not federal courts, should be the final arbiters of state law" in our federalist system. Ameritox, Ltd. v. Millennium Lab'ys, Inc., 803 F.3d 518, 540 (11th Cir. 2015). The value of comity—allowing Tennessee state courts to address in the first instance the issue of Tennessee common law—weighs in favor of certification to the Supreme Court of Tennessee. See Arizonans for Official English v. Arizona, 520 U.S. 43, 79 (1997) (noting that a "federal tribunal risks friction-generating error when it endeavors to construe a novel state Act not yet reviewed by the State's highest court").

This Court may certify a question of state law to the Supreme Court of Tennessee when the question is "determinative of the cause" and "there is no controlling precedent in the decisions of the Supreme Court of Tennessee." Tenn. Sup. Ct. R. 23, § 1. "The decision whether or not to utilize a certification procedure lies within the sound discretion of the district court." Transamerica Ins. Co. v. Duro Bag Mfg. Co., 50 F.3d 370, 372 (6th Cir. 1995) (citing Lehman Bros. v. Schein, 416 U.S. 386, 391 (1974)). Generally, district courts should not turn to certification "every time an arguably unsettled question of state law" arises, Pennington v. State Farm Mut. Auto. Ins. Co., 553 F.3d 447, 450 (6th Cir. 2009); however, certifying a question is warranted if "the question is

22

new and state law is unsettled" and the district court cannot "see a reasonably clear and principled course[.]"[13] Id. When properly invoked, certification can "save time, energy, and resources and helps build a cooperative judicial federalism," Lehman Bros., 416 U.S. at 391. It appears certification could meet these goals. Accordingly, the Court is inclined to certify the following question (or a similar question): does Tennessee law recognize a common law duty of prisons and/or prison officials to protect inmates from drugs, and if so, what is the scope of that duty.

However, before invoking this procedure—which will cost the parties time and money and encroach upon the time of another busy court —the Court would like to hear from the parties on this issue. In the meantime, however, the Court will deny the motion to dismiss, subject to renewal by the Defendants.[14]

### 2. Conspiracy (TTCC Defendants).

The elements of conspiracy under Tennessee common law are: "(1) a common design between two or more persons; (2) to accomplish by concerted action an unlawful purpose, or a lawful purpose by unlawful means; (3) an overt act in furtherance of the conspiracy; and (4) injury to person or property resulting in attendant damage." Freeman Mgmt. Corp. v. Shurgard Storage Ctrs., LLC, 461 F. Supp. 2d 629, 642 (M.D. Tenn. 2006) (citing Braswell v. Carothers, 863 S.W.2d 722, 727 (Tenn. Ct. App. 1993)). Civil conspiracy must have a predicate tort committed as part of

---

[13] Here, there is no reasonably clear and principled course. The Court has found no other decision recognizing a common law duty to protect another from taking drugs. Yet, the Sixth Circuit has recognized a limited Eighth Amendment duty requiring that prisons do just that. Therefore, the Court would merely be guessing at how the Supreme Court of Tennessee would rule on this issue.

[14] If the Court decides to certify the question, Defendants can renew their motion to dismiss following a favorable decision from the Tennessee Supreme Court. If the Court decides against certifying the question, Defendants can renew their motion to dismiss the common law claims at that time.

the conspiracy. See Knox Trailers, Inc. v. Maples, 581 F. Supp. 3d 1000, 1019–20 (E.D. Tenn. 2022).

Plaintiffs have identified two predicate torts—wrongful death and negligence—that could serve as the basis for a civil conspiracy claim. However, for the reasons discussed above, the Court is uncertain whether the Supreme Court of Tennessee would recognize a wrongful death or negligence claim on these facts. Because the Court currently plans to certify a dispositive legal question to the Supreme Court of Tennessee that would impact this claim, the Court will deny the motion to dismiss at this time subject to renewal by the Defendants.

## IV.    CONCLUSION

Based on the allegations in the Amended Complaint, it appears TTCC had a serious drug problem that led to multiple daily overdoses, including Mr. Leeper's fatal overdose. The allegations in the Amended Complaint, if true, provide the answer to "how" the drugs were entering the prison and "who" was bringing them inside. Because the Estate alleges that inmates had "unfettered access to drugs" and that Warden Vantell and CoreCivic did nothing to stem the flow of drugs despite knowing how the drugs were entering TTCC and who was smuggling them inside, the Estate has stated plausible § 1983 claims against CoreCivic, Warden Vantell, and Assistant Warden Porter. This result is dictated largely by the Sixth Circuit's decision in Zakora.

By contrast, the Estate has not pleaded plausible claims against the County or any of its officials. The claims against the County and its officials must be dismissed.

An appropriate order will follow.

IT IS SO ORDERED.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE