**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **ESTATE OF KYLAN TAYLOR LEEPER, et al.,** | ) | |
| **Plaintiffs,** | ) | |
| **v.** | ) | **No. 3:24-cv-01197** |
| **CORECIVIC, INC., et al,** | ) | |
| **Defendants.** | ) | |

## MEMORANDUM OPINION

This case concerns the death of Kylan Leeper—an inmate formerly housed in Unit Foxtrot Bravo at the Trousdale Turner Correctional Center ("TTCC")—who died of a fentanyl overdose in his cell on October 6, 2023. Leeper's Estate and his minor son ("Estate") sue CoreCivic, Inc. and CoreCivic of Tennessee, LLC ("CoreCivic"), which own and operate TTCC; Vincent Vantell, TTCC's warden in 2023; and Jermaris Porter, TTCC's assistant chief and then chief of unit management in 2023.[1] (Doc. No. 63). They claim that those Defendants violated Leeper's Eighth Amendment rights by exposing him to unfettered access to deadly drugs. (Id. ¶¶ 107–58). Defendants move for summary judgment. (Doc. No. 66). They argue that the Estate has no evidence that Porter, Vantell, or CoreCivic caused the risk that resulted in Leeper's death. (Doc. Nos. 67, 76). The Estate responds that five former CoreCivic employees have "come forward under oath to describe a prison overwhelmed by drugs and compromised by complacency and

[1] The Estate also names in the Second Amended Complaint several correctional officers and John Does whom it has never served: William Chamberlain, Keisha O'Daniel, "Chief Carter," "Sergeant Carter," "Chief Mitchell," Carolyn Matthews, Nkoli Nwosu, and John Does 1–100. (Doc. No. 63 ¶¶ 10–18). As explained below, those claims are due to be dismissed under Fed. R. Civ. P. 4(m).

corruption at the highest levels of its security operations." (Doc. No. 73 at 1). The motion is ripe for decision (Doc. Nos. 66–70, 73–76) and, for the reasons below, will be granted.

## I. Factual Background and Undisputed Facts

The Court draws the facts from the summary-judgment record, including the Estate's response to Defendants' statement of undisputed material facts (Doc. No. 74). The Court views the facts in the light most favorable to the Estate. The facts below are undisputed unless they are attributed to a particular witness or otherwise noted as disputed. The Court disregards evidence of events after Leeper's death because the objective component of a failure-to-protect claim, like the Estate's, concerns only "the risk to the injured party before the alleged injury occurred."[2] Zakora v. Chrisman, 44 F.4th 452, 469 (6th Cir. 2022).

Leeper lived in Unit Foxtrot Bravo, a general-population pod in TTCC's Unit F. (Doc. No. 74 ¶ 1). Unit F has three pods: Foxtrot Alpha, a drug-treatment pod; Foxtrot Bravo; and Foxtrot Charlie, an intake pod. (Doc. No. 68-2 at 73–74). Inmates are not permitted to move between pods. (Id. at 74).

Amy Stephens, a CoreCivic treatment counselor, worked in Foxtrot Alpha for eight to nine months, including September and October 2023. (Doc. No. 75-2 at 14, 56, 66). According to Stephens, Leeper's cellmate, Willie Duncan, "was known to be a drug dealer." (Id. at 80). Stephens testified that Duncan would "rig his cell door" and that he drew "a lot of traffic to his cell" from inmates in Foxtrot Bravo and Foxtrot Charlie who wanted drugs. (Id. at 81). After

---

[2] For that reason, the Court disregards the affidavit of Ada Branham-Ball, who began working at TTCC in April 2024. (Doc. No. 75-5 ¶ 1). Everything she describes, including overdoses that followed Porter's visits to Unit F, occurred after Leeper's death and is thus irrelevant. (Id. ¶¶ 13–60). The Court also notes that Defendants challenge the admissibility of the Estate's remaining affidavits. They say that the Estate disclosed four of the affiants after the fact-discovery deadline and indicate that they "intend to move to exclude these individuals from testifying." (Doc. No. 76 at 2 n.1). The Court has not ruled on the admissibility of those affidavits, and considers them here.

Duncan slipped into Foxtrot Alpha during a count, Stephens asked, "the CO and an AW to have him removed," but he was not moved out of Unit F before October 6, 2023. (Id. at 81–82). Leeper asked Stephens to help him get into the treatment pod and, later, out of Duncan's cell. (Id. at 83–85). On the night of October 6, CoreCivic staff found Leeper unresponsive during a count. (Doc. No. 74 ¶ 1). He died of fentanyl toxicity. (Id.)

Drugs were a problem across TTCC in 2023. Vantell agreed that in September and October of 2023, he knew inmates were overdosing "up to ten or more times per day," and that by October 2023 he knew of "multiple overdose deaths." (Doc. No. 75-3 at 12–13). Stephens testified that starting "probably the 1st of September [2023], it was daily," and that at the peak there were "[p]robably ten or 15" a day during her shift. (Doc. No. 75-2 at 54). Kyle Graves, who worked at TTCC from June 2020 until June or July 2023, eventually as a lieutenant, described a day in 2023 when "there were 10 overdoses in Bravo Charlie and 7 more in Delta Alpha." (Doc. No. 75-1 ¶¶ 1–2, 40–43). He also described occasions when officers, himself included, were overcome by drug exposure. (Id. ¶¶ 40–43). Porter likewise acknowledged TTCC's facility-wide drug problem. When asked whether TTCC had "a serious contraband problem" in 2023, Porter answered, "Probably, yes." (Doc. No. 75-6 at 81). He also acknowledged that "some deaths" had occurred as a result of the drug problem in 2023. (Doc. No. 68-1 at 83).

In response to the drug problem, CoreCivic took various measures to try to keep drugs out of TTCC. According to CoreCivic, those measures included body scanners, a canine unit, mail and package scanning, drone detection, perimeter patrols, shakedowns, urinalysis, and video surveillance. (Doc. No. 68-3 at 43–46; Doc. No. 68-6 at 1–7). CoreCivic also had an overdose protocol. After a suspected overdose in 2023, "the housing unit where the inmate was housed was locked down," "wellness checks were performed on every inmate," security personnel would

"perform a search of the housing unit or of targeted areas within the housing unit, including with a canine," "[a] urinalysis screening was performed on every inmate within the housing unit," and staff "would perform contact tracing." (Doc. No. 68-6 at 6–7). The Estate does not dispute that "these measures may have existed." (Doc. No. 74 ¶ 8). It disputes whether "the measures functioned, were applied to everyone, or constituted a reasonable response in practice." (Id.)

TTCC was chronically understaffed in 2023. Jason Medlin, CoreCivic's corporate designee, acknowledged as much. (Doc. No. 68-3 at 31). According to Vantell, for example, a single officer could have been responsible for a 360-inmate unit at night. (Doc. No. 68-2 at 129). To address its understaffing problem, CoreCivic raised pay, added hiring and referral bonuses, held more job fairs, and brought in temporary staff. (Id. at 22). The Estate does not dispute that CoreCivic took those measures. (Doc. No. 74 ¶ 9). It disputes that TTCC "was adequately staffed or that these initiatives addressed the security gaps through which drugs flowed." (Id.)

The Estate's case centers on Porter. According to the Estate, "Porter's willingness to repeatedly violate CoreCivic policies intended to mitigate drug contraband inside of TTCC, coupled with Vantell's acquiescence and CoreCivic's willful ignorance, directly created an environment of unfettered access to drugs in the days and months prior to Kylan's death." (Doc. No. 73 at 2). In addition to Stephens's testimony, the Estate relies primarily on the affidavits of four former TTCC employees and an inmate. Graves swore that Porter escorted inmates between units, met with gang-affiliated inmates behind closed doors, and would not let Graves pat him down "and would ask another officer to do the search." (Doc. No. 75-1 ¶¶ 9–12). Joseph Eustache, who worked at TTCC from November 2019 to March 2024, eventually as a facility investigator, described Porter's movements with gang-affiliated inmates, his practice of letting unsearched inmates into other buildings, and a state investigation of Porter. (Doc. No. 75-4 ¶¶ 1–3, 6–9, 20–

23). Samantha Pollard, who worked at TTCC from August 2022 to August 2023, partly as an investigative sergeant, swore to a "mass overdose event" in Units C and F in 2023, two traffickers in "Porter's unit" whom Porter kept reinstating, informants' statements implicating Porter, and Vantell's instruction to her to stop investigating Porter. (Doc. No. 75-7 ¶¶ 1–3, 7, 10–22). Richard Roe #3, an inmate whom the Estate identifies by pseudonym, swore that he saw Porter "bringing in drugs to cells to drop them off" at an unidentified time. (Doc. No. 75-9 at 2). Finally, the Estate offers the affidavit of Ada Branham-Ball (Doc. No. 75-5), but the Court does not consider her statements because she began working at TTCC after Leeper's death.

The Estate brings seven claims under 42 U.S.C. § 1983: failure to protect against Porter and Vantell (Counts I, III, and IV), failure to supervise against Porter, Vantell, and others (Count II), civil conspiracy against Porter, Vantell, and others (Count V), Monell liability against CoreCivic (Count VI), and wrongful death against Porter, Vantell, CoreCivic, and others (Count VII). (Doc. No. 63 ¶¶ 107–58).

## II. Legal Standard

Summary judgment is appropriate when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003). In deciding a motion for summary judgment, the Court reviews all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citation omitted). The Court does not weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter, and instead determines only whether the evidence presented reveals a disputed material issue of fact for the jury to decide.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). The plaintiff "must present affirmative evidence in order to defeat a properly supported motion for summary judgment." Id. at 257. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment; there must be evidence on which the jury could reasonably find for the nonmoving party. Rodgers, 344 F.3d at 595. The "[p]laintiff must present probative evidence based 'on more than mere speculation, conjecture, or fantasy' to meet her burden." Zakora v. Chrisman ("Zakora II"), No. 1:19-CV-1016, 2025 WL 1593141, at *5 (W.D. Mich. Feb. 11, 2025) (quoting Lewis v. Philip Morris Inc., 355 F.3d 515, 533 (6th Cir. 2004)), R. & R. adopted, 2025 WL 1603524 (W.D. Mich. June 6, 2025).

## III. Analysis

After review of the record, the Court finds that Defendants are entitled to summary judgment. The summary judgment record shows that drugs were a *serious* problem at TTCC in 2023. The Estate, however, has not come forward with sufficient evidence that Leeper faced unfettered access to drugs in his specific unit—Foxtrot Bravo—in the days before he died, or that Porter's, Vantell's, or CoreCivic's specific conduct caused the risk he faced.

The Eighth Amendment bars the infliction of "cruel and unusual punishments." U.S. Const. amend. VIII. Prison officials violate the Eighth Amendment by "display[ing] 'deliberate indifference' to a sufficiently serious risk of harm from which they owe an inmate protection." Caraway v. CoreCivic of Tenn., LLC, 98 F.4th 679, 683 (6th Cir. 2024) (quoting Estelle v. Gamble, 429 U.S. 97, 104 (1976)). A viable failure-to-protect claim, like the Estate's, has "two components: one objective, one subjective." Id. Because the Estate's failure-to-protect claim fails under the objective component, the Court need not reach the subjective component.

A. Failure to Protect – Objective Component

The objective component requires the Estate to prove at trial that Leeper "faced an objectively excessive risk of harm." Caraway, 98 F.4th at 683 (citing Farmer v. Brennan, 511 U.S. 825, 837 (1994)). Because the Estate's claim is "premised on a drug overdose," it "faces an uphill battle" to make that showing. Cole v. Ashtabula Cnty., No. 26-3007, 2026 WL 1847748, at *4 (6th Cir. June 26, 2026). Evidence of "simple exposure to drugs, without more," is not enough. Zakora v. Chrisman, 44 F.4th 452, 472 (6th Cir. 2022). Rather, the Estate must show "unfettered access to deadly drugs." Caraway, 98 F.4th at 684 (quoting Zakora, 44 F.4th at 470–71). "[T]hat condition is satisfied if there was a widespread presence of drugs at the facility, there were recent prior overdoses, and jail officials failed to investigate the overdoses." Cole, 2026 WL 1847748, at *4 (citation modified) (quoting Caraway, 98 F.4th at 684).

"The relevant constitutional 'injury' is the exposure to an objectively excessive risk, *not* any physical harm that befalls the inmate because of that risk." Caraway, 98 F.4th at 685. Thus, "[s]erious physical harm—even death—does not *ipso facto* satisfy a failure-to-protect claim's objective component." Id. The Estate, moreover, "must show that the [Defendants'] actions caused the objectively serious mistreatment." Williams v. CoreCivic of Tenn., LLC, No. 25-5377, 2026 WL 323971, at *3 (6th Cir. Feb. 6, 2026) (citing id.). The objective component thus requires both an objectively excessive risk of harm and causation. Caraway, 98 F.4th at 685; Williams, 2026 WL 323971, at *3. The Estate has not raised genuine disputes as to either.

**1. Objectively Excessive Risk of Harm**

Defendants argue that the Estate cannot establish unfettered access to deadly drugs because "the record is replete with examples of measures Defendants employed to prevent drugs from entering [TTCC] and to investigate incidents of drug overdose." (Doc. No. 67 at 13). The Estate responds that "[t]wo overdoses in two days satisfied Zakora; here the Defendant Vincent Vantell

admits ten or more overdoses per day, for two months, with multiple deaths." (Doc. No. 73 at 15). In the Estate's view, "[t]he question is not whether CoreCivic owned body scanners and K-9 units; it is whether, in practice, drugs flowed into and through the facility essentially without restraint." (Id.)

The Estate's comparison misreads Zakora. What mattered in Zakora was that the alleged overdoses happened in Zakora's own small unit in the days right before he died, and that officials allegedly failed to investigate those unit-specific overdoses. Zakora, 44 F.4th at 470, 472. The Estate has not come forward with evidence of either in Foxtrot Bravo.

Zakora reached the Sixth Circuit at the motion to dismiss stage, and the Sixth Circuit's holding turned on allegations specific to Zakora's unit. Specifically, "[t]hree alleged facts" drove the Sixth Circuit's conclusion that Zakora had stated a failure-to-protect claim: (1) "the complaint contained detailed allegations about the 'widespread presence of drugs' at Zakora's facility"; (2) "in the two days before Zakora's overdose, two other inmates in his twelve-to-sixteen-inmate unit had also overdosed"; and (3) "prison officials failed to investigate those overdoses." Caraway, 98 F.4th at 684 (describing Zakora's holding). The Sixth Circuit found those allegations sufficient because the estate had alleged "the wide spread presence of drugs at Lakeland, and in the C-Unit specifically," and alleged that officials failed "to promptly investigate the two prior overdoses in Zakora's C-Unit." Zakora, 44 F.4th at 470, 472.

On remand, the district court reached the opposite result at summary judgment because the evidence showed that officials did, in fact, investigate the overdoses in Zakora's unit. Zakora II, 2025 WL 1593141, at *5. The defendants produced evidence "that prison officials investigated after both" overdoses, "first by searching [the first inmate's] living area, and then by searching the entire unit and the prisoners housed there when it became apparent from [the second inmate's]

overdose that additional drugs might be present in the unit." Id. The plaintiff did not dispute that the investigation occurred and instead argued that the investigation was inadequate because the defendants did not use a "trained canine to search the unit." Id. The district court rejected that argument because "nowhere in its decision did the [Sixth Circuit] say that an investigation is reasonable only if it includes a drug-sniffing dog." Id. The district court further found that the claim failed because the plaintiff presented "no evidence establishing the 'widespread presence of drugs.'" Id.

Here, the Estate has come forward with evidence of the widespread presence of drugs at TTCC—the first of Zakora's three key facts. Caraway, 98 F.4th at 684. But the Estate has not come forward with evidence supporting the other two key facts.

Start with recent prior overdoses. The Estate does not link any prior overdoses to Foxtrot Bravo in the days leading up to Leeper's death. Vantell's estimated overdoses "up to ten or more times per day" and Stephens's estimated "ten or 15" were counts across TTCC as a whole, which houses around 2,300 to 2,500 inmates. (Doc. No. 75-1 ¶ 45; Doc. No. 75-2 at 54; Doc. No. 75-3 at 12–13). The overdose event that Graves described occurred in units "Bravo Charlie" and "Delta Alpha" on "[o]ne day in 2023." (Doc. No. 75-1 ¶ 43). Because Graves left TTCC in June or July 2023, that day came at least two months before Leeper's death. (Id.) Pollard described "a mass overdose event between in [sic] Unit C (Charlie) and Unit F (Foxtrot)" sometime "[i]n 2023." (Doc. No. 75-7 ¶ 7). But she does not say which of Unit F's three pods was involved. She left TTCC in August 2023, moreover, so the event occurred at least five weeks before Leeper's death.

The Estate's strongest Foxtrot-specific evidence comes from Stephens. But even she could not place any specific overdose in Foxtrot Bravo leading up to Leeper's death. She testified to overdoses "daily, multiple times a day" beginning "probably the 1st of September [2023]" and

continuing into October. (Doc. No. 75-2 at 54–55). But she heard those overdoses as facility-wide calls on the radio. (Id. at 54, 57). The only overdose she witnessed was in her own pod, Foxtrot Alpha, and it is unclear when. (Id. at 56). That is telling considering that Stephens testified that from Foxtrot Alpha she "could see everything going on in [Foxtrot Bravo]." (Id. at 81).

The Estate's facility-wide evidence of overdoses is far from the "two prior overdoses in Zakora's small C-Unit in the days immediately preceding his own death." Zakora, 44 F.4th at 471. No doubt the Estate's evidence shows that inmates were overdosing at TTCC at an alarming rate. The Court does not condone that risk. But this case concerns the "magnitude of the overdose problem" that Leeper in particular faced. Caraway, 98 F.4th at 685. Without direct or circumstantial evidence specifically linking the facility-wide overdoses to Leeper in Foxtrot Bravo, both physically and temporally, a jury "can only speculate" about the risk to him before he died in a facility housing 2,300 to 2,500 inmates. Id.

Consider next the failure to investigate. The record shows that CoreCivic investigated overdoses at TTCC. CoreCivic's overdose protocol in 2023 required for a lockdown, wellness check, a canine search of the unit where the inmate was housed, a urinalysis screening of every inmate in the unit, and contact tracing. (Doc. No. 68-6 at 7). Porter testified that CoreCivic searched after "[e]very overdose" and that "[i]t was protocol" for them to do so. (Doc. No. 68-1 at 84). Vantell testified that he received the investigation reports, read them, and "amped up some of the . . . outer technology pieces," "redesigned the whole entire checkpoint," brought in "investigative units from . . . the central office of CoreCivic," and that "searches . . . increased during that time frame." (Doc. No. 75-3 at 61).

The Estate does not challenge the investigation of any prior overdose in Foxtrot Bravo. It cannot, because it identifies no such overdose. That makes the Estate's position weaker than the

one that the district court rejected in Zakora II, where the plaintiff at least challenged the search of Zakora's unit after the two overdoses there. Zakora II, 2025 WL 1593141, at *5. The Estate instead challenges TTCC's security measures as a whole, arguing that they failed because Vantell and Porter flouted them and CoreCivic understaffed the prison. (Doc. No. 73 at 15–16; Doc. No. 74 ¶¶ 8–9). It also argues that Vantell curtailed Pollard's investigation of Porter and that Vantell and CoreCivic obstructed the state's investigation of him. (Doc. No. 73 at 12–13). Those arguments go to how drugs entered TTCC and who let them in, not whether Defendants failed to investigate overdoses.

The Estate's only challenge to the overdose investigations themselves is that TTCC may not have conducted all of them. (Doc. No. 73 at 18). The Estate relies on Vantell's testimony that every overdose was "supposed to be investigated," but could not rule out whether some were missed. (Id.; Doc. No. 75-3 at 60–61). But the Estate does not identify any specific overdose that was not investigated, and certainly none in Foxtrot Bravo before Leeper died. The Estate also notes that CoreCivic never determined how Leeper obtained the fentanyl that killed him. (Doc. No. 73 at 18). That investigation came after his death, so it says nothing about the risk he faced before it. Zakora, 44 F.4th at 469.

Because the Estate has not come forward with evidence of a failure to investigate prior overdoses in Foxtrot Bravo, the third key fact from Zakora, like the second, is missing here. See Caraway, 98 F.4th at 684. The Court therefore finds that the Estate has not come forward with evidence that Leeper faced unfettered access to deadly drugs in the days before his death, and thus that he did not face an objectively excessive risk of harm. That alone is "enough to sink [the Estate's] Eighth-Amendment claim." Id. at 686. But even if Leeper faced such a risk, the Estate

has produced no evidence causally connecting the conduct of Porter, Vantell, or CoreCivic to Leeper's risk

**2. Causation**

The Estate's theory of causation differs for each Defendant. It argues that Porter smuggled drugs himself or let them spread by escorting unsearched inmates between units, that Vantell shut down the investigation into Porter, and that CoreCivic's chronic understaffing allowed drugs to proliferate. (Doc. No. 73 at 18–21). Defendants respond that the Estate's evidence fails "to connect Porter or Vantell to the distribution of fentanyl at [TTCC], much less to the drugs that Leeper unfortunately was able to access," and that its understaffing evidence does not show causation either. (Doc. No. 76 at 2).

"[T]raditional tort concepts of causation inform the causation inquiry on a § 1983 claim." Caraway, 98 F.4th at 685 (citation omitted). The Estate must show that each Defendant's "actions caused" an objectively excessive risk of harm to Leeper. Williams, 2026 WL 323971, at *3. To do so, the Estate must show that each Defendant's "unconstitutional act or omission failed to alleviate the excessive risk he faced." Caraway, 98 F.4th at 685. That showing requires "[s]ome factual basis"; a "mere possibility" is not enough. Id. at 686. The question, then, is whether the Estate has come forward with evidence to raise genuine disputes of material fact about whether each Defendant's conduct contributed to the risk that Leeper faced in Foxtrot Bravo before he died. See id.; Williams, 2026 WL 323971, at *3. It has not done so.

A. Porter

The Estate's case against Porter is its strongest, but its evidence does not sufficiently connect him or his activities to the access to drugs in Foxtrot Bravo leading up to Leeper's death.

The Estate relies on the following evidence against Porter[3]:

- **Porter's movement of inmates across units**. Graves saw Porter take inmates from Unit E "and let them into every other unit, including Unit F." (Doc. No. 75-1 ¶ 12). Eustache saw Porter, during lockdowns, give inmates entry into buildings where they did not live without having them searched. (Doc. No. 75-4 ¶¶ 7, 9). In Eustache's view, that access "could easily lead to the introduction and proliferation of contraband," and "[t]his was one of the ways drugs spread throughout the facility." (Id. ¶ 8).
- **Porter's association with gang-affiliated inmates**. Graves "consistently saw" Porter with "a certain group of inmates" that he knew "to be Vice Lord affiliated gang members." (Doc. No. 75-1 ¶ 9). Eustache said that Porter "always had one or more known gang members walking around with him." (Doc. No. 75-4 ¶ 6). Stephens saw Porter with inmates known to be gang affiliated "[d]aily." (Doc. No. 75-2 at 77).
- **Porter's closed-door discussions with inmates**. Graves saw Porter take "inmates into his personal office in the Echo Unit, about 4-5 at a time, and close the door." (Doc. No. 75-1 ¶ 10). Graves testified that he "believe[s] that there was gang related activity that was discussed between Porter and the inmates during the times those inmates were in his office with the door closed." (Id. ¶ 14). Pollard saw "two inmates and several others going into and out of Porter's office nearly every day." (Doc. No. 75-7 ¶ 15). Pollard testified that she "believe[s] that there were discussions of gang activity, drug and contraband trafficking, and other illegal activity that took place between Porter and the inmates while they were with Porter in his office." (Id. ¶ 16). Porter agreed that

[3] As stated above, the Court will not consider the affidavit of Ada Branham-Ball, who began working at TTCC after Leeper's death, in the causation analysis.

there is no reason to have multiple inmates behind closed doors with a single staff member and that doing so would be "[v]ery dangerous." (Doc. No. 75-6 at 71–72).

- **Porter's connection to Unit F**. According to Stephens, at some point Porter "moved offices and moved to the Fox unit." (Doc. No. 75-2 at 77).

- **Porter bypassing security protocol**. During a month Graves worked the security checkpoint, Porter would not let Graves pat him down and "would ask another officer to do the search." (Doc. No. 75-1 ¶ 11). Stephens saw Porter bypass the security protocol twice. (Doc. No. 75-2 at 75–77).

- **Porter's reinstatement of drug-trafficking inmates**. Pollard identified "two inmates in Porter's unit that were constantly trafficking contraband (drugs, weapons, phones) and being caught with contraband." (Doc. No. 75-7 ¶ 10). "[E]ach time they were terminated from their positions" as food-service workers, "Porter would reinstate them." (Id. ¶¶ 11–12). After the two were moved "to another unit away from Porter," Pollard "saw these two inmates being allowed back into Porter's unit, accompanied by Porter himself." (Id. ¶¶ 13–14).

- **Pollard's investigation into Porter**. Pollard's "confidential informants mentioned Porter's name over and over again as a key player in the introduction, dissemination, and sale of contraband, including fentanyl." (Id. ¶¶ 18–19). After Pollard's team "began to terminate the correctional officers under Porter," they "noticed an immediate reduction in the proliferation of contraband for a time." (Id. ¶ 20).

- **The state's investigation into Porter**. According to Eustache, "during the end of 2022 and beginning of 2023," the state's Office of Investigation and Conduct "identified Porter as the key suspect in its investigation of the introduction of drugs and other

contraband into the facility." (Doc. No. 75-4 ¶¶ 20–21). Porter "was placed on administrative leave by Warden Frink." (Id. ¶ 23). According to CoreCivic's corporate representative, the investigation found "nothing substantiated." (Doc. No. 68-3 at 105).

- **Porter's alleged drug trafficking**. Roe #3 swore that "Porter helps bring alot of the drugs in" and that he has "witnessed [Porter] bringing in drugs to cells to drop them off." (Doc. No. 75-9 at 2).

As an initial matter, the Court cannot consider some of that evidence for the purpose that the Estate offers it. The informants' statements to Pollard and the state investigator's statements to TTCC management are hearsay if offered to prove that Porter trafficked drugs. Fed. R. Civ. P. 56(c)(2). Likewise, the Court cannot consider Graves's or Pollard's beliefs about what Porter discussed behind closed doors because those statements are not based on personal knowledge. Fed. R. Civ. P. 56(c)(4); (Doc. No. 75-1 ¶ 14; Doc. No. 75-7 ¶ 16). The Court will disregard that evidence.

None of the Estate's remaining evidence sufficiently connects Porter to the risk from access to drugs in Foxtrot Bravo in the days leading up to October 6, 2023. Start with timing. The Estate offers no evidence that places Porter's activities in the weeks leading up to Leeper's death. Graves left TTCC in June or July of 2023 (Doc. No. 75-1 ¶ 1), so the conduct he described regarding Porter's movements with gang-affiliated inmates, escorts into Unit F, closed-door meetings in Unit E, and refusal of Graves's pat-downs all occurred at least two months before Leeper died (id. ¶¶ 9–12). Pollard left TTCC in August 2023 (Doc. No. 75-7 ¶ 1), and she did not specify when in 2023 Porter reinstated the two inmate workers, walked with inmates, or met with them in his office (id. ¶¶ 10–17). Eustache likewise did not indicate when Porter walked with gang members or let unsearched inmates into other buildings. (Doc. No. 75-4 ¶¶ 6–9). Stephens also did not say when

she saw Porter bypass the checkpoint or when he moved his office to Unit F. (Doc. No. 75-2 at 75–77). Roe #3 did not say when he saw Porter bring drugs to cells. (Doc. No. 75-9 at 2).

Next, consider location. The Estate offers no evidence connecting Porter's alleged drug-trafficking activities to Foxtrot Bravo. Only two witnesses connect Porter to Unit F at all. Graves testified that he saw Porter let inmates "into every other unit, including Unit F" (Doc. No. 75-1 ¶ 12), and Stephens testified that at some point Porter moved his office to "the Fox unit" (Doc. No. 75-2 at 77). But Unit F has three pods, and neither witness mentioned Foxtrot Bravo specifically. The rest of the Estate's evidence points elsewhere. Graves testified that Porter's closed-door meetings happened in his office "in the Echo Unit." (Doc. No. 75-1 ¶¶ 10, 13). Pollard did not identify which unit was Porter's unit when the two inmates trafficked contraband, or where Porter's office was located. (Doc. No. 75-7 ¶¶ 10–15). Eustache did not indicate which buildings Porter moved inmates to during lockdowns. (Doc. No. 75-4 ¶¶ 7–9). Roe #3 did not say where he saw Porter bring drugs to cells. (Doc. No. 75-9 at 2).

Consider finally the drugs themselves. Other than Roe #3, no witness saw Porter with drugs. But even Roe #3 could not place Porter's alleged drug delivery in Foxtrot Bravo on or before October 6, 2023. Credited in full, his account shows at most that Porter delivered drugs to unidentified cells at an unidentified time. (Id.) Pollard testified that the two inmates that Porter continually reinstated had been caught with contraband, but she did not testify that they or their contraband made it to Foxtrot Bravo. (Doc. No. 75-7 ¶¶ 10–15). The "reduction in the proliferation of contraband" that Pollard testified to after "terminat[ing] the correctional officers under Porter" was facility-wide, not unit specific. (Id. ¶ 20). Eustache's statement that unsearched access "was one of the ways drugs spread throughout the facility" likewise does not connect any drugs to Foxtrot Bravo. (Doc. No. 75-4 ¶ 8).

The Estate also fails to connect Porter to Duncan (Leeper's cellmate)—i.e., the one source of drugs the record places in Foxtrot Bravo. The Estate alleges, on information and belief, that Duncan "had dealings with Defendant Porter . . . to obtain illegal drugs." (Doc. No. 63 ¶ 82). But it has not come forward with any evidence whatsoever to support that allegation.

In sum, the Estate's evidence shows that Porter broke the rules. He escorted unsearched inmates between units, met with gang-affiliated inmates behind closed doors, skirted security screening, and may have even delivered drugs himself. But the Estate has not come forward with evidence connecting that conduct, or any drug trafficking that Porter allegedly engaged in or enabled, to the risk that Leeper faced in Foxtrot Bravo in the time leading up to his death. Without such evidence, the Estate cannot establish causation. Porter is entitled to summary judgment on the Estate's failure-to-protect claim.

B. Vantell

The Estate's case against Vantell is even thinner. It relies on the following evidence:

- **Vantell's alleged interference with Pollard's investigation**. Pollard said that as she "started to get closer to Porter's illegal activity," Vantell told her "not to investigate Porter any further," and her "investigative authority was curtailed." (Doc. No. 75-7 ¶¶ 21–22). Vantell denied saying that or terminating Pollard's investigation. (Doc. No. 68-2 at 115).
- **Vantell bypassing security protocol**. Stephens testified that she saw "Vantell bypass the security protocol." (Doc. No. 75-2 at 74).
- **Vantell prohibiting Stephens from carrying Narcan**. Stephens asked Vantell for Narcan, and he "told [her] that [she] had to go through a training and that [she] couldn't have it until [she] had that training." (Id. at 62).

- **Vantell's knowledge of overdoses and understaffing**. Vantell admitted that he knew of the overdoses in September and October 2023 and acknowledged that "there were critical posts that were closed during the time of 2023" because of understaffing. (Doc. No. 75-3 at 12–13, 23).

The Estate has come forward with no evidence connecting Vantell to the risk from access to drugs in Foxtrot Bravo leading up to Leeper's death. The Estate's strongest evidence linking any of Vantell's activity to any alleged drug trafficking is Pollard's testimony that Vantell allegedly curtailed her investigation into Porter. (Doc. No. 75-7 ¶¶ 21–22). On the Estate's theory, Vantell knew about Porter's alleged drug smuggling, and stopping that investigation allowed Porter to keep supplying drugs. That is why the Court observed at the pleading stage that this case contained "a factual twist not in Zakora or Caraway" and that "[a] jury could conclude that the only reasonable measure to abate the drug problem was cut off the head of the snake." Est. of Leeper v. CoreCivic, Inc., 797 F. Supp. 3d 797, 810 (M.D. Tenn. 2025).

But that theory is reliant on Porter's causal role. For the reasons already explained, the Estate has failed to come forward with evidence connecting any alleged drug trafficking by Porter to any risk that Leeper faced, so curtailing the investigation into Porter could not have caused that risk either. The remaining evidence that the Estate offers—i.e., that Vantell bypassed screening (Doc. No. 75-2 at 74), required training before Stephens could carry Narcan (id. at 62), and knew of the overdoses and understaffing in 2023 (Doc. No. 75-3 at 12–13, 23)—does not connect Vantell to Foxtrot Bravo at all, let alone connect him to the access to drugs in Foxtrot Bravo leading up to Leeper's death. Without such evidence, the Estate again cannot establish causation. Vantell is entitled to summary judgment on the Estate's failure-to-protect claim.

C. CoreCivic

The Estate's Monell claim against CoreCivic rests on understaffing.[4] (Doc. No. 73 at 18–21). "CoreCivic—as a private entity performing a government function—can be liable under § 1983 only if its policies, practices, or customs were the driving or moving force behind a violation of Leeper's federal rights." Est. of Leeper, 797 F. Supp. 3d at 811 (citing City of Canton v. Harris, 489 U.S. 378, 385 (1989)). "[T]he failure to adequately staff a prison—even a deliberate failure—is not itself a constitutional violation." Caraway, 98 F.4th at 685. Rather, the Estate "must link the understaffing to the actual deprivation which, in this case, is the risk of overdose caused by unfettered access to drugs." Williams, 2026 WL 323971, at *3. That requires the Estate to show "that the understaffing caused [Leeper's] risk of overdose." Id. (citing Pineda v. Hamilton Cnty., 977 F.3d 483, 490–91 (6th Cir. 2020)).

The facts and reasoning of Williams are instructive. In that case, the plaintiff's "basic theory" was "that CoreCivic deliberately understaffed [the prison] to maximize its profits" and that the "lack of manpower, in turn, caused [the inmate's] injury by making it impossible for the prison to curb the flow of drugs inside the prison." Id. The plaintiff further alleged that "the understaffing prevented the prison from performing sufficient security sweeps to detect drugs, from dedicating sufficient resources to investigate staff smuggling drugs into the prison, and from offering sufficient rehabilitative programs." Id. at *4.

The Sixth Circuit held that those allegations were "too generalized and conclusory to sustain a plausible claim" against CoreCivic because they were not "supported by specific factual allegations that make a plausible preliminary showing that the causal relationship actually existed."

[4] The Estate also argues that CoreCivic tolerated Porter's alleged drug dealing and promoted him anyway. (Doc. No. 73 at 19–20). The Estate does not appear to plead that theory in the Second Amended Complaint as part of its Monell claim. (See Doc. No. 63 ¶¶ 143–52). In any case, that theory fails because the Estate has not connected Porter to the risk Leeper faced.

Id. The Sixth Circuit further explained that the plaintiff might have alleged causation had she included facts showing that "specific Tennessee laws or prison procedures required [the prison] to take certain steps to detect drugs, but that understaffing made it impossible for [it] to do so, directly leading to the presence of drugs in the prison." Id.

Here, there is no doubt that TTCC was understaffed in 2023. CoreCivic's corporate designee and Vantell, among others, acknowledged as much. (Doc. No. 68-2 at 129; Doc. No. 68-3 at 31; Doc. No. 75-3 at 23).

But the Estate, like the plaintiff in Williams, has not come forward with evidence that causally links the understaffing to the access to drugs in Foxtrot Bravo in the days leading up to Leeper's death. It does not identify any law or prison procedure that required TTCC to take a particular step to detect or stop drugs that understaffing kept TTCC from taking. See Williams, 2026 WL 323971, at *4. The Estate's theory essentially boils down to the proposition that fewer staff meant more drugs. (Doc. No. 73 at 18–21). That evidence, like in Williams, is "too generalized and conclusory" to establish causation. See Williams, 2026 WL 323971, at *4. The Estate comes closest with its assertion that Vantell conceded that understaffed checkpoints increase the risk of drugs entering TTCC. (Doc. No. 73 at 21). But the deposition page the Estate cites to support that admission is not in the record. (See Doc. Nos. 68-2, 75-3). Even that concession, moreover, would speak only to drugs entering the facility as a whole.

Without evidence linking understaffing to the risk Leeper faced, the Estate cannot show that CoreCivic's understaffing was the "moving force" behind a violation of his rights. See Est. of Leeper, 797 F. Supp. 3d at 811. CoreCivic is entitled to summary judgment on the Estate's Monell claim.

B. Remaining Claims

With the dismissal of the Estate's failure-to-protect claim (Counts I, III, IV, and VI), that leaves the failure-to-supervise claim against Porter and Vantell (Count II), the civil-conspiracy claim against Porter and Vantell (Count V),[5] and the wrongful-death claim against Porter, Vantell, and CoreCivic (Count VII). (Doc. No. 63 ¶¶ 118–26, 137–42, 153–58). The Estate brings each claim under § 1983, and each is predicated on the same alleged constitutional violation as the failure-to-protect claim—i.e., Leeper's exposure to drugs in the days leading up to his death.[6] Because each of those remaining claims requires an underlying constitutional violation, and the Estate has failed to come forward with sufficient evidence to support its failure-to-protect claim, they fail. For that same reason, the Monell claim against CoreCivic, and any official-capacity claims against Porter and Vantell, independently fail. Lowrance v. CoreCivic, Inc., No. 25-5553, 2026 WL 700444, at *4 (6th Cir. Mar. 12, 2026) (holding that "[w]ithout an underlying unconstitutional act," plaintiff's claims against CoreCivic "under § 1983 must also fail" (quoting Baynes v. Cleland, 799 F.3d 600, 622 (6th Cir. 2015))); Caraway, 98 F.4th at 687 ("[B]ecause the complaint doesn't allege an underlying constitutional violation, [the Monell] claims fail."); Cook v. CoreCivic, Inc., No. 3:24-CV-00095, 2025 WL 967544, at *5, *8 (M.D. Tenn. Mar. 31, 2025) (dismissing supervisory liability claims and Monell claim against CoreCivic for the same reason).

---

[5] As the Court already held at the motion to dismiss stage, "a § 1983 civil conspiracy by itself does not constitute a separate cause of action." Est. of Leeper, 797 F. Supp. 3d at 813. Accordingly, that claim is due to be dismissed.

[6] The Estate also alleges in Count II that Porter and Vantell failed "to monitor, assess, and timely respond to medical emergencies involving inmate overdose." (Doc. No. 63 ¶ 119). But the Estate does not appear to plead a separate claim for deliberate indifference to Leeper's medical needs.

C. Unserved Defendants

The Estate names in the Second Amended Complaint several correctional officers and John Does whom it has never served: William Chamberlain, Keisha O'Daniel, "Chief Carter," "Sergeant Carter," "Chief Mitchell," Carolyn Matthews, Nkoli Nwosu, and John Does 1–100. (Doc. No. 63 ¶¶ 10–18). The time for service under Fed. R. Civ. P. 4(m) has long expired. Defendants' motion noted the lack of service (Doc. No. 67 at 3 n.3), and the Estate neither disputed that point nor sought more time. Nor has the Estate offered any evidence against these Defendants or mentioned them in its opposition. (See Doc. No. 73).

Rule 4(m) requires service "within 90 days after the complaint is filed." Fed. R. Civ. P. 4(m). If service is not made within that time, the court "must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Id. "But if the plaintiff shows good cause for the failure, the court must extend the time for service for an appropriate period." Id.

The claims against the unserved Defendants rest on the same alleged constitutional violation as the rest of the Estate's claims—i.e., Leeper's exposure to deadly drugs in Foxtrot Bravo in the days leading up to his death.. As explained above, the Estate has not come forward with sufficient evidence of that risk. Nor has it offered any evidence connecting any of the unserved Defendants to the risk Leeper faced. Given that, the Court sees no good cause for the failure to serve and no reason to extend the time for service at this late stage of the case. Accordingly, the Estate will be ordered to show cause within five days why its claims against the unserved defendants should not be dismissed without prejudice under Rule 4(m). Absent a timely showing of good cause, those claims will be dismissed without prejudice.

## IV. Conclusion

The record in this case reflects a serious drug problem at TTCC, and the Court does not minimize it. Drugs in prisons, including facilities that CoreCivic operates, have generated repeated litigation in this Circuit and repeated harm to inmates. The Court is disturbed by the danger that problem poses to inmates. But this case concerns only Leeper. The Estate has not come forward with specific evidence of a serious risk of harm to Leeper in Foxtrot Bravo, or that Porter, Vantell, or CoreCivic caused it. For those reasons, Defendants' motion for summary judgment (Doc. No. 66) will be granted. The claims against CoreCivic, Vantell, and Porter will be dismissed with prejudice. The Estate will be ordered to show cause within five days why its claims against the unserved defendants should not be dismissed without prejudice under Rule 4(m).

An appropriate order will enter.

WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE